## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| In re | § | **Chapter 11** |
| | § | |
| **GLOBAL GEOPHYSICAL** | § | |
| **SERVICES, LLC, *et al.*,**[1] | § | **Case No. 16-20306** |
| | § | |
| Debtors. | § | **Joint Administration** |
| | § | **Requested** |
| | § | |

### DECLARATION OF SEAN M. GORE IN SUPPORT OF FIRST DAY MOTIONS

I, Sean M. Gore, declare as follows under penalty of perjury:

1.       I am the Chief Executive Officer of Global Geophysical Services, Inc. ("GGS," together with the other debtors in the above captioned cases, the "Debtors").  I have been employed by the Debtors since 2012, and have previously served as the Debtors' Chief Financial Officer and as Vice President of Corporate Development.  I am familiar with Debtors' day-to-day operations, business, and financial affairs.

2.       I submit this Declaration to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these cases and in support of the Debtors' petitions for relief under chapter 11 of the Bankruptcy Code and the pleadings filed by the Debtors on or around the Petition Date.  I have reviewed the factual support set forth in each of the first day pleadings and attest to the accuracy thereof.  Except as otherwise indicated, all facts set forth herein are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my

---

[1]     The Debtors in these chapter 11 cases are:  Global Geophysical Services, LLC (7582); Global Geophysical Services, Inc. (4281); Global Geophysical, EAME, Inc. (2130); GGS International Holdings, Inc. (2420); Global Ambient Seismic, Inc. (2256); Autoseis, Inc. (5224); Autoseis Development Company (9066); and Global Geophysical (MCD), LLC (a disregarded entity for tax purposes).

opinion based on upon experience, knowledge, and information concerning the Debtors' operations and financial affairs.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

3.     The Debtors have filed these cases to pursue a pre-packaged chapter 11 plan of liquidation (the "<u>Prepackaged Plan</u>") and implement a wind-down of their business.  The Debtors' solicited votes on the Prepackaged Plan prior to commencement of these cases.  The voting classes unanimously voted to accept the Prepackaged Plan.[2]

4.     This declaration has two parts.  Part One of this Declaration provides an overview of the Debtors' business, capital structure, events giving rise to these chapter 11 cases, and information regarding the Debtors' bankruptcy objectives.   Part Two summarizes the relief requested with respect to, and the support for, the Debtors' various first day motions and requests for related interim and final orders.

PART ONE:  FIRST DAY NARRATIVE

**I.**     <u>**Overview of the Debtors and their Business**</u>

5.     GGS and the other Debtors historically have provided an integrated suite of seismic-data solutions to the global oil and gas industry consisting primarily of seismic-data acquisition, micro-seismic monitoring, processing, and interpretation services and the sale of seismic recording equipment.  Through these services, the Debtors delivered data that enables the creation of high-resolution images of the earth's subsurface and reveals complex structural and stratigraphic details.  These images are used primarily by oil and gas companies to identify geologic structures favorable to the accumulation of hydrocarbons, to reduce risk associated with

---

[2]     As further described in the *Declaration Of Christina Pullo Of Prime Clerk LLC Regarding Solicitation Of Votes And Tabulation Of Ballots Cast On The Joint Prepackaged Plan Of Liquidation For Global Geophysical Services, LLC And Its Affiliated Debtors*, each First Lien Lender that submitted a ballot voted to accept the plan and all eight holders of Second Lien Claims voted to accept.

oil and gas exploration, to optimize well-completion techniques, and to monitor changes in hydrocarbon reservoirs.

6.     The Debtors have historically generated revenues by providing two types of services to their clients, proprietary services and multi-client services.  Proprietary services ("Proprietary Services") consist of conducting geophysical surveys for clients on a contractual basis where the clients generally acquire all rights to the seismic data obtained through such surveys.[3]  Multi-client services ("Multi-client Services") include selling licenses, on a non-exclusive basis, to seismic data the Debtors own as a part of their collection of seismic data. This collection of data is generally referred to as a "seismic-data library" or "multi-client library."  In return for their underwriting participation in a Multi-client Services project, customers receive a non-exclusive license to a designated portion of the underlying seismic data acquired by the Debtors at a favorable price on a per-square-mile basis.  The Debtors include the seismic data sets acquired through multi-client surveys in their multi-client library, which is then available for licensing to other clients on a non-exclusive basis for a fee (referred to as a "Late Sale").  The Debtors also historically generate revenues by providing micro-seismic monitoring, data processing, and interpretation services and through the sale of seismic-recording equipment to third parties.

7.     Many of the world's largest and most technically advanced oil and gas exploration and production companies have used the Debtors' services.  These include national oil companies, major integrated oil companies, and large independent oil and gas companies.  In prior years, the Debtors and their foreign non-debtor subsidiaries provided seismic-data acquisition services throughout the world, including in some of its most challenging political and

---

[3]   For proprietary seismic-data acquisition services, clients typically would request a bid for a seismic survey based on their own survey design specifications.  Due to reduced demand for oil and gas exploration, the Debtors have ceased providing Proprietary Services and have no plans for future operations in this line of business.

natural environments.  The Debtors' operated internationally through foreign branch offices of GGS and foreign non-debtor affiliates.

8.      As the Petition Date, substantially all of the Debtors' ongoing field operations have ceased, with the exception of certain work in Brazil by a non-debtor foreign subsidiary.  To execute on an orderly wind down of their businesses, the Debtors employ approximately thirty-seven individuals globally, including twenty individuals located at the headquarters in Houston, nine individuals located at various business units, and eight individuals assisting with operations of a Brazilian subsidiary.  As also described further below, the Debtors were the subject of a corporate reorganization under a chapter 11 plan that became effective on February 9, 2015.[4]

## II.    Overview of Capital Structure

### Senior Secured First Lien Revolving Credit Facility and Term Loan

9.      Each of the Debtors is a borrower or guarantor under a secured First Lien Credit Agreement, dated as of February 9, 2015 (as amended, the "First Lien Credit Agreement"), with Wilmington Savings Fund Society, FSB as the administrative agent and collateral agent (the "First Lien Agent," and the lenders thereunder, the "First Lien Lenders").  The First Lien Credit Agreement provides for (i) a senior secured first lien revolving credit facility in an aggregate principal amount of up to $25 million (the "First Lien Revolving Loan") and (ii) a first lien term loan in the original principal amount of $60 million (the "First Lien Term Loan").  As of the Petition Date, approximately $85,104,644 of principal and accrued and unpaid interest was outstanding under First Lien Credit Agreement.  The indebtedness under the First Lien Credit Agreement is secured by substantially all real and personal property of the Debtors, and certain assets of certain foreign non-debtor subsidiaries of the Debtors, pursuant to various security and

---

[4]    The Debtors' prior cases, which are open, are pending in the United States Bankruptcy Court for the Southern District  of Texas, jointly administered under case no. 14-20130.

collateral documents.   The indebtedness under the First Lien Credit Agreement is also guaranteed by the following foreign subsidiaries of the Debtors: Global Geophysical Services Canada Inc., an Alberta corporation, Sensor Geophysical Ltd., an Alberta corporation, Global Geophysical Services, Ltd., a Cayman Islands company, and Global Servicos Geofisicos Ltda., a Brazilian limited liability company.

