**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

-------------------------------------------------------- X
                                                         :
In re:                                                   :   Chapter 11
                                                         :
**GLOBAL GEOPHYSICAL**                                   :   Case No. 16-20306
**SERVICES, INC., *ET AL.*[1]**                          :
                                                         :
              Debtors.                                   :   (Joint Administration Requested)
                                                         :
-------------------------------------------------------- X

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:
(I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507, BANKRUPTCY RULES 2002, 4001 AND 9014 AND
BANKRUPTCY LOCAL RULES 2002-1, 4001-1(B) AND 9013-1 AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT
SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND
(D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"Debtors"), hereby move (the "Motion") for entry of interim and final orders:  (i) authorizing the

Debtors to (a) obtain postpetition financing, (b) grant senior liens and superiority administrative

claims, (c) use cash collateral; and (d) grant adequate protection; (ii) scheduling a final hearing;

and (iii) granting related relief.  In support of the Motion, the Debtors rely upon the *Declaration

of Sean M. Gore in Support of First Day Motions and Applications* (the "First Day Declaration")

and the *Declaration of Jonathan Goulding in Support of the DIP Financing* (the "Goulding

Declaration") filed contemporaneously and incorporated herein by reference.  In further support

of the Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases are:  Global Geophysical Services, LLC (7582); Global Geophysical
Services, Inc. (4281); Global Geophysical, EAME, Inc. (2130); GGS International Holdings, Inc. (2420); Global
Ambient Seismic, Inc. (2256); Autoseis, Inc. (5224); Autoseis Development Company (9066); and Global
Geophysical (MCD), LLC (a disregarded entity for tax purposes).

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.   The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b)(2).   Venue of this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## RELIEF REQUESTED

3.     By this Motion, the Debtors request entry of an interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order")[2] and a final order upon notice and following a final hearing (the "Final Order," together with the Interim Order, the "DIP Orders"):

   a.     authorizing the Debtors to (A) obtain postpetition secured debtor-in-possession financing (the "DIP Facility") in an aggregate principal amount of up to $2,000,000.00 (the "DIP Loans") pursuant to the terms and conditions of the Interim Order and that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (substantially in the form attached to the proposed Interim Order as Exhibit A thereto, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), dated as of the Closing Date, by and among Global Geophysical Services, LLC as Holdings, Global Geophysical Services, Inc., as Borrower, and the domestic subsidiaries of Global Geophysical Services, Inc. as guarantors, Wilmington Savings Fund Society, FSB ("WFSF"), as agent (the "DIP Agent"), and the lenders from time to time thereunder (the "DIP Lenders," and together with the DIP Agent and any other party to which the Obligations as defined in the DIP Credit Agreement (the "DIP Obligations") are owed, the "DIP Parties"), and (B) incur the DIP Obligations under the DIP Credit Agreement (the DIP Credit Agreement and the

---

[2]     Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Loan Documents and the DIP Orders, as applicable.

amendments thereto, together with the Interim Order, any Final Order and any related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

b.      authorizing the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses (including legal expenses) and other amounts payable under the DIP Documents as such amounts become due and payable;

c.      authorizing the Debtors to grant security interests, liens and superpriority claims (including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent for the benefit of the DIP Parties, in the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in the Interim Order;

d.      authorizing the Debtors' use of Cash Collateral of the Pre-Petition Secured Parties (as defined below) as provided herein, and the provision of adequate protection to the Pre-Petition Secured Parties for any Diminution in Value (as defined below) of their interests in the Pre-Petition Collateral (as defined below), including Cash Collateral;

e.      authorizing the Debtors to borrow under the DIP Facility up to an aggregate principal amount of $2,000,000.00, subject to the terms of the DIP Documents, the Interim Order and the Final Order (as applicable);

f.      scheduling an interim hearing (the "Interim Hearing") on an emergency basis, and a final hearing (the "Final Hearing") to consider entry of an Interim Order and Final Order authorizing the borrowings under the DIP Facility and the use of Cash Collateral (as defined below); and

g.      modifying of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, the Interim Order and the Final Order (as applicable).

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

4.      The Interim Order contains certain of the provisions (the "Significant Provisions") identified on Exhibit B to the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Bankruptcy Cases in the Southern District of Texas (the "Complex Chapter 11 Procedures") as summarized in the Attorney Checklist Concerning Motion and Order Pertaining to Use of Cash Collateral attached as **Exhibit B**.