10.     The First Lien Revolving Loan and First Lien Term Loan each mature on February 8, 2017, subject to the Debtors' right to extend the maturity date to May 8, 2017 in accordance with the terms and conditions of the First Lien Credit Agreement. The First Lien Revolving Loan bears interest at a rate of 9% per annum and the First Lien Term Loan bears interest at a rate of 12.5% per annum.  Interest on the First Lien Revolving Loan and on  the First Lien Term Loan is payable monthly in arrears.

11.     To address various outstanding defaults under the First Lien Credit Agreement, the Debtors, the First Lien Agent and the First Lien Lenders entered into a Forbearance Agreement and First Amendment to the First Lien Credit Agreement (the "Forbearance Agreement"), dated as of April 12, 2016.   Thereby, the Debtors acknowledged various outstanding defaults, agreed that interest would apply at the default rate and be payable in kind, and the First Lien Lenders agreed to forebear from exercising any remedies during the Forbearance Period (as defined in the Forbearance Agreement).  The Debtors, the First Lien Agent and the First Lien Lenders are also party to a Consent Agreement to Forbearance Agreement, dated May 31, 2016 (the "Consent Agreement"), pursuant to which the First Lien Lenders consented to the commencement of insolvency proceedings in Canada with respect to Global Geophysical Services Canada Inc. and Sensor Geophysical Ltd., each an Alberta corporation.  Finally, on July 14, 2016, the Debtors and the First Lien Lenders entered into the

first amendment to the Forbearance Agreement, which among other things extended the forbearance period and the availability of the revolving loans.

### *Senior Secured Second Lien Term Loan*

12.     Each of the Debtors is also a borrower or guarantor under a secured Second Lien Credit Agreement, dated as of February 9, 2015 (as amended, the "Second Lien Credit Agreement") with Wilmington Trust, National Association as the administrative agent and collateral agent (the "Second Lien Agent") for the lenders party thereto (the "Second Lien Lenders").  The Second Lien Credit Agreement provides for a senior secured second-lien term loan in the original principal amount of $32,089,257.85. As of the Petition Date, approximately $40,445,999 principal and accrued and unpaid interest was outstanding under the Second Lien Credit Agreement. The liens securing the Debtors' obligations under the Second Lien Credit Agreement are subordinate and junior to the liens securing the Debtors' obligations under the First Lien Credit Agreement.  The indebtedness under the Second Lien Credit Agreement is secured by substantially all real and personal property of the Debtors, and certain assets of certain foreign non-debtor subsidiaries of the Debtors, pursuant to various security and collateral documents. The indebtedness under the Second Lien Credit Agreement is also guaranteed by the following foreign subsidiaries of the Debtors: Global Geophysical Services Canada Inc., an Alberta corporation, Sensor Geophysical Ltd., an Alberta corporation, Global Geophysical Services, Ltd., a Cayman Islands company, and Global Servicos Geofisicos Ltda., a Brazilian limited liability company.

13.     The second lien term loan matures on August 9, 2017, subject to the Debtors' right to extend the maturity date to November 9, 2017 in accordance with the terms and

conditions of the Second Lien Credit Agreement. The second lien term loans bear interest at a rate of 15.5% per annum, payable in kind monthly in arrears.

### Intercreditor Agreement

14.     The First Lien Agent and Second Lien Agent are parties to an intercreditor agreement, dated as of February 9, 2015 (the "Intercreditor Agreement").   Under its terms, the Debtors' indebtedness and other obligations under the First Lien Credit Agreement are senior in right, priority, operation, effect and all other respects to the Debtors' indebtedness and obligations under the Second Lien Credit Agreement.  The Second Lien indebtedness is fully subordinated to the First Lien indebtedness.  Under section 4.02 of the Intercreditor Agreement, any recoveries or payments to the Second Lien Lenders prior to the repayment in full of the First Lien obligations—including in any insolvency proceeding—are to be held in trust and turned over to the First Lien Agent.[5]  The Intercreditor Agreement also provides that until the First Lien obligations have been fully satisfied, the Second Lien Agent and Lenders will (i) not oppose or object to any post-petition financing offered or supported by the First Lien Lenders under section 364 of the Bankruptcy Code, and (ii) subordinate and consent to such post-petition financing, including with respect to any liens that prime or are *pari passu* with the First Liens.  *See* Intercreditor Agreement §  6.01(a)(ii).  Where DIP financing is to be provided by the First Lien Lenders—as is the case here—the Intercreditor Agreement also provides that the Second Lien Lenders may propose alternative DIP financing only if they irrevocably agree to purchase all outstanding obligations under the First Lien Credit Agreement.

---

[5]   Notwithstanding the payment and other subordination provisions of the Intercreditor Agreement, if the Plan filed on the Petition Date is confirmed and becomes effective, holders of Second Lien Claims will receive the treatment and recovery provided for in the Plan, despite  the fact that the First Lien Lenders will not be paid in full.

*Insurance Financing*

15.     Debtor Global Geophysical Services, Inc., is party to a Premium Finance Agreement with IPFS Corporation ("IPFS"), dated April 25, 2016 (the "Insurance Financing Agreement").   Under the Insurance Financing Agreement, the Debtors financed more than $900,000 of premiums due in respect of certain insurance policies (the "Financed Policies"). With respect to amounts that may become owed under the Insurance Financing Agreement, the Debtors are required to make monthly payments to IPFS, which obligations are secured by security interests in the unearned premiums for the Financed Policies.