5.      The proposed Interim Order: (a) binds the estate or any parties in interest with respect to the validity, perfection, or amount of a secured creditor's prepetition lien or debt or the waiver of claims against the secured creditor (subject to certain challenge rights); (b) waives the Debtors' rights under section 506(c) of the Bankruptcy Code upon entry of the Final Order; (c) grants a prepetition secured creditor liens on the proceeds of the Debtors' claims and causes of action under chapter 5 of the Bankruptcy Code; (d) grants administrative adequate protection claims; and (e) imposes deadlines for the filing of a chapter 11 plan and disclosure statement.

6.      The explanation for the inclusion of the foregoing Significant Provisions, as required by rule 4(C)(vi) of the Complex Chapter 11 Procedures, which is made applicable by Bankruptcy Local Rule 1075-1, is that without such Significant Provisions, the First Lien Lenders would not consent to the terms of the Debtors' Prepackaged Plan of Liquidation (the "Prepackaged Plan") or the Debtors' use of Cash Collateral.  As a result, the Debtors would not be able to access the additional liquidity to be provided by the DIP Facility to fund the administration of these cases and an orderly wind-down of their business.  As further described in the Goulding Declaration, the Debtors sought and were unable to find alternative sources of liquidity.  The DIP Facility, the indebtedness of which will be assumed by NewCo on the effective date of the Prepackaged Plan, is an integral part of a comprehensive chapter 11 transaction.

## SUMMARY OF THE PROPOSED DIP FACILITY

7.      The Debtors submit this statement listing certain material terms set forth in the DIP Facility and the Interim Order.   Specifically, the significant terms of the DIP Loan Documents to be executed and to which the DIP Facility refers are as follows:[3]

| | |
|---|---|
| **Borrowers:** | Global Geophysical Services, Inc. ("Borrower"), as a debtor and debtor-in possession under Chapter 11 (the "Chapter 11 Cases") of the U.S. Bankruptcy Code ("Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division ( "Bankruptcy Court"). |
| **Guarantors:** | Global Geophysical Services, LLC ("Holdings"), Autoseis, Inc., Global Ambient Seismic, Inc., Global Geophysical EAME, Inc., GGS International Holdings, Inc., Autoseis Development Company, Global Geophysical (MCD), LLC (each individually a "Guarantor" and collectively, "Guarantors", each as a debtor and debtor-in possession under Chapter 11 Cases.  The  Borrowers and the Guarantors are referred to herein each individually, as a "Loan Party" and collectively, "Loan Parties"). |
| **Administrative And Collateral Agent:** | WSFS will act as the DIP Agent under the DIP Facility. |
| **Lenders:** | Certain First Lien Lenders and such  financial institutions as are parties to the DIP Facility as lenders from time to time. |
| **Credit Facility:** | The DIP Facility will consist of a post-petition senior secured revolving loan facility provided to Borrowers of up to **$2,000,000** (the "Maximum Credit"). The revolving loans under the DIP Facility ("Revolving Loans") will be subject to certain terms described below. |
| **Interest And Fees:** | *Interest Rate*—The Revolving Loans shall bear interest at a rate per annum of 15%.   Interest is payable on  the last Business Day of each month until maturity, in cash or in kind.  DIP Credit Agreement § 2.06. |
| | *Unused Commitment Fee*—Borrowers shall pay to DIP Agent, for the account of DIP Lenders, an unused commitment fee calculated at 2.5 % per annum (the "Commitment Fees") of the average daily amount of each DIP Lender's unused commitments during the period from and including the closing date of the DIP Facility to but excluding the date on which such DIP Lender's commitments terminate. Accrued Commitment Fees shall be payable in arrears on the last day of each calendar month of each year and on the date on which the commitments terminate, commencing on the first such date to occur after the date of the agreement. All Commitment Fees shall be (x) payable-in- |

---

[3] This is intended as a summary for purposes of Federal Rule of Bankruptcy Procedure 4001(c) only and does not reference all of the terms, conditions, representations, warranties, covenants and other provisions which will be contained in the definitive documentation for the DIP Credit Agreement and the transactions contemplated thereby. It is not meant to be, nor shall it be construed as an attempt to describe all of, or the specific phrasing for, the provisions of the DIP documentation.