*Warrants*

16.     Pursuant to the Warrant Agreement between Global Geophysical Services, LLC and Computershare Inc. and Computershare Trust Company, N.A., as warrant agent, dated as of February 9, 2015, holders of Financial Claims (as such term was defined in the *Second Amended Joint Chapter 11 Plan of Reorganization of Global Geophysical Services, Inc. and its Debtor Affiliates, as Reformed* (the "2015 Plan")) received a pro rata share of 1,111,111 warrants (each, a "Warrant" and collectively, the "Warrants").   The Warrants entitle the holders thereof to purchase up to 10%, in the aggregate, of the common units in Global Geophysical Services, LLC.  The Warrants are exercisable for four years after February 9, 2015, at a per share price based upon a $235 million total enterprise value of the company.

*Common Units*

17.     The Debtors are a private company.  Their parent is debtor Global Geophysical Services, LLC, the equity interest of which is held in the form of common units under the terms of the Amended and Restated Limited Liability Company Agreement of Global Geophysical

Services, LLC dated as of February 9, 2015, as amended.  As of July 20, 2016, there were approximately 9,804,646 common units outstanding.

### *Organizational Structure*

18.     Attached as <u>Exhibit A</u> is a copy of the Debtors' organizational chart.  Only the U.S. entities are debtors in these cases. Other than Global Geophysical Services Canada Inc., an Alberta corporation, and Sensor Geophysical Ltd., an Alberta corporation , none of the foreign subsidiaries currently are debtors in any proceeding.  The Debtors have historically operated a significant portion of their international business through foreign branch offices of GGS, as opposed to separate foreign subsidiaries.  As a result, a material portion of the Debtors' remaining physical assets are still located in foreign jurisdictions, but in the process of being liquidated or otherwise repatriated to the United States in connection with the wind down plan.

## III.    <u>Events Leading to Bankruptcy</u>

### *The Debtors' Prior Restructuring*

19.     Having consummated a prior restructuring on February 9, 2015, the Debtors are the subjects of prior chapter 11 cases still pending before this Court.   As a result, the Debtors' current capital structure and funded debt obligations were authorized and incurred pursuant to the terms of this Court's prior confirmation order.  In particular, paragraphs 36–38 of such order provides that the Pre-Petition First Liens and Pre-Petition Second Liens are automatically valid, perfected and unavoidable.[6]

20.     On March 25, 2014, GGS and certain of its affiliates filed voluntary chapter 11 petitions before this Court, commencing cases that were jointly administered under case no. 14-

---

[6]     *See Findings of Fact and Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Global Geophysical Services, Inc. and its Debtors Affiliates, as Reformed*, Case No. 14-20130, Feb. 6, 2015 [Docket No. 987].

20130 (the "2014 Cases").  A combination of events lead to the 2014 Cases,[7] which the Debtors

filed for hallmark bankruptcy rationales—to achieve a breathing spell for the development of

restructuring alternatives, implement debtor-in-possession financing to resolve immediate

liquidity needs, and maximize value for the benefit of all stakeholders.

21.     When the Debtors filed their 2014 Cases, they owed: (i) approximately $81.765

million under a senior secured Financing Agreement, dated as of September 30, 2013 (as

amended, the "September 2013 TPG Financing Agreement"), with TPG Specialty Lending, Inc.

and Tennenbaum Capital Partners, LLC (collectively, the "2013 Secured Lenders");

(ii) approximately $255 million aggregate principal and accrued but unpaid interest in respect of

publicly traded unsecured notes due in 2017 (the "10.5% Senior Notes"); and (iii) other material

indebtedness in excess of $10 million, including unsecured bank notes in Colombia and secured

tax obligations.

22.     Ultimately, an ad hoc group of holders of the 10.5% Senior Notes provided the

Debtors with more than $151.9 million in post-petition financing, pursuant to the terms of a

Financing Agreement dated as of April 14, 2014 (the "2014 DIP Credit Agreement"), the

proceeds of which were used to repay the 2013 Secured Lenders at a compromised amount, fund

the administration of the 2014 Cases, and for general corporate purposes.  The Debtors thereafter

negotiated a chapter 11 plan with various stakeholders that, in general terms, provided for the

---

[7]  In the latter part of 2012, following a change in executive leadership, the Company made a strategic decision to
increase its emphasis on Proprietary Services in what it viewed to be a more lucrative international market and
decrease its emphasis on Multi-client Services in an increasingly competitive U.S. market.  This change in
emphasis to international Proprietary Services severely impacted the Company's liquidity.  The Company
thereafter experienced a number of adverse developments that, collectively, further adversely impacted liquidity
in the first part of 2014.  These developments included higher than anticipated working capital requirements
associated with project start-up costs for new international projects; reduced revenues attributable to reductions
in programs in Colombia; higher than anticipated project costs and increases in estimated taxes; slower than
anticipated production in Kenya; and project cancellations in Libya due to security concerns. Compounding their
liquidity problems, the Debtors also faced potential covenant defaults under a prior secured credit facility related
to liquidity and restatement of historical financial statements and related consolidated financial information for
various annual and quarterly periods going back to 2009.

repayment of the 2014 DIP Credit Agreement in cash and distribution of equity in the reorganized company to the holders of the 10.5% Senior Notes. The Debtors noticed a confirmation hearing on such plan for early December of 2014.

### The Downturn in Energy Commodity Prices

23.     As the Court is aware, the energy industry has been burdened by a dramatic decline in the price of oil and gas.  With gas prices already relatively low due to the substantial increase in supply in North America over the past decade (due largely to hydraulic fracturing technology), oil prices began a steep descent beginning in the summer of 2014.  Aggravating the decline, in November 2014 the Organization of Petroleum Exporting Countries—after years of tempering significant fluctuations in oil prices through the control of supply—announced that it would not reduce production quotas in the face of the significant decrease in the price of oil.

24.     Like other energy-related service companies, the performance of the Debtors' business is indirectly tied to the price of oil and gas.  In particular, demand for seismic data services and the projected value of the Debtors' multi-client library depend on the amount of exploration being conducted by upstream energy firms, which is largely driven by the forward price curve of energy commodities.   As prices declined, so did the projected capital expenditures of E&P companies, which in turn depressed the fundamental valuations of the Debtors enterprise.

### The Impact of the Downturn on the Debtors

25.     The decline in energy commodity prices greatly hindered the Debtors' ability to confirm a plan and emerge from the 2014 Cases.  When the Debtors filed the 2014 Cases and negotiated the terms of the 2014 DIP Credit Agreement, oil prices were in excess of $100/bbl. By the time the Debtors were seeking to confirm a chapter 11 plan in late 2014, however, energy

markets and the value of the Debtors' enterprise had fundamentally changed, such that it was unclear how the Debtors would be able to repay their DIP lenders and emerge adequately capitalized for their business. As commodity prices further cratered, it became apparent that the plan then being pursued by the Debtors was not feasible. With the support of their creditors, the Debtors postponed confirmation for approximately two months.