| | |
|---|---|
| | kind by adding such amount to the outstanding principle balance of the loans then outstanding, (y) computed on the basis of a year of 360 days and (z) payable for the actual number of days elapsed (including the first day but excluding the last day).  DIP Credit Agreement § 2.05(a)<br><br>*Administrative Agent Fee*— Borrower shall pay to the DIP Agent, for its own account, the administrative fees payable in the amounts and at the times separately agreed upon between Borrower and the DIP Agent, acting as collateral agent and administrative agent.  DIP Credit Agreement § 2.05(b).<br><br>*Upfront Fee* — Borrower shall pay to the DIP Agent for the account of each DIP Lender an upfront fee in an amount equal to 1.00% of an amount equal to the commitments of such DIP Lender as of the closing date of the DIP Facility. Such upfront fee shall be payable-in-kind by adding such amount to the outstanding principal balance of the DIP Facility. DIP Credit Agreement § 2.05(c).<br><br>*Expense Reimbursement and Indemnity*—As provided at section 10.03 of the DIP Credit Agreement. |
| ***Collateral And Priority:*** | To secure all obligations of each Loan Party under the DIP Facility, the Loan Parties will grant a first priority (subject to certain permitted liens) perfected security interests in and liens upon substantially all pre-Petition Date and all post-Petition Date assets, rights, entitlements and any other interests of any kind and, in each case, all proceeds therefrom, whether now owned or hereafter acquired by Holdings or its Subsidiaries (as defined in the DIP Credit Agreement) (the "DIP Liens").<br><br>All amounts owing by the Loan Parties under the DIP Facility at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases having priority over all other administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, other than the Carve Out (the "DIP Superpriority Claim").<br><br>Notwithstanding anything to the contrary contained in any of the DIP Documents, the DIP Collateral shall not include the Carve Out.<br><br>Interim Order ¶¶ 9,10; DIP Credit Agreement § 4.01(t) |
| ***Carve Out:*** | For all purposes of the DIP Documents, the "Carve Out" means the following expenses:<br><br>  (i)     all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717;<br><br>(ii)     to the extent allowed by the Bankruptcy Court at any time, the accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors or the Committee (if any) pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Professionals") at any time before or on the date of the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice, whether such amounts are allowed by the Bankruptcy Court prior to or after |

| | |
|---|---|
| | delivery of such Carve Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve Out Trigger Notice) in an amount not to exceed the amounts set forth for each such Professional firm in the Approved Budget in effect on the date of the delivery of a Carve Out Trigger Notice; and<br><br>(iii)     all unpaid fees, disbursements, costs and expenses incurred by the Professionals after the day date of the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, in an aggregate amount not to exceed $100,000.00<br><br>Interim Order ¶ 14. |
| *Use Of Proceeds:* | The proceeds of the Revolving Loans will be used in accordance with the Budget, as approved, or as otherwise consented to in writing by the DIP Lenders.<br><br>DIP Facility § 3.12 |
| *Closing Date:* | August 5, 2016 (the "Closing Date"). |
| *Maturity Date:* | The DIP Facility shall be for a term ending on the earliest of (the earliest of such dates being referred to as the "Maturity Date"):<br><br> (a) November 1, 2016, (b) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court and (c) the acceleration of the Loans and termination of the Commitments in accordance with Article VIII of the DIP Credit Agreement. |
| *Events Of Default:* | Substantially as provided in the Pre-Petition First Lien Credit Agreement, with the additions of bankruptcy-related events of default, including, *inter alia*: the termination of the Debtors' exclusive right to file and solicit acceptances of a plan of reorganization; the confirmation of a plan of reorganization which does not either provide for the repayment in full in cash of the DIP facility or provide for another treatment acceptable to the DIP Lenders; the appointment of a trustee, receiver or examiner with expanded powers in the Debtors' chapter 11 cases; the sale, without the DIP Lenders' consent, of substantially all of any Debtor's assets; the dismissal of these cases or the conversion of these cases to chapter 7 cases;  the reversal, vacatur or stay of the effectiveness of any of the Interim Order, the Final Order or any provision thereof without the prior written consent of the DIP Lenders; and certain other Events of Default as further set forth in Section 8.01 of the DIP Credit Agreement..<br><br>DIP Credit Agreement § 8.01 |

<u>BACKGROUND</u>

## I.      Introduction and Case Background

8.      On August 3, 2016 (the "<u>Petition Date</u>"), the Debtors commenced these cases (the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court.   No trustee, examiner, or creditors' committee has been appointed in the Chapter 11 Cases.   The Debtors are operating as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      For a more detailed description of the Debtors, their business and capital structure, and the events giving rise to the Chapter 11 Cases, please see the First Day Declaration.