26.     Eventually, the Debtors secured a commitment for exit financing—the First Lien Credit Agreement—that allowed them to emerge from bankruptcy. The Debtors amended the plan to provide for the First Lien Credit Agreement and the lenders under the 2014 DIP Credit Agreement agreed to receive take-back notes in the form of the Second Lien Credit Agreement, as well as equity in the reorganized Debtors. In effect, the ad hoc group (and DIP lenders) determined that it was better for the company to emerge from chapter 11, giving such group of holders the opportunity to participate if and when oil and gas prices recovered. The Bankruptcy Court confirmed the Debtors' chapter 11 plan on February 6, 2015 and the plan became effective on February 9, 2015.[8]

### *Further Deceases in Oil Prices Following the Debtors' Exit from the 2014 Cases*

27.     By the end of the third quarter of 2015, the price of oil had decreased by more than 50% year over year—from approximately $92/bbl as of September 15, 2014, to below $50/bbl as of September 15, 2015. On January 12, 2016, oil fell below $30/bbl for the first time in 12 years. These market conditions continue to affect oil and gas companies at every level of the industry. Even the largest multinational integrated oil and gas companies have been substantially affected by the current market conditions. Current equity and debt trading prices in the sector reflect the scale of the current financial distress.

---

[8]   *See* Docket No. 997 in the 2014 Cases.

28.     Notwithstanding the Debtors' and their management's vast efforts to improve revenues amid industry-wide challenges, by January of 2016 the Debtors were in breach of multiple covenants under the First Lien Credit Agreement and facing mounting liquidity pressures.  As currently organized, the Debtors do not have a business plan that can withstand the trough in commodity prices and the associated decline in capital expenditures in the exploration market.  As described in the Disclosure Statement, the valuation of the Debtors' enterprise is substantially less than the amount of indebtedness owed to the First Lien Lenders, who have senior first priority lien on substantially all assets of the Debtors, which liens and security interests are valid, perfected and not subject to challenge per the terms of the confirmation order. *See* 2015 Plan ¶ 38.

29.     After months of negotiation and forbearance, the First Lien Lenders have agreed upon the terms of the Prepackaged Plan filed on the Petition Date, which includes DIP financing, the means to implement an orderly wind-down of the Debtors' business, and a transfer of the multi-client library, real property, and the other NewCo Assets to an entity formed by the First Lien Lenders.  While the First Lien Lenders are undersecured, the Prepackaged Plan the Debtors have negotiated for nevertheless provides for eventual distributions to the Debtors' unsecured creditors, including the subordinated Second Lien Lenders.

### The Debtors' Wind-Down and Liquidation

30.     In January of 2016, the Debtors began to execute on a plan to wind down their business.  Such initiatives include the marketing and disposition of non-core assets, multiple rounds of work-force reductions, an orderly cessation of operations in various jurisdictions, and the filings of insolvency proceedings in Canada for certain subsidiaries.

31.     The Debtors' wind down will be more fully implemented pursuant to the Plan. First, the Debtors' business will be divided into two primary groups:  (i) a new entity to be owned 100% by the First Lien Lenders ("NewCo"), which will own the multi-client library, real property owned by the Debtors on the Petition Date (including their headquarters facility near Houston), causes of action, and the proceeds of certain intercompany receivables;[9] and (ii) a liquidating company, which will retain all assets of the Debtors other than the NewCo Assets (the "Liquidating Assets") in order to implement an orderly wind down.  Following the repayment of an exit working capital facility to be provided to the Liquidating Company by affiliates of the First Lien Lenders, proceeds from the Liquidating Assets will be shared as follows: the First Lien Lenders will receive 66.66% of the net proceeds on account of approximately $6 million of First Lien obligations assumed by the Liquidating Company (as further defined in the Prepackaged Plan, the "Assumed First Lien Debt"), and holders of allowed General Unsecured Claims and the Second Lien Lenders will receive a pro rata share of 33.33% of such proceeds.  After the Assumed First Lien Debt has been satisfied, 100% of net proceeds of the Liquidating Assets will go pro rata to the holders of Second Lien Claims and allowed General Unsecured Claims.[10]

32.     In order to implement the plan, liquidate the assets of the Liquidating Companies, and make distributions to creditors, on or before the Effective Date, the Debtors will effectuate

---

[9]   Defined as the "NewCo Assets" in the Plan.  The First Lien Lenders have valid and perfected security interests in substantially all of such assets pursuant to, among other things, the Court's confirmation order on the 2015 Plan.

[10]   Should total recoveries exceed 250% of the Assumed Net Recoveries, then NewCo will be entitled to certain contingent value.  Likewise, should NewCo's disposition of certain NewCo Assets—Autoseis and Ambient lines of business in particular—result in recoveries above an expected threshold, the Liquidating Company will be entitled to certain contingent value payments.

the following the restructuring transactions, as further described in Article VI of the Prepackaged Plan:[11]

- As of the Effective Date, all Parent Interests shall be deemed cancelled, and Post-Effective Date Holdings shall issue new membership interests, all of which shall be issued to the Plan Administrator, and the Plan Administrator shall be appointed as the sole officer and sole member of Post-Effective Date Holdings;

- On or prior to the Effective Date, NewCo shall be incorporated under the laws of Delaware;

- As of the Effective Date, NewCo shall authorize and issue one class of equity securities consisting of the NewCo Common Stock, which shall be distributed on the Effective Date in accordance with Section 5.2 of the Prepackaged Plan;

- NewCo and the Liquidating Companies shall enter into the Shared Services Agreement as of the Effective Date;

- The Plan Administrator and the Liquidating Companies shall enter into the Plan Administrator Agreement as of the Effective Date;

- Pursuant to Section 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Prepackaged Plan, the Liquidating Companies Exit Credit Agreement, the other Plan Documents or the Confirmation Order (or, with respect to NewCo, any portion of the obligations constituting the First Lien Claims that are assumed by NewCo), on the Effective Date: (i) the Liquidating Company Assets shall vest in the Liquidating Companies free and clear of all Claims, liens, encumbrances, charges and other interests and (ii) the NewCo Assets shall vest in NewCo, free and clear of all Claims, liens, encumbrances, charges, and other interests;

- The Liquidating Companies and the agent and lenders thereunder shall enter into the Liquidating Companies Working Capital Facility;

- The Debtors shall consummate the Prepackaged Plan by (i) making Distributions of the NewCo Common Stock and Cash, and (ii) causing the Liquidating Companies to enter into the Liquidating Companies Exit Credit Agreement; and

- the releases provided for in Article VIII of the Plan will become effective.