## II.      The Debtors' Material Pre-Petition Secured Indebtedness

### *Pre-Petition First Lien Facility*

10.      In connection with their emergence from prior chapter 11 cases, on February 9, 2015, Global Geophysical Services, LLC, Global Geophysical Services, Inc. and the other Debtors (as Guarantors) entered into the Pre-Petition First Lien Credit Agreement (the "<u>Pre-Petition First Lien Credit Agreement</u>") with the banks and other financial institutions party thereto as lenders (the "<u>First Lien Lenders</u>") and Wilmington Savings Fund Society, FSB as agent (the "<u>First Lien Agent</u>" and, together with the First Lien Lenders, the "<u>First Lien Secured Parties</u>"), which provided for (i) a senior secured first lien revolving credit facility in an aggregate principal amount of up to $25 million (the "<u>Pre-Petition First Lien Revolving Loan</u>") and (ii) a first lien term loan in the principal amount of $60 million (the "<u>Pre-Petition First Lien Term Loan</u>" and, together with the Pre-Petition First Lien Revolving Loan, the "<u>Pre-Petition First Lien Loans</u>").

11.     As of the Petition Date, approximately $85,104,644 of principal and accrued and unpaid interest was outstanding under the Pre-Petition First Lien Credit Agreement.

12.     The indebtedness under the Pre-Petition First Lien Credit Agreement is secured by liens on substantially all real and personal property of the Debtors, and certain assets of certain foreign non-debtor subsidiaries of the Debtors (the "First Lien Collateral"), pursuant to various security and collateral documents (the "Pre-Petition First Liens").[4]

13.     The Pre-Petition First Lien Credit Agreement matures on February 8, 2017, subject to the Debtors' right to extend the maturity date to May 8, 2017 in accordance with the terms and conditions of the Pre-Petition First Lien Credit Agreement. The Pre-Petition First Lien Revolving Loan bears interest at a rate of 12.5% per annum and the First Lien Term Loan bears interest at a rate of 12.5% per annum.  Interest on the First Lien Revolving Loan and on  the First Lien Term Loan is payable monthly in arrears.

*The Pre-Petition Second Lien Facility*

14.     Also in connection with their emergence from prior chapter 11 cases, on February 9, 2015, Global Geophysical Services, LLC, Global Geophysical Services, Inc. and the other Debtors and their affiliates (as Guarantors) entered into a Second Lien Credit Agreement (as amended, modified or supplemented from time to time, the "Pre-Petition Second Lien Credit Agreement") with the banks and other financial institutions party thereto as lenders (the "Second Lien Lenders") and Wilmington Trust, National Association as agent (the "Second Lien Agent" and, together with the Second Lien Lenders, the "Second Lien Secured Parties"; the Second Lien Secured Parties together with the First Lien Secured Parties, the "Pre-Petition Secured Parties").

---

[4] The indebtedness under the Pre-Petition First Lien Credit Agreement is also guaranteed by the following foreign non-debtor subsidiaries of the Debtors: Global Geophysical Services Canada Inc., an Alberta corporation; Sensor Geophysical Ltd., an Alberta corporation; Global Geophysical Services, Ltd., a Cayman Islands company; and Global Servicos Geofisicos Ltda., a Brazilian limited liability company.

The Pre-Petition Second Lien Credit Agreement provides for a senior secured second-lien term loan in the original principal amount of $32,089,257.85 (the "Pre-Petition Second Lien Loan").

15.     As of the Petition Date, approximately $40,445,999 of principal and accrued and unpaid interest was outstanding under the Pre-Petition Second Lien Credit Agreement. The liens securing the Debtors' obligations under the Pre-Petition Second Lien Credit Agreement are subordinate and junior to the liens securing the Debtors' obligations under the Pre-Petition First Lien Credit Agreement in all respects.

16.     The indebtedness under the Pre-Petition Second Lien Credit Agreement is secured by liens on substantially all real and personal property of the Debtors, and certain assets of certain foreign non-debtor subsidiaries of the Debtors (together with the First Lien Collateral, the "Pre-Petition Collateral"), pursuant to various security and collateral documents (the "Pre-Petition Second Liens").

17.     The Pre-Petition Second Lien Credit Facility matures on August 9, 2017, subject to the Debtors' right to extend the maturity date to November 9, 2017 in accordance with the terms and conditions of the Pre-Petition Second Lien Credit Agreement, and loans thereunder bear interest at a rate of 15.5% per annum, payable monthly in arrears.