33.     Operationally, the Debtors' wind down plan consists of three categories of simultaneous initiatives, on which the Debtors have been executing since January of 2016:

---

[11]   Capitalized Terms used in this section and not otherwise defined herein shall have the meaning ascribed to them in the Plan.

- *Group 1*:  the immediate cessation of any remaining operations in approximately 18 jurisdictions in which the Debtors' business is already mostly inactive;

- *Group 2*:  near-term disposition or other cessation of operations in 12 jurisdictions or business units; and

- *Group 3*:  longer-term plans to exit other jurisdictions and business units upon completion of current contracts and work in process, including in Brazil and the Isle of Man and with respect to corporate operational support.

34.     The liquidity challenges the Debtors face are substantial.  Having explored their alternatives, sought to maximize value for their stakeholders, and negotiated at arms' length with the First Lien Lenders—who have liens on substantially all assets and are undersecured—the pre-packaged plan and wind down represent the best outcome available for all stakeholders under the Debtors' circumstances.   To be sure, the Debtors' liquidity and budget for administrative expenses are thin, and leave no margin for protracted chapter 11 cases.  These cases will succeed only if the timeline contemplated by the Prepackaged Plan and DIP Financing holds.  Otherwise, the Debtors are likely to become administratively insolvent, with the result of the First Lien Lenders receiving all remaining value.

[*Part Two Follows*]

## PART TWO: TESTIMONY IN SUPPORT OF FIRST DAY RELIEF

### A.    Wages and Benefits Motion

35.    The Debtors seek authority to (i) pay prepetition wages, salaries, and other compensation; (ii) pay prepetition payroll taxes and benefits and continue benefit programs in the ordinary course; and (iii) direct banks to honor checks for payment of prepetition Payment and Program Obligations (as defined below) (the "Wages and Benefits Motion").

36.    To execute on an orderly wind down of their businesses, the Debtors employ approximately thirty-seven individuals globally, including twenty individuals located at the headquarters in Houston, nine individuals located at various business units, and eight individuals assisting with operations of a Brazilian subsidiary (collectively, the "Wind-Down Team").  It is essential that the Debtors be authorized to continue to honor the existing obligations to the Wind-Down Team, as their efforts are essential to the timely and effective resolution of the wind-down process.

37.    As the Debtors wind down their operations, additional reductions in force will occur, including during the pendency of these cases.  In order to ensure an orderly process in making such workforce reductions, the Debtors seek the relief in the Wages and Benefits Motion.  The Debtors' obligations to the Wind-Down Team, as described below, are defined as the "Payment and Program Obligations."[12]

38.    The Debtors last disbursed wages, salaries, and other compensation for the Wind-Down Team (collectively, "Compensation") on August 2, 2016, just prior to filing these cases.

---

[12]    Board Members, although not technically employees, also receive $1,250 per month in compensation and expense reimbursement related to their service on the Board.  As of the petition date, I understand that there are no outstanding accrued and unpaid Board Member compensation or expenses.  Out of an abundance of caution, however, the Debtors include payments applicable to Board Members within the definition of Payment and Program Obligations.

As of the Petition Date, no Compensation is due and payable, but a portion of the future Compensation will be attributed to the prepetition period because the Wind-Down Team is paid in arrears.   It is my understanding that the prepetition accrued but unpaid portion of Compensation for the Wind-Down Team is approximately $219,000.[13]   To the best of my knowledge, none of the individuals on the Wind-Down Team are owed amounts exceeding the $12,850 designated cap under 11 U.S.C. § 507(a)(5), for accrued and unpaid Compensation. While some portion of the Cash-Payable PTO Benefits (as defined below) owed by the Debtors may have accrued more than 180 days prior to the Petition Date, such amounts, together with unpaid Compensation, do not exceed $12,850 in respect of any individual.

39.    For each applicable pay period, the Debtors deduct and/or withhold certain amounts from the paychecks for the Wind-Down Team, including, without limitation: (i) pre-tax and after-tax contributions pursuant to certain Benefit Plans (as defined below) and (ii) other miscellaneous items, such as child support and garnishment.   I understand that the Debtors generally deduct and/or withhold, on average, approximately $45,000 per month from the paychecks for the Wind-Down Team.

40.    The Debtors are required by law to (i) withhold certain amounts from wages on account of, among other things, federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authorities and (ii) make matching payments for Social Security and Medicare taxes and pay additional amounts, based upon a percentage of gross payroll, for state and federal unemployment insurance (collectively, the "Payroll Taxes").   I understand that the Debtors withhold, on average,

---

[13]   This amount does not include payments related to Expense Reimbursement and Benefit Plans (as those terms are defined below).

approximately 22.5% of gross wages per month in Payroll Taxes.  I understand that, as of the Petition Date, there are no accrued and unpaid Payroll Taxes.

41.     The Debtors have hired Paycom Software, Inc. ("Paycom") to submit and pay Payroll Taxes to the appropriate governmental authorities, in addition to providing other payroll and tax related services.  The amounts for the Payroll Taxes are funded to Paycom the day before Compensation is paid.  I understand that the Debtors pay, per pay cycle, a fixed fee of $400 and a subscription fee of approximately $6.50 per employee to Paycom for this service, amounting to approximately $4,000 each month.  As of the Petition Date, there are no accrued but unpaid amounts owed to Paycom.

42.     In the ordinary course, the Debtors reimburse the Wind-Down Team for certain expenses (the "Reimbursable Expenses") that are incurred in relation to the wind-down operations (collectively, "Expense Reimbursement").  Reimbursable Expenses include payments for travel (including meals, lodging, and automobile mileage), business supplies, and other Wind-Down related expenses.  In certain instances, the Debtors utilize four credit cards provided by Bank of America, with a collective limit of $80,000 to pay for certain business expenses directly.[14]  In other instances, the employee makes an out-of-pocket payment of a Reimbursable Expense, submits an Expense Reimbursement request, and then is reimbursed by the Debtors.  As of the Petition Date, I understand that there are no accrued but unpaid Expense Reimbursements.