*Intercreditor Agreement*

18.     The First Lien Agent and Second Lien Agent are parties to an intercreditor agreement, dated as of February 9, 2015 (the "Intercreditor Agreement").   Under its terms, the Debtors' indebtedness and other obligations under the Pre-Petition First Lien Credit Agreement (the "First Lien Obligations") are senior in right, priority, operation, effect and all other respects to the Debtors' indebtedness and obligations under the Pre-Petition Second Lien Credit Agreement (the "Second Lien Obligations").   Indebtedness under the Pre-Petition Second Lien

Credit Agreement is fully subordinated to indebtedness under the Pre-Petition First Lien Credit Agreement.  Under section 4.02 of the Intercreditor Agreement, any recoveries or payments to the Second Lien Lenders prior to the repayment in full of all First Lien Obligations—including in any insolvency proceeding—are to be held in trust and turned over to the First Lien Agent.[5]

19.     Significantly, the Intercreditor Agreement also provides that until the First Lien Obligations have been fully satisfied, the Second Lien Agent and Lenders shall (i) not oppose or object to any post-petition debtor-in-possession financing offered or supported by the First Lien Lenders, and (ii) subordinate and consent to such post-petition financing, including with respect to any liens that prime or are *pari passu* with the liens held by the First Lien Agent under the Pre-Petition First Lien Credit Agreement and related documents.  *See* Intercreditor Agreement § 6.01(a)(ii).  Where DIP financing is to be provided by the First Lien Lenders—as is the case here—the Intercreditor Agreement also provides that the Second Lien Lenders may propose alternative DIP financing only if they irrevocably agree to purchase all outstanding obligations under the First Lien Credit Agreement.

*Perfection of the Pre-Petition Liens Pursuant to the Prior Confirmation Order*

20.     Having consummated a prior restructuring on February 9, 2015, the Debtors are the subjects of prior chapter 11 cases before this Court, which cases have not yet been closed. *See In re Autoseis, Inc., et al.*, Case No. 14-20130.  As a result, the Debtors' current capital structure and funded debt obligations were authorized and incurred pursuant to the terms of this

---

[5] Notwithstanding the payment and other subordination provisions of the Intercreditor Agreement, if the Prepackaged Plan filed on the Petition Date is confirmed and becomes effective, holders of Second Lien Claims will receive the treatment and recovery provided for in the Prepackaged Plan, despite the fact that the First Lien Lenders will not be paid in full.

Court's prior confirmation order.   In particular, paragraphs 36–38 provides that the Pre-Petition First Liens and Pre-Petition Second Liens are automatically valid, perfected and unavoidable.[6]

### III.    Negotiation of the DIP Facility

21.    As more fully described in the First Day Declaration, the Debtors' business has been severely impacted by the downturn in energy commodities markets, and the associated decease in the energy industry of capital expenditures on exploration services.

22.    In early 2016, faced with a heavy debt burden, declining revenues and an uncertain near-term outlook in its industry, the Debtors hired financial and legal advisors to evaluate a wide range of options to improve their financial position in the event of a prolonged market downturn.   Thereafter, the Debtors commenced discussions with the First Lien Lenders to determine available options to enhance liquidity, including new financing, the pledge of additional collateral, and other deleveraging measures.   The Debtors considered both out-of-court as well as bankruptcy court-focused alternatives.   The Debtors and their management carefully considered and weighed each option with the benefit of advice from their restructuring advisors.

23.    In April of 2016, the Debtors and the First Lien Agent entered into negotiations regarding a potential restructuring transaction that would transfer certain of the collateral under the Pre-Petition First Lien Credit Agreement to the First Lien Agent and the First Lien Lenders.

24.    On May 31, 2016, after weeks of extensive, arms-length negotiations, the Debtors and the First Lien Agent entered into a Forbearance Agreement pursuant to which the First Lien Agent and the First Lien Lenders agreed to forbear from exercising their rights and remedies under the Pre-Petition First Lien Facility with respect to existing defaults.

---

[6] *See Findings of Fact and Conclusions of Law and Order Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Global Geophysical Services, Inc. and its Debtors Affiliates, as Reformed*, Case No. 14-20130, Feb. 6, 2015 [Docket No. 987].

25.     Faced with the default of certain terms under the Pre-Petition First Lien Facility and the Pre-Petition Second Lien Facility, the Debtors resumed negotiations with the First Lien Agent and the First Lien Lenders.   Those negotiations culminated in the terms of the Prepackaged Plan, by which the Debtors would transfer certain collateral under the Pre-Petition First Lien Facility, including certain real property, claims and causes of action of the Debtors, receivables owed to the Debtors by the Debtors' Brazilian subsidiary, the seismic data library and other intellectual property into a new entity ("NewCo"), to be owned by the First Lien Lenders.   The Debtors would retain all other assets not transferred to NewCo under the Prepackaged Plan and implement an orderly wind down and liquidation, making possible distributions for junior stakeholders.