43.     The Debtors also provide the Wind-Down Team with access to certain benefit plans, policies, and programs (collectively, the "Benefit Plans").  The Benefit Plans include, but

---

[14]   The Debtors may incur and pay credit card debt on account of Reimbursable Expenses in the ordinary course without approval from the Court.  11 U.S.C. §§ 363(b)(1), 364(a).  Out of an abundance of caution, however, the Debtors are requesting authority to continue to incur and pay credit card debt on account of Reimbursable Expenses in the ordinary course, consistent with prior practices and the DIP Budget.

are not limited to: (i) medical and dental care insurance; (ii) flexible spending accounts; (iii) life, accidental death, and dismemberment insurance, short-term and long-term disability insurance, and related supplemental insurance; (iv) COBRA medical coverage; (v) workers' compensation insurance; (vi) paid time-off benefits; and (vii) severance benefits.  I understand that, as of the Petition Date, there is approximately $960,510 in accrued but unpaid obligations in connection with the Benefits Plans.

44.     I believe the vast majority of the Wind-Down Team rely exclusively on their compensation to pay their daily living expenses.  Such amounts are a critical component of the Wind-Down Team's total compensation package, and if the Debtors are not permitted to honor their outstanding Wind-Down Team obligations, I believe many of the employees comprising the Wind-Down Team will be exposed to significant financial difficulties.  Moreover, if the Debtors are unable to satisfy such obligations, employee morale will be jeopardized at a time when employee support is critical.  Any resulting loss in workforce could significant hinder the Debtors' efforts to successfully implement their wind down plan.

45.     I believe that the relief requested in the Wages and Benefits Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their business during these chapter 11 cases without disruption so as to avoid immediate and irreparable harm to Debtors' estates.  Accordingly, I respectfully submit that the Wages and Benefits Motion should be approved.

**B.     Cash Management Motion**

46.     The Debtors seek an order authorizing them to (i) maintain their existing bank accounts, (ii) continue their use of the current business forms and checks, and (iii) continue to operate their cash management system and related processes, including the intercompany

transactions, ordinary course payments, credit card programs, and payment of any bank fees, consistent with their prepetition practices.  The Debtors also respectfully request that the Court authorize and direct their banks to continue to maintain, service, and administer the Debtors' bank accounts as accounts of the Debtors as debtors in possession ("DIP Accounts"), without interruption, and in the ordinary course of business (the "Cash Management Motion").

47.     The Debtors utilize and maintain in the ordinary course a centralized cash management system (the "Cash Management System") to collect and transfer the funds generated by their legacy and wind-down operations and to disburse funds to satisfy their financial obligations.  The Cash Management System is complex due to the wide-spread, international nature of the Debtors' legacy business operations, which includes foreign branch offices and subsidiaries (collectively, the "Foreign Branches and Subsidiaries").

48.     The Debtors have designed the Cash Management System to (i) meet their operating needs; (ii) enable them to centrally control and monitor corporate funds; (iii) ensure cash availability and liquidity; (iv) comply with the requirements of their financing agreements; (v) reduce administrative expenses by facilitating the efficient movement of funds; and (vi) enhance the development of accurate account balances.  The Cash Management System further provides the Debtors with the ability to quickly create status reports on the location and amount of the Debtors' funds, thereby allowing management to track and control such funds.

49.     As part of the Cash Management System, the Debtors maintain deposit, collection, concentration, disbursement, and other accounts in the United States and abroad. Specifically, the Cash Management System consists of approximately twelve domestic bank accounts (the "Domestic Bank Accounts") and twenty-three foreign bank accounts (the "Foreign Bank Accounts," and together with the Domestic Bank Accounts, the "Bank Accounts")

maintained at approximately nine different banks (collectively, the "Banks") around the globe, all of which are identified on Exhibit A attached to the Cash Management Motion.

50.     The majority of the Bank Accounts are used to fund domestic operations.  Many of the Foreign Bank Accounts are being reviewed for closure and repatriation of the remaining cash balances.  For various accounts that hold little to no cash balances, the Company is in the process of reviewing the cost and time associated with closing down such accounts to determine whether it would be appropriate to abandon those accounts.  For example, there are two accounts in Benghazi, Libya, which contain approximately $24,450, and cannot reasonably be closed and the funds repatriated because of difficulties arising from the conflict in that region.

51.     As of the Petition Date, approximately nineteen of the Bank Accounts are located in banks designated as authorized depositories (the "Authorized Depositories") by the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee") pursuant to the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession (the "UST Guidelines"), or in non-U.S. branches thereof.

52.     I understand that one of the U.S. Trustee Guidelines in this jurisdiction requires a chapter 11 debtor-in-possession to open new bank accounts and close all existing accounts.  The Debtors seek a waiver of, among other things, the U.S. Trustee's requirement that the Bank Accounts be closed and new post-petition accounts be opened.  This requirement would cause significant disruption in the Debtors' business and would impair their efforts to implement their wind down plan.  Similarly, the requirement to immediately alter its business forms and checks to comply with the U.S. Trustee obligations would require the Debtors to expend significant time and resources.

53.    The Debtors' continued use of the Cash Management System and the Bank Accounts during the pendency of these chapter 11 cases is essential to the Debtors' business operations.  In particular, requiring the Debtors to open new bank accounts and devise a new centralized cash management system at this early and critical stage would disrupt the Debtors' operations and impose needless expense and administrative burden.  Any such disruption would adversely affect the Debtors' ability to maximize the value of their estates, at little to no benefit, as the Debtors maintain accounting controls with respect to each of the Bank Accounts and have put systems in place to be able to accurately trace the funds throughout their Cash Management System and ensure that all transactions are adequately documented and readily ascertainable.

54.    As part of continuing the Cash Management System, the Debtors seek the authority to continue to engage in routine business relationships with each other (the "Intercompany Transactions") resulting in intercompany receivables and payables (the "Intercompany Claims").  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations could be unnecessarily disrupted to the detriment of the Debtors and their creditors and other stakeholders.

55.    In the ordinary course of business, the Debtors also make and receive certain payment transfers (the "Ordinary Course Payments").  The Debtors conduct transactions by check, wire, automatic clearing house payments ("ACH Payments"), and other similar methods.  In addition, a certain percentage of the Debtors' customer receipts are received through wire transfer payments.  Moreover, the Debtors are required by certain federal and state taxing authorities to submit tax payments electronically through wire or ACH Payments, and failure to do so results in the imposition of penalties.