26.     As described in the Goulding Declaration in support of this Motion, the Debtors thoroughly considered and pursued various strategic alternatives.   Ultimately however, the Debtors were unable to negotiate an alternative transaction that would have provided sufficient consideration to resolve the company's financial challenges or provide any distribution to stakeholders other than the First Lien Lenders.   Therefore, prior to the Petition Date, the Debtors solicited votes from stakeholders with respect to the Prepackaged Plan.

27.     While negotiating the terms of the proposed DIP Facility with the First Lien Lenders, the Debtors solicited and explored potential DIP financing from third parties.   Over the course of a number of weeks, the Debtors and A&M reached out to more than 25 different potential financing sources, including certain of the Second Lien Lenders.   In this process, the Debtors and A&M sought to raise DIP financing in the amount of $2 million or $5 million of exit financing for the Liquidating Companies.

28.     None of the parties contacted were willing to provide DIP financing on terms more favorable than the First Lien Lender's proposal. In conversations with potential lenders, the far-flung geographical nature of the Debtors' assets, the challenges faced by seismic companies in the current commodity market, the lack of depth in the marketplace for the sale of the Debtors' assets, and that these financings would be used for a liquidation rather than a reorganization were reasons cited by potential lenders as to why they were not interested in such financing.

<u>**BASIS FOR THE RELIEF REQUESTED**</u>

29.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both.   Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[7]

30.     As set forth above and in the Goulding Declaration, the DIP Facility is the best financing available under the circumstances.  The DIP financing is in the best interests of all stakeholders because it will finance these cases and provide a bridge to exit financing that, together with the Prepackaged Plan and related agreements, will allow for an orderly wind-down

---

[7]     11 U.S.C. §§ 364(c), (d).

and a recovery for unsecured creditors.  Furthermore, should the Prepackaged Plan ultimately be confirmed by the Bankruptcy Court, the DIP Lenders have agreed that NewCo will assume the obligations under the DIP Facility (subject to the terms of the Prepackaged Plan) in lieu of payment in full in cash upon the Debtors' exit from bankruptcy.[8]

31.     The Debtors submit that they have satisfied the requirements to obtain postpetition financing on a superpriority, secured basis pursuant to sections 364(c) and (d) of the Bankruptcy Code.  Importantly, the First Lien Lenders have consented to the priming of their liens by the DIP Liens and usage of Cash Collateral.  Under the terms of the Intercreditor Agreement, the Second Lien Lender have also agreed to consent and not oppose the DIP financing offered here.

32.     As further discussed herein, the DIP Facility will be secured by substantially all of those assets of the Debtors' estates constituting collateral securing the Debtors' obligations under the Pre-Petition First Lien Credit Agreement.  Such security includes super-priority claims, security interests, and secured liens pursuant to section 364.  The circumstances of the Chapter 11 Cases necessitate postpetition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

**I.     The Debtors Should Be Authorized to Obtain Post-Petition Financing Under Section 364(c) of the Bankruptcy Code**

33.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already

---

[8] See Interim Order ¶ 23.

encumbered assets.[9]  Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[10]

34.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    a.    The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

    b.    The credit transaction is necessary to preserve the assets of the estate; and

    c.    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[11]

35.     The Debtors propose to obtain the financing set forth in the DIP Loan Agreement by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)—(3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

**A.     The Debtors Could Not Obtain Unsecured Financing.**

36.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[12]  Thus, "[t]he statute imposes no duty to

---

[9]     11 U.S.C. § 364(c).

[10]    *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (a debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

[11]    *In re Ames Dep't Stores*, 115 B.R. at 37-39.

[12]    *Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 125 (Bankr. S.D.N.Y. 2009).

seek credit from every possible lender before concluding that such credit is unavailable."[13]

Moreover, in circumstances where only a few lenders likely can or will extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct

such an exhaustive search for financing."[14]

37.    As set forth in the Goulding Declaration, unsecured post-petition financing was

simply not available to the Debtors under the circumstances of their pre-petition capital structure,

existing indebtedness, and the state of their industry.  This is unsurprising given, among other

things, the substantial level of secured debt the Debtors have incurred and the others factors

leading to the commencement of these cases.   Accordingly, the Debtors have satisfied the

requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable

terms was unavailable to the Debtors.