56.    Finally, to minimize expense and disruption to the estates and to the other parties with whom the Debtors transact, including employees, customers, vendors, and suppliers, the Debtors request that the Court authorize the continued use of the Cash Management System, including the transacting of receipts and disbursements via wire transfer and continued maintenance of the Accounts and existing business letterhead, including for invoices and checks.

57.    In sum, I submit that requiring the Debtors to adopt new cash management systems and open new bank accounts at this early and critical stage of these chapter 11 cases would be expensive, impose administrative burdens, and cause needless disruption. Accordingly, I believe granting the relief in the Cash Management Motion is in the best interest of the Debtors' estates and all parties in interest.

### C.    Debtor-in-possession Financing Motion

58.    In connection with the filing of these cases, the Debtors are asking Court to approve the proposed debtor-in-possession financing facility, more fully described in the DIP Motion and the proposed interim order thereon (the "DIP Facility").  The Debtors have an urgent and immediate need for liquidity.  The DIP Facility will facilitate the Debtors' restructuring process by providing liquidity and funding administration of these cases.   With the assistance of their restructuring and other advisors, the Debtors have considered and explored numerous alternatives to the DIP Facility.  Because the Debtors were unable to negotiate an alternative transaction that would have provided sufficient consideration to resolve their financial challenges, the proposed DIP Facility provides the Debtors the best opportunity to effectuate an orderly wind down.  For these reasons, entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets, and is an exercise of the Debtors' sound and reasonable business judgment.

D.     **Insurance Motion**

59.     The Debtors have asked the Court for authorization to: (i) continue their pre-petition insurance program; (ii) pay any pre-petition premiums and related obligations; (iii) honor obligations under pre-petition premium financing agreements; (iv) authorizing post-petition insurance financing agreements; and (v) prospectively modifying the automatic stay (the "Insurance Motion").

60.     The Debtors, as part of their wind-down operations, maintain an insurance program (the "Insurance Program") that provides coverage for the Debtors' assets and operations around the globe, including workers' compensation, general liability, property, casualty, and directors' and officers' liability (each, a "Policy" and collectively, the "Policies"). These Policies are provided by several different insurance carriers (the "Carriers"). Attached as Exhibit A to the Insurance Motion is a comprehensive list of the Policies, the type of coverage, Policy numbers, the identity of Carriers, and the total annual premium for each Policy.

61.     Although the Insurance Motion describes the current Policy coverage, the Debtors are only seeking authority to maintain insurance coverage to the extent necessary to implement the plan and wind-down operations. The nature and amount of the Policies under the Insurance Program are subject to ongoing review and may be cancelled, reduced, amended, or otherwise modified depending on the circumstances of the wind-down operations and as provided in the DIP budget.

62.     Certain of the Policies also provide coverage protecting the Debtors' foreign subsidiaries and assets. The Debtors, in the ordinary course, pay the required premiums and accounts for their foreign subsidiaries' share of the premiums through the creation of intercompany obligations owed to a Debtor by the relevant subsidiary. By obtaining the required

insurance coverage for the company on a combined basis, the Debtors have been able to realize substantial savings and efficiencies in the cost of their Insurance Program. Further, it would not be feasible to separate out the insurance needs of non-debtor subsidiaries and obtain new insurance coverage at a reasonable cost or within a reasonable time frame without exposing the Debtors and their operations to significant risk of disruption and increased expense from any material disruption of the Insurance Program.

63.     In many cases, the coverage provided by the Policies is required by various regulations, laws and contracts that govern the Debtors' wind-down operations under applicable non-bankruptcy law. Likewise, both the U.S. Trustee Guidelines for debtors-in-possession operating in Chapter 11 cases in this Bankruptcy Court and the terms of the Debtors' DIP Facility require the Debtors to maintain adequate insurance coverage. Such coverage could not be provided without the continuation of the entire Insurance Program.

64.     It is not always economically advantageous for the Debtors to pay the premiums on each of the Policies on an annualized basis. Accordingly, from time to time, in the ordinary course, the Debtors have financed the premiums payable on some of the Policies. As of the Petition Date, the premiums for certain of the Policies are financed under the Premium Finance Agreement dated April 25, 2016, with Talbot Premium Financing, LLC (the "Insurance Financing Agreement"), which was subsequently assigned to IPFS. The Debtors pay approximately $75,000 per month under the Insurance Financing Agreement.

65.     With respect to amounts that may become owed under the Insurance Financing Agreement, the Debtors are required to make monthly payments to IPFS, which obligations are secured by security interests in the unearned premiums for any financed policies. If the Debtors are unable to continue making payments when and as due under the Insurance Financing

Agreement, IPFS ultimately may be permitted to terminate such financed policies and recover the unearned premiums due on any such terminated polices to satisfy the indebtedness due and owing to them under the Insurance Financing Agreement.  The Debtors would then be required to obtain replacement insurance on an expedited basis and likely at substantial incremental cost to the bankruptcy estates.  Additionally, any interruption of payments could adversely affect the Debtors' ability to finance premiums for future policies, whether under the current Insurance Finance Agreement or otherwise.  Given the nature of their insurance needs, I believe financing premiums fosters the Debtors' ability to maximize the value of the estate.  The Debtor's insurance financing needs are subject to ongoing review and may be cancelled, reduced, amended, or otherwise modified depending on the circumstances of the wind-down operations and as provided in the DIP budget.

66.    I believe it is essential to the continued operation of the Debtors' business that the Insurance Program be maintained on an ongoing and uninterrupted basis.  Accordingly, I believe that granting the relief requested in the Insurance Motion is in the best interests of the Debtors' estates and all parties in interest.

**E.    Motion to Reject Certain Lease**

67.    The Debtors are requesting the Court to authorize them to reject a non-residential real property lease and all amendments thereto, effective retroactively to the Petition Date (the "Rejection Motion").  The Debtors are party an unexpired non-residential real property lease, as set forth on the schedule attached as Exhibit A to the Rejection Motion (the "Scheduled Lease").

68.    I believe that the Scheduled Lease is not beneficial to the Debtors and should be rejected because it is a net liability for the estates.  The Scheduled Lease concerns commercial office space at 17013 Preston Road, Suite 120, Dallas, Texas.  The Debtors have already vacated

the premises and there is no justification for the Debtors to incur postpetition administrative expenses.  Consequently, I believe rejection on a *nunc pro tunc* basis will prevent the estates from incurring unnecessary administrative expenses, thereby preserving assets of the estate for all parties in interest.  Accordingly, I believe the Court should grant the relief requested in the Rejection Motion

### F.   Utilities Motion

69.     The Debtors seek to (i) prohibit the Utility Companies from altering, refusing, or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (ii) determine that the Utility Companies have been provided adequate assurance of payment within the meaning of section 366; and (iii) obtain Court approval of the Debtors' proposed offer of adequate assurance and procedures governing the Utility Companies' requests for additional or different adequate assurance (the "Utilities Motion").