### B.    Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.

38.    A debtor's decision to enter into a post-petition lending facility under section 364

of the Bankruptcy Code is governed by the business judgment standard.[15]  Courts grant a debtor

---

[13]   *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

[14]   *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

[15]   *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *In re Monitor Dynamics, Inc.*, Case No. 10–51821, 2010 WL 4780375, (Bankr. W.D. Tex. June 30, 2010) (applying business judgment standard for post-petition financing); *In re Broadstar Wind Systems Group LLC*, No. 10–33373–BJH, 2010 WL 5208222 (Bankr. N.D. Tex. July 1, 2010) (same).

considerable deference in acting in accordance with its sound business judgment.[16]   To determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."[17]

39.     The Debtors' decision to enter into the proposed DIP Facility is an exercise of sound judgment that warrants approval by the Court.   Without the DIP financing, the Debtors will not have the liquidity necessary to execute on their wind-down plan.   The Debtors' management, board, and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing as part of this process.   None of those alternatives yielded a result that would allow the Debtors to continue to operate outside of chapter 11 and achieve a result other than a foreclosure by the First Lien Lenders.   As a result, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.   The DIP Facility will provide immediate access to capital to pay the Debtors' remaining operating and restructuring related expenses while preserving value and allowing the Debtors the flexibility needed to effectuate the Prepackaged Plan on terms that, collectively, are the best and most favorable terms available.

40.     Without the DIP Facility, the Debtors' restructuring cannot be consummated on the terms and timeline contemplated by the Prepackaged Plan.   Otherwise, the Debtors are likely to become administratively insolvent, with the result of the First Lien Lenders receiving all remaining value.

---

[16]   *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

[17]   *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

### C.  The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.

41.  In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.[18]  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

42.  First, the DIP Facility, coupled with the consent to use cash collateral, will provide the Debtors with sufficient liquidity through the effective date of the Prepackaged Plan. The DIP Facility is entirely new money.  Second, the financial terms of the DIP Facility are consistent with market terms for such financing in this economic environment and the Debtors' industry.  There is, in fact, no other proposal available to the Debtors, much less one with materially superior economic terms.  Finally, the non-economic terms of the DIP Facility— notably the budget, covenants, consensual priming, and the ability for the DIP obligations to  roll over to NewCo at emergence—make the DIP Facility superior to any other facility with other comparable economic terms.

43.  Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve Out for certain administrative and professional fees.  Carve Outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate is adequately assisted by counsel and other professionals.[19]  For these reasons, in the Debtors' business judgment, the

---

[18]  *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

[19]  *See In re Ames*, 115 B.R. at 38.

terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases, and the Debtors could not obtain post-petition financing from any other lending source.

### D.   The DIP Lenders are Extending Credit in Good Faith

44.     Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

45.     As set forth in the Goulding Declaration, the Debtors and the DIP Lenders negotiated the DIP Credit Agreement and Interim Order at arm's length and good faith. Accordingly, the DIP Orders should provide that the DIP Agent and DIP Lenders are entitled to all of the protections set forth in section 364(e) of the Bankruptcy Code.

## II.   The Consensual Priming Liens And Granting of Adequate Protection to the First Lien Lenders and Second Lien Lenders Should be Approved

46.     If a debtor is unable to obtain credit under the provisions of section 364(c) alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."[20]  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

    a.     The trustee is unable to obtain credit otherwise; and

---

[20]   11 U.S.C. § 364(d).

        b.      There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[21]

47.    To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.[22]  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.[23]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."[24]  However, consent by a secured creditor to priming obviates the need to show adequate protection.[25]

48.    Section 361 of the Bankruptcy Code states that adequate protection may be provided by:

> "(1) requiring the [debtor in possession] to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;
>
> (2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or
>
> (3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property."

---

[21]   *Id.*

[22]   *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

[23]   *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

[24]   *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

[25]   *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

49.     In accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the First Lien Agent and First Lien Lenders with adequate protection solely to the extent of any diminution in value of the Pre-Petition First Liens, and subject to the payment in full in cash of the amounts due under the Carve Out, as follows:

a.     (i) on the Closing Date, payment of all reasonable accrued and unpaid prepetition and postpetition fees and expenses of counsel for the First Lien Lenders (which shall be Willkie Farr & Gallagher LLP) and counsel to the First Lien Agent (which shall be Kelley Drye & Warren LLP) (the "First Lien Lenders' Counsel"); and (ii) thereafter, payment upon demand of all reasonable fees and expenses of the First Lien Lenders' Counsel;