70.     The Debtors obtain electricity, water, telephone, internet, and/or other similar services (the "Utility Services") from certain utility companies (the "Utility Companies").  To provide adequate assurance of payment to the Utility Companies, the Debtors submit that an amount equal to one-half of one month's Utility Service payment (calculated as a historical average over the past twelve months) (an "Adequate Assurance Deposit"), together with the Debtors' ability to pay for future Utility Services in the ordinary course of business, provides sufficient adequate assurance of payment and that no additional deposit, security, or other assurance of payment is or should be required for the Utility Services.  A list of the names and addresses of the Utility Companies and proposed Adequate Assurance Deposits is attached as Exhibit A to the Utilities Motion.

71.     The proposed procedures provide that a Utility Company must make an initial request for a Utility Deposit within 30 days of the Petition Date.  In the event that any Utility Company believes the Utility Deposit does not provide satisfactory assurance, the proposed procedures allow such Utility Company to serve a request for an additional deposit on the Debtors and their counsel.  The Debtors shall then have a brief period to seek to resolve the request by agreement without further order of this Court.  If the Debtors believe that the additional request is unreasonable and/or is unable to resolve the request, then the Debtors shall request a hearing before this Court seeking a determination from the Court that the proposed deposit, plus any additional consideration that may be offered by the Debtors, constitute adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code.  Pending such a hearing, any Utility Company that is the subject of the unresolved request may not alter, refuse, or discontinue services to the Debtors.  In addition, any Utility Company that fails to make a timely request shall be deemed to have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code.

72.     I believe the proposed procedures are reasonable and it is my understanding they are consistent with those provided by debtors in similar Chapter 11 cases.  In addition, I submit that uninterrupted utility service is essential to the Debtors' ability to maintain their operations, and therefore the emergency relief requested in the motion is necessary to prevent irreparable harm to the Debtors' business.

 G.     **Administrative Motions**

     i.   ***Notice of Complex Designation***

73.     Currently, the Debtors have total debt of more than $125 million and there are more than 50 parties in interest in the Cases.  I believe that application of the Complex Chapter 11 Procedures to these chapter 11 cases will ensure appropriate notice of the filings in these

cases, assist in the efficient administration of the Debtors' estates, and serve the best interests of the Debtors and their creditors and equity holders. Accordingly, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Notice of Complex Designation.

### ii.     Motion for Joint Administration

74.     Each of the Debtors filed a motion in its respective case seeking an order directing the joint administration of these chapter 11 cases for procedural purposes only (the "Joint Administration Motion"). The Debtors request that the Clerk of the Court be directed to maintain one file and one docket for all eight of the Debtors' chapter 11 cases under the case name and number assigned to Debtor Global Geophysical Services, LLC.

75.     Joint administration of these cases will eliminate the need for duplicative filings, thereby saving considerable time and expense for the estates, the Court, and all parties in interest. Joint administration will also simplify the supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee. Claim and interest holders will benefit from the reduction in costs resulting from joint administration, and the Debtors accordingly request that the Court grant the order sought in the motion for joint administration. Accordingly, I believe the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates and all parties in interest.

### iii.     Motion to File Consolidated List of Creditors and Consolidated Top 30 List of Creditors and to Set a Bar Date

76.     There are hundreds of creditors and parties in interest in these chapter 11 cases. The Debtors maintain lists of the names and addresses of all such entities on various computer programs that permit the Debtors or an outside firm to print mailing labels for each such entity. I believe that the most effective and efficient manner by which to accomplish the process of

photocopying and transmitting notices in these chapter 11 cases is to authorize Prime Clerk, LLC, the Debtors' proposed noticing and claims agent (the "Noticing and Claims Agent"), to act as an authorized noticing agent of the Court.  The Debtors will separately file an application to employ the Noticing and Claims Agent to serve this purpose.

77.     Because the preparation of separate lists of creditors for each Debtor would be expensive and time consuming, and because a large number of creditors are shared amongst the Debtors, I believe the consolidated Creditors Matrix and the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

78.     For the foregoing reasons, I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested.

### iv.     Solicitation Procedures Motion

79.     The Debtors commenced solicitation of holders of claims regarding the Plan prior to the Petition Date in accordance with the following Solicitation Procedures. On July 20, 2016, the Debtors caused their solicitation agent, Prime Clerk, LLC (the "Solicitation Agent"),[15] to distribute packages containing the Disclosure Statement, the Plan, and ballots (the "Solicitation Packages") to holders of claims entitled to vote to accept or reject the Plan as of the Voting Record Date.  Holders of claims to whom the Solicitation Packages were transmitted were directed in the Disclosure Statement and ballots to follow the instructions contained in the ballots (and described in the Disclosure Statement) to complete and submit their respective ballots to cast a vote to accept or reject the Plan. Each holder was explicitly informed in the Disclosure Statement and applicable ballot that such holder needed to submit its ballot such that it is actually received by the Solicitation Agent on or before the Voting Deadline to be counted.

---

[15]   The Debtors have also applied for authority to retain Prime Clerk LLC as their claims and noticing agent.

80.     As clearly set forth in the Disclosure Statement and ballots, the Voting Deadline was set for August 1, 2016, or 12 days after the date of the start of solicitation and distribution of the Plan.  The Debtors expect to complete a final tabulation of the ballots on or about August 3, 2016.

81.     I submit that the Solicitation Procedures should be approved, and I believe that it is in the best interests of the Debtors, their estates and creditors, and all other parties in interest that the Court grant the relief requested in the Solicitation Procedures Motion.

[*Signature Page and Exhibit Follows*]

Pursuant to 28 U.S.C. §  1746, the undersigned makes the forgoing declaration as of the date of its filing under penalty of perjury.

Sean M. Gore
Chief Executive Officer

Exhibit A

Organizational Chart

Active 25717165

**Global Geophysical Services, Inc.**

*Legal Entity Org Chart*



**GLOBAL LEGAL ENTITY STRUCTURE**

*(effective August 1, 2016)*