b.     continuing valid, binding, enforceable, unavoidable and fully-perfected post-petition replacement liens (the "Pre-Petition First Lien Replacement Liens") on and security interests in the DIP Collateral, which Liens shall be (i) senior to the Pre-Petition First Liens, the Pre-Petition Second Lien Replacement Liens (as defined below) and the Pre-Petition Second Liens, (ii) junior to the DIP Liens and (iii) junior and subject to the Carve Out and those liens expressly permitted by the terms of the Pre-Petition First Lien Credit Agreement (the "Pre-Petition Permitted Liens"); and

c.     superpriority administrative expense claims (the "Pre-Petition First Lien Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which Pre-Petition First Lien Superpriority Claims shall be payable from and have recourse to all assets and property of the Debtors, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the Pre-Petition First Lien Superpriority Claims shall be subject to the DIP Obligations, DIP Superpriority Claims and the Carve Out.

50.     Although obviated by the Intercreditor Agreement and the fact that the First Lien Lenders are undersecured, the Debtors nevertheless also seek to provide adequate protection to the Pre-Petition Second Lien Lenders as follows:  (i) replacement liens, solely to the extent of any diminution in value in the Second Lien Lenders' respective interest in their collateral, on and

security interests in the DIP Collateral, which liens shall be (x) senior to the Pre-Petition Second Liens, (y) junior to the Pre-Petition First Lien Replacement Liens, Pre-Petition First Liens and the DIP Liens and (z) junior and subject to the Carve Out and Pre-Petition Permitted Liens.  The Debtors submit that such provisions constitute sufficient adequate protection under the facts of these cases and for purposes of section 361 of the Bankruptcy Code.

## III.   Authority for Use of Cash Collateral

51.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.[26]

52.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.   Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

a.     Each entity that has an interest in such collateral consents; or

b.     The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[27]

53.     During the ordinary course of operations, the Debtors generate cash from the use of the DIP Collateral.   The Debtors need the proposed DIP Facility and the use of Cash Collateral in order to fund their ordinary course of business operations and administer the

---

[26]     11 U.S.C. § 363(c)(1).

[27]     11 U.S.C. § 363(c)(2).

Chapter 11 Cases while they pursue prompt confirmation of the Prepackaged Plan.  As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion. Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

54.    The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The party with the senior interest in the prepetition Cash Collateral—namely the First Lien Lenders—consent to the use of Cash Collateral provided that the relief requested herein is granted.  Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to continue operations and could substantially impair the value of their assets as they attempt to execute on an orderly wind down. On the other hand, allowing the Debtors to use Cash Collateral and, by extension, sustain their remaining operations will permit the Debtors to preserve and maintain value and yield the highest recovery for their creditors.  Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

**IV.    Interim Approval Should Be Granted**

55.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

56.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein.  This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### FINAL HEARING

57.     The Debtors further respectfully request that this Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (a) the U.S. Trustee; (b)  the Internal Revenue Service; (c) the parties included on the Debtors' consolidated list of thirty largest unsecured creditors; (d)  all other known parties with liens of record on assets of the Debtors as of the Petition Date; (e) all financial institutions at which the Debtors maintain deposit accounts; and (f) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001.

### NOTICE

58.     The Debtors will provide notice of this Motion to the following parties or their respective counsel (if known): (a) the Debtors' thirty largest unsecured creditors on a consolidated basis; (b) the Office of the United States Trustee for the Southern District of Texas; (c)  the DIP Agent; (d) the First Lien Agent; (e) the DIP Lenders and First Lien Lenders; (f) the Second Lien Agent and the Second Lien Lenders; (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service (i) all known parties asserting a lien against the DIP Collateral or Prepetition Collateral; and (j) any other party that has filed a request

for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Complex Case Rules.

**WHEREFORE**, the Debtors respectfully request that the Court enter (i) the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

[*Signature Page Follows*]

Dated:   August 3, 2016                         BAKER BOTTS LLP
         Corpus Christi, Texas

                                                _/s/ Ian E. Roberts_____
                                                C. Luckey McDowell
                                                Ian E. Roberts
                                                Noah M. Schottenstein
                                                2001 Ross Avenue
                                                Dallas, Texas  75201
                                                Telephone:   214.953.6500
                                                Facsimile:   214.953.6503
                                                _luckey.mcdowell@bakerbotts.com_
                                                _ian.roberts@bakerbotts.com_
                                                _noah.schottenstein@bakerbotts.com_

                                                Proposed Counsel for Debtors
                                                and Debtors in Possession

27148153