

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION**

ENTERED
08/08/2016

| | | |
|---|---|---|
| **In re** | § | **Chapter 11** |
| | § | |
| **GLOBAL GEOPHYSICAL** | § | |
| **SERVICES, LLC,** *et al.*[1] | § | **Case No. 16-20306** |
| | § | |
| **Debtors.** | § | **Joint Administration Requested** |
| | § | |
| | § | |

**INTERIM ORDER: (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364,
AND 507, BANKRUPTCY RULES 2002, 4001 AND 9014 AND
BANKRUPTCY LOCAL RULES 2002-1, 4001-1(B) AND 9013-1 AUTHORIZING
THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING, (B) GRANT
SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,
(C) USE CASH COLLATERAL OF PREPETITION SECURED PARTIES, AND
(D) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF**
(Docket No. 11)

This matter is before the Bankruptcy Court on the motion, dated August 3, 2016

(the "Motion"),[2] as supplemented on the record before the Bankruptcy Court, of Global

Geophysical Services, LLC, and its affiliated debtors and debtors in possession (collectively, the

"Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for

entry of an interim order (this "Interim Order") and a final order (the "Final Order"), under

sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-

1532 (the "Bankruptcy Code"), and Rules 2002, 4001, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), Rules 2002-1, 4001-1(b) and 9013-1 of the

---

[1]   The Debtors in these chapter 11 cases are: Global Geophysical Services, Inc. (4281); GGS International
Holdings, Inc. (2420); Global Geophysical EAME, Inc. (2130); Autoseis, Inc. (5224); Accrete Monitoring, Inc.
(2256); Autoseis Development Company (9066); Global Geophysical (MCD), LLC (a disregarded entity for tax
purposes).

[2]   All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the
DIP Documents (as defined herein) as the context requires.

Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), and the Procedures for Complex Chapter 11 Bankruptcy Cases (the "Complex Case Rules") promulgated by the United States Bankruptcy Court for Southern District of Texas, seeking, among other things:

(1)     authorization for the Debtors to (A) obtain postpetition secured debtor-in-possession financing (the "DIP Facility") in an aggregate principal amount of up to $2,000,000.00 pursuant to the terms and conditions of this Interim Order and that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (substantially in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), dated as of the Closing Date, by and among Global Geophysical Services, LLC as Holdings, Global Geophysical Services, Inc., as Borrower, and the domestic subsidiaries of Global Geophysical Services, Inc. as guarantors, Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (the "DIP Agent"), and the lenders from time to time thereunder (the "DIP Lenders," and together with the DIP Agent and any other party to which the Obligations as defined in the DIP Credit Agreement (the "DIP Obligations") are owed, the "DIP Parties"), and (B) incur the DIP Obligations under the DIP Credit Agreement (the DIP Credit Agreement and the amendments thereto, together with this Interim Order, any Final Order and any related agreements, documents, certificates and instruments delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

(2)      authorization for the Debtors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses (including legal expenses) and other amounts payable under the DIP Documents as such amounts become due and payable;

(3)      authorization for the Debtors to grant security interests, liens and superpriority claims (including superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and priming liens pursuant to section 364(d)(1) of the Bankruptcy Code), to the DIP Agent for the benefit of the DIP Parties, in the DIP Collateral (as defined below), including, without limitation, all property constituting "Cash Collateral," as defined in section 363(a) of the Bankruptcy Code, to secure all DIP Obligations, as more fully set forth in this Interim Order;

(4)      authorization for the Debtors' use of Cash Collateral of the Prepetition Secured Parties (as defined below) as provided herein, and the provision of adequate protection to the Prepetition Secured Parties for any Diminution in Value (as defined below) of their interests in the Prepetition Collateral (as defined below), including Cash Collateral, as set forth in Paragraphs 11 and 12 below;

(5)      authorization for the Debtors to borrow under the DIP Facility up to an aggregate principal amount of $2,000,000, subject to the terms of the DIP Documents, the Interim Order and the Final Order (as applicable);

(6)     the scheduling of an interim hearing (the "Interim Hearing") on an emergency basis, and a final hearing (the "Final Hearing") to consider entry of an Interim Order and Final Order authorizing the borrowings under the DIP Facility and the use of Cash Collateral (as defined below); and

(7)     modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents, this Interim Order and the Final Order (as applicable).

This Court having found that notice of the Motion was provided by the Debtors as set forth in Paragraph J below, and having held the Interim Hearing on August [5], 2016, after considering the pleadings, motions and other papers filed with this Court and as further stated on the record at the Interim Hearing; and this Court having overruled all unresolved objections to the interim relief requested in the Motion; and upon the record made by the Debtors at the Interim Hearing, and upon (i) the *Declaration of Sean M. Gore in Support of First Day Motions*, and (ii) the *Declaration of Jonathan Goulding In Support of the Debtors' Motion to Approve DIP Financing*, and after due deliberation and consideration and good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.     *Petition Date*.  On August 3, 2016 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     *Jurisdiction and Venue*.  Consideration of the Motion constitutes a "core-proceeding" as defined in 28 U.S.C. § 157(b)(2).  This Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Venue for

the Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, Bankruptcy Local Rules 2002-1, 4001-1(b) and 9013-1 and the Complex Case Rules.

C.   _Debtors' Stipulations_.  Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in Paragraph 16 below), the Debtors hereby admit, acknowledge, agree and stipulate that:

(i)   Pursuant to that certain First Lien Credit Agreement, dated as of February 9, 2015 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "First Lien Credit Agreement," and together with all loan and security documents related thereto, the "First Lien Credit Documents"), among Global Geophysical Services, Inc., as borrower, Global Geophysical Services, LLC, certain subsidiary guarantors, the lenders from time to time thereunder (the "First Lien Lenders"), and Wilmington Savings Fund Society, FSB, as administrative agent and collateral agent (the "First Lien Agent," and together with the First Lien Lenders, the "First Lien Secured Parties"), the First Lien Lenders provided a revolving credit facility and a term loan facility to or for the benefit of the borrowers thereunder (the "Prepetition First Lien Facility").  As of the Petition Date, the Debtors were truly and justifiably indebted to the First Lien Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made and in the aggregate outstanding amount of $85,104,644 (inclusive of principal and accrued and unpaid interest), plus fees, expenses and any other amounts due under the terms of the First Lien Credit Documents (the "Prepetition First Lien Obligations");

(ii)   To secure the Prepetition First Lien Obligations, the borrowers thereunder granted to the First Lien Secured Parties a first priority security interest in and liens (the "Prepetition First Liens") upon all "Collateral" (the "Prepetition Collateral") under and as defined in the First Lien Credit Documents and that certain Second Lien Credit Agreement, dated as of February 9, 2015 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Second Lien Credit Agreement," and together with all loan and security documents related thereto, the "Second Lien Credit Documents," and the obligations thereunder, together with the Prepetition First Lien Obligations, the "Prepetition Secured Obligations"), among Global Geophysical Services, Inc., as borrower, Global Geophysical Services, LLC, certain subsidiary guarantors, the lenders from time to time thereunder (the "Second Lien Lenders"), and Wilmington Trust, National Association, as agent (the "Second Lien Agent," and together with the Second Lien Lenders, the "Second Lien Secured Parties," and collectively with the First Lien Secured Parties, the "Prepetition Secured Parties"), (the Second Lien Credit Documents, together with the First Lien Credit Documents, the "Prepetition Credit Documents"), subject to the terms of that

certain Intercreditor Agreement, dated as of February 9, 2015, by and between the First Lien Agent and the Second Lien Agent (the "Intercreditor Agreement") which provides that the second priority security interest in and liens upon all "Collateral" securing the obligations arising under the Second Lien Credit Documents (the "Prepetition Second Liens," and together with the Prepetition First Liens, the "Prepetition Liens") are junior in priority to the Prepetition First Liens;

(iii)     (a) the Prepetition First Lien Obligations constitute legal, valid, enforceable and binding obligations of each of the Debtors; (b) no offsets, defenses or counterclaims to the Prepetition First Lien Obligations exist; (c) no portion of the Prepetition First Lien Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (d) the First Lien Credit Documents are valid and enforceable by the First Lien Secured Parties against each of the Debtors; (e) the Prepetition First Liens were perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected liens in and to the Prepetition Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and such liens had priority over any and all other liens on the Prepetition Collateral, subject only to those certain liens expressly permitted by the First Lien Credit Documents (to the extent any such permitted liens were legal, valid, properly perfected, non-avoidable and senior in priority to the Prepetition First Liens as of the Petition Date or thereafter pursuant to section 546(b) of the Bankruptcy Code, the "Prepetition Permitted Liens"); (f) the Prepetition First Lien Obligations constitute allowed secured claims against the Debtors' estates; and (g) the Debtors and their estates have no claim, objection, challenge or cause of action against the First Lien Secured Parties or any of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), in connection with any of the First Lien Credit Documents (or the transactions contemplated thereunder), the Prepetition First Lien Obligations or the Prepetition First Liens, including without limitation, any right to assert any disgorgement or recovery;

(iv)     All of the Debtors' cash, including any cash of the Debtors in deposit accounts of the Debtors, wherever located, constitutes Cash Collateral of the First Lien Secured Parties; and

(v)     As a result of the commencement of the Chapter 11 Cases, the Debtors are in default under the First Lien Credit Agreement.

D.     _Need for Post-Petition Financing_.     Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the

DIP Facility and the use of Cash Collateral. The Debtors' ability to make payroll and to satisfy other working capital and operational needs and otherwise finance these cases is essential to the Debtors' ability to maximize the value of the Debtors' assets for the benefit of their stakeholders. In addition, based on the record presented at the Interim Hearing: (i) the Debtors' critical need for financing is immediate and the entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates; and (ii) in the absence of the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

E. _No Credit Available on More Favorable Terms_. Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. New credit is unavailable to the Debtors without providing the DIP Agent for the benefit of the DIP Parties (i) the DIP Superpriority Claims (as defined below) and (ii) the DIP Liens (as defined below) in the DIP Collateral, as provided herein and in the DIP Documents.

F. _Findings Regarding the DIP Facility_. Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtors and the DIP Parties and (iii) any credit extended, loans made and other financial accommodations

7

extended to the Debtors by the DIP Parties has been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Facility, the DIP Liens (as defined below) and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

G.      *Need for Use of Cash Collateral*.  An immediate and critical need exists for the Debtors to use the Cash Collateral (in addition to the DIP Facility) to fund the Chapter 11 Cases, including for the payment of wages, in order to maintain business relationships with vendors and suppliers, make adequate protection payments, and generally conduct their business affairs so as to avoid immediate and irreparable harm to their estates and the value of their assets.

H.      *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of Prepetition Secured Parties*.  The First Lien Secured Parties, and, pursuant to the terms of the Intercreditor Agreement, the Second Lien Secured Parties (together with the First Lien Secured Parties, the "Prepetition Secured Parties") have consented to the (i) financing arrangements contemplated by this Interim Order and the DIP Documents and (ii) Debtors' proposed use of Cash Collateral, on the terms and conditions set forth in this Interim Order.  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Parties and the First Lien Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and in accordance with the Approved Budget (as defined below), subject to the Maximum Permitted Variance (as

8

defined in the DIP Credit Agreement and further described below), solely for the purposes set forth in the DIP Credit Agreement. The consent of the First Lien Secured Parties is expressly limited to the postpetition financing being provided by the DIP Lenders under the terms of the DIP Documents, the use of Cash Collateral as contemplated by this Interim Order and the DIP Documents and the provision of adequate protection herein, and shall not extend to any other postpetition financing or to any modified version of the DIP Facility or to any modified version of the use of Cash Collateral.

I.     *Adequate Protection*. The Prepetition Secured Parties are each entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, as set forth in Paragraphs 11 and 12 below, for any diminution in the value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from (i) the Debtors' use, sale or lease of the Prepetition Collateral, (ii) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, and (iii) the subordination to the Carve-Out and the DIP Liens (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

J.     *Notice*. Electronic (to the extent possible), telephonic, facsimile notice or overnight mail notice of the Interim Hearing and the proposed entry of this Interim Order has been provided to: (i) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (ii) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"); (iii) counsel to the DIP Agent; (iv) counsel to the First Lien Agent; (v) counsel to the DIP Lenders and First Lien Lenders; (vi) the Second Lien Agent and the Second Lien Lenders; (vii) the United States Attorney's Office for the Southern District of Texas; (viii) the Internal Revenue Service (ix) all known parties asserting a lien against the DIP Collateral or Prepetition

Collateral; and (x) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or are required to receive notice under the Bankruptcy Rules and the Complex Case Rules.

K.      *Immediate Entry*.  The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be immediately and irreparably harmed.  This Court concludes that entry of this Interim Order is in the best interests of the Debtors' respective estates and creditors as its implementation will, among other things, allow for the continued operation of the Debtors' existing businesses and enhance the Debtors' ability to maximize the value of their assets for the benefit of their stakeholders.

Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      Approval of Interim Order.  The Motion is approved on the terms and conditions set forth in this Interim Order.  Any objections to the interim relief requested in the Motion that have not previously been withdrawn, waived, settled or resolved pursuant to the terms of this Interim Order are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.      Approval of DIP Documents; Authority Thereunder.  Pursuant to this Interim Order, the Debtors are hereby authorized to enter into, and execute and deliver the DIP Documents, including the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be required or requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.

3.     <u>Validity of DIP Documents</u>.   Upon execution and delivery of the DIP Documents, each of the DIP Documents shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of each Debtor party thereto, enforceable against each such Debtor in accordance with its terms.   Loans advanced under the DIP Credit Agreement (the "<u>DIP Loans</u>") will be made to fund the Debtors' working capital and general corporate needs, in each case, in the ordinary course of business to the extent permitted under the DIP Credit Agreement and the Approved Budget (subject to the Maximum Permitted Variance), and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court.   No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.     <u>Authorization to Borrow; Use of Cash Collateral</u>.   Upon entry of this Interim Order and execution of the DIP Documents, the Debtors are immediately authorized to borrow from the DIP Lenders under the DIP Facility, subject to the terms and conditions set forth in the DIP Documents and this Interim Order.   Subject to the terms and conditions of this Interim Order, the DIP Documents and in accordance with the Approved Budget (subject to the Maximum Permitted Variance), the Debtors are authorized to use Cash Collateral until the earlier of (a) the Maturity Date (as defined in the DIP Credit Agreement) and (b) the date upon which the Debtors' rights to use Cash Collateral is terminated hereunder.

5.     <u>Use of Proceeds</u>.   From and after the entry of this Interim Order, the Debtors shall use advances of credit under the DIP Facility only for the express purposes

specifically set forth in this Interim Order, the DIP Documents and in compliance with the Approved Budget, subject to the variances set forth in Section 6.09 of the DIP Credit Agreement and Paragraph 6 hereof.

6.     Approved Budget.

(a)     General.   Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required Lenders as defined in the DIP Credit Agreement (the "Required DIP Lenders")), the proceeds of the DIP Facility shall be used only in compliance with the Approved Budget (subject to the Maximum Permitted Variance).   Attached as Exhibit B hereto and incorporated by reference herein is a cash flow forecast setting forth on a line item basis, the projected cash receipts and expenditures for the Debtors on a weekly basis for the period beginning as of the week of the Petition Date through the 13-week period following the Petition Date (the "Initial Approved Budget").   Upon entry of this Interim Order, the Initial Approved Budget shall be deemed an Approved Budget.

(b)     Budget Covenants.   Pursuant to the terms set forth in Section 5.01(c) of the DIP Credit Agreement, and as further set forth therein, commencing with the fourth calendar week following the Petition Date and every fourth calendar week thereafter, not later than the second Business Day of such week, a proposed update to the then-applicable Approved Budget (each, an "Updated Budget") setting forth the projected cash receipts and expenditures of the Debtors during the period commencing at the start of such week through and including thirteen (13) weeks thereafter (such Updated Budget shall contain projections for thirteen (13) weeks, the first nine (9) of which shall be the same as those included in the then-applicable Approved Budget and four (4) of which shall be proposed).   If acceptable to the Required DIP Lenders in their sole discretion, such Updated Budget shall become the "Approved

Budget" and shall govern for the period set forth therein until such time as a new Updated Budget shall be approved by the Required DIP Lenders. Until replaced by an updated Approved Budget, the prior Approved Budget shall remain in effect for all purposes hereunder and the DIP Credit Agreement. The Debtors shall not make disbursements other than itemized amounts set forth in the Approved Budget (subject to the Maximum Permitted Variance permitted by Section 6.09 of the DIP Credit Agreement).[3]

(c)     Commencing with the first full one-week period following the Closing Date (as defined in the DIP Credit Agreement) and for every subsequent one-week period thereafter, not later than the second Business Day of each week, a report, in form and substance satisfactory to the Required DIP Lenders, for the immediately preceding one-week period, comparing on a line-by-line basis, the actual cash receipts and disbursements and borrowings of DIP Loans to the corresponding amounts projected in the Initial Approved Budget or Approved Budget, as applicable, shall be prepared by the Debtors and delivered to the DIP Agent, the DIP Lenders and the First Lien Lenders.

7.      <u>Payment of DIP Fees and Expenses</u>.  All fees and amounts as set forth in the DIP Documents are each hereby approved in their entirety and the Debtors are hereby authorized and directed to pay such fees and other amounts in accordance with, and on the terms set forth in, the DIP Documents. The Debtors are hereby authorized and directed to pay the fees and expenses of the DIP Agent and DIP Lenders incurred on or before the date of this Interim

---

[3]     Pursuant to the DIP Credit Agreement, "<u>Maximum Permitted Variance</u>" shall mean, with respect to any calculation set forth in the Approved Budget in effect at such time, an amount equal to (i) 10% of the amount set forth in such Approved Budget *plus* (ii) with respect to Section 6.09(b)(i) of the DIP Credit Agreement, the Rollover Disbursement Amount (as defined in the DIP Credit Agreement), if any, and (B) with respect to Section 6.09(b)(ii) of the DIP Credit Agreement, the Rollover Receipts Amount (as defined in the DIP Credit Agreement), if any.

Order, and thereafter, upon demand, all other fees, costs, expenses and other amounts payable under the terms of the DIP Documents and all other fees and reasonable out-of-pocket costs and expenses of the DIP Parties in accordance with the terms of the DIP Documents, including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of counsel to the DIP Lenders (which shall be Willkie Farr & Gallagher LLP) and counsel to the DIP Agent (which shall be Kelley Drye & Warren LLP), subject to the receipt of a written invoice.  None of such fees, costs, expenses or other amounts shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that the following procedures shall apply to the payment of fees and expenses of counsel to the DIP Lenders and counsel to the DIP Agent incurred following the Closing Date (the "Lender Reimbursement Procedures"):

(a)     copies of written invoices shall be provided to the Debtors, the Committee (if any) and to the U.S. Trustee;

(b)     such invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine;

(c)     if the Debtors, Committee (if any) or U.S. Trustee object to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved within ten (10) days of receipt of such invoices, the Debtors, the Committee (if any) or the U.S. Trustee, as the case may be, shall file with the Court and serve on the DIP Parties an objection limited to the reasonableness of such fees and expenses (each, a "Fee Objection"); and

(d)     the Debtors shall pay in accordance with the terms and conditions of this Interim Order within ten (10) days after receipt of the applicable invoice (i) the full amount invoiced if no objection has been timely filed, and (ii) the undisputed fees, costs, and expenses reflected on any invoice to which an objection has been timely filed.  All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

8.     <u>Indemnification</u>.   The Debtors are hereby authorized to indemnify and hold harmless the Indemnitees (as such term is defined in the DIP Credit Agreement) to the extent set forth in the DIP Documents.

9.     <u>DIP Superpriority Claims</u>.   In accordance with section 364(c)(1) of the Bankruptcy Code the DIP Obligations shall constitute senior administrative expense claims against each Debtor (the "<u>DIP Superpriority Claims</u>") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due under the Carve-Out; <u>provided</u>, <u>further</u> that the DIP Superpriority Claims shall have recourse to and be payable from all pre-petition and post-petition property of the Debtors and their estates

15

and all proceeds thereof, including, subject to the entry of the Final Order, the proceeds of all claims or causes of actions of the Debtors or their estates, including, upon entry of the Final Order, avoidance actions under chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), whether pursuant to federal law or applicable state law.

10.    DIP Liens.  As security for the DIP Obligations, the DIP Agent, for the benefit of the DIP Parties, is hereby granted (effective upon the date of this Interim Order, without the necessity of the execution by the Debtors or the filing or recordation of mortgages, security agreements, lockbox or control agreements, financing statements, or any other instrument or the possession or control by the DIP Parties) valid, perfected, and unavoidable security interests in and liens upon (such security interests and liens, collectively, the "DIP Liens"), subject to the terms of the DIP Documents, any and all present and after-acquired tangible and intangible property and assets of the Debtors and their estates, including, without limitation: (a) all Prepetition Collateral; (b) all accounts, chattel paper, commercial tort claims, deposit accounts, documents (including electronic documents), general intangibles (including payment intangibles), Copyright Collateral, Patent Collateral, Trademark Collateral and Programs (each as defined in the DIP Documents), goods (including inventory, equipment and any accessions thereto), instruments (including promissory notes), investment property, letter of credit rights (whether the letter or credit is evidenced by writing), money, oil and gas and other minerals before extraction, insurance and insurance claims, the proceeds of Avoidance Actions (subject to the entry of a Final Order), all other personal property, all fixture property, supporting obligations of the foregoing, and all proceeds and products of all of the foregoing assets, whether tangible or intangible, whether coming into existence prior to the Petition Date or after the Petition Date; and (c) to the extent not covered by the foregoing, all other assets or property of

16

the Debtors, whether tangible, intangible, real, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing, and in each case to the extent of any Debtor's respective interest therein; (all of which being hereinafter collectively referred to as the "DIP Collateral;" provided, however, that notwithstanding anything herein or in any subsequent order of the Court, the DIP Liens shall be junior and subject in all respects to the payment in full in cash of the amounts due under the Carve-Out.  The DIP Liens shall not be subject or subordinate to (w) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (x) except as expressly set forth herein or in the DIP Documents, any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases, (y) any intercompany or affiliate liens of the Debtor, or (z) the Prepetition First Liens, the Prepetition Second Liens or the Replacement Liens (as defined below).  Upon entry of the Final Order, the DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

11.     Prepetition First Lien Facility Adequate Protection.     As adequate protection against any Diminution in Value of the Prepetition First Liens, the First Lien Secured Parties are hereby granted, subject to the payment in full in cash of the amounts due under the Carve-Out, solely to the extent of such Diminution in Value of the Prepetition First Liens in the Prepetition Collateral from and after the Petition Date:

(a)     (i) on the Closing Date, payment of all reasonable accrued and unpaid prepetition and postpetition fees and expenses of the First Lien Agent, counsel for the First Lien Lenders (which shall be Willkie Farr & Gallagher LLP) and counsel to the First Lien

Agent (which shall be Kelley Drye & Warren LLP) (collectively, the "First Lien Fees"); and (ii) thereafter, payment upon demand of all reasonable First Lien Fees. None of such fees and expenses shall be subject to Court approval, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, such fees and expenses shall be subject to the Lender Reimbursement Procedures, and any accrued unpaid fees and expenses, regardless of any pending Fee Objection, shall be secured by the Prepetition Collateral and afforded all of the priorities and protections afforded to the Prepetition First Lien Obligations under this Interim Order and the Prepetition Credit Documents;

(b)      continuing valid, binding, enforceable, unavoidable and fully-perfected post-petition replacement liens (the "Prepetition First Lien Replacement Liens") on and security interests in the DIP Collateral, which Liens shall be (i) senior to the Prepetition First Liens, the Prepetition Second Lien Replacement Liens (as defined below) and the Prepetition Second Liens, (ii) junior to the DIP Liens and (iii) junior and subject to the Carve-Out and Prepetition Permitted Liens; and

(c)      superpriority administrative expense claims (the "Prepetition First Lien Superpriority Claims") under and to the extent set forth in sections 503 and 507(b) of the Bankruptcy Code against the Debtors' estates, which Prepetition First Lien Superpriority Claims shall be payable from and have recourse to all assets and property of the Debtors, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (upon entry of the Final Order), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code, or otherwise and including those resulting from the conversion of any of the

Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided that the Prepetition First Lien Superpriority Claims shall be subject to the DIP Obligations, DIP Superpriority Claims and the Carve-Out.

12.     Prepetition Second Lien Adequate Protection.   As adequate protection against Diminution in Value of the Prepetition Second Liens, the Second Lien Secured Parties are hereby granted, solely to the extent of such Diminution in Value of the Prepetition Second Liens in the Prepetition Collateral from and after the Petition Date, continuing valid, binding, enforceable, unavoidable and fully-perfected post-petition replacement liens (the "Prepetition Second Lien Replacement Liens," together with the Prepetition First Lien Replacement Liens, the "Replacement Liens") on and security interests in the DIP Collateral, which Liens shall be (x) senior to the Prepetition Second Liens, (y) junior to the Prepetition First Lien Replacement Liens, Prepetition First Liens and DIP Liens and (z) junior and subject to the Carve-Out and Prepetition Permitted Liens.

13.     The receipt by the Prepetition Secured Parties of adequate protection provided pursuant to this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Lenders to seek additional forms of adequate protection at any time in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution in Value of their respective Prepetition Liens in the Prepetition Collateral during the Chapter 11 Cases.

14.     Carve-Out.

(a)     As used in this Interim Order, the term "Carve-Out" shall mean the following expenses:

19

(i)     all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest pursuant to 31 U.S.C. § 3717;

(ii)    to the extent allowed by the Bankruptcy Court at any time, the accrued and unpaid fees, disbursements, costs and expenses incurred by professionals or professional firms retained by the Debtors or the Committee (if any) pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code (other than ordinary course professionals) (collectively, the "Professionals") at any time before or on the date of the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice (as defined herein), whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice) in an amount not to exceed the amounts set forth for such Professionals in the Approved Budget in effect on the date of the delivery of a Carve-Out Trigger Notice; and

(iii)   all unpaid fees, disbursements, costs and expenses incurred by the Professionals after the date of the delivery by the DIP Agent (at the direction of the Required DIP Lenders) of a Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, in an aggregate amount not to exceed $100,000.00 (such amount set forth in this clause (iii), the "Post-Carve-Out Trigger Notice Cap," and, together with such amounts set forth in clauses (i) and (ii) above, the "Carve-Out").

(b)     As used herein, the term "Carve-Out Trigger Notice" means a written notice provided by the DIP Agent (at the direction of the Required DIP Lenders) to the Debtors, the U.S. Trustee, the Committee (if any) and the Professionals (by email to the following email addresses: luckey.mcdowell@bakerbotts.com and jgoulding@alvarezandmarsal.com) that the Post-Carve-Out Trigger Notice Cap is invoked, which notice can be delivered only when the DIP Agent is entitled to exercise remedies under the DIP Facility due to the occurrence of an Event of Default (as defined in the DIP Credit Agreement). Notwithstanding anything to the contrary contained in this Interim Order or in any

20

DIP Documents, the liens and claims granted to any of the DIP Parties or Prepetition Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Prepetition First Lien Superpriority Claims, Replacement Liens, Prepetition Secured Obligations, and Prepetition Liens) under, pursuant to or in connection with the DIP Facility, any of the DIP Documents, this Interim Order, or any of the Prepetition Credit Documents shall be subject to the payment in full in cash of the amounts due under the Carve-Out.

(c)      After receipt of the Carve-Out Trigger Notice, the Debtors shall file a notice thereof on the docket of the Bankruptcy Court within two (2) Business Days after the Debtors' receipt of a Carve-Out Trigger Notice informing all parties in interest that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay Professionals is subject to and limited by the Carve-Out.

(d)      Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Interim Order: (i) the Debtors shall be permitted to pay administrative expenses of Professionals allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable, including on an interim basis, subject to the Approved Budget (subject to the Maximum Permitted Variance); and (ii) such payments shall not reduce, or be deemed to reduce, the Post-Carve-Out Trigger Notice Cap.

(e)      Any payment or reimbursement made on or after the delivery of the Carve-Out Trigger Notice in respect of any Professional's fees incurred on or after the delivery by the DIP Agent of a Carve-Out Trigger Notice, that are allowed by the Bankruptcy

Court shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis.

15.    <u>Limitation on Use of Cash Collateral and DIP Facility Proceeds</u>. Notwithstanding anything herein to the contrary, no portion of the Carve-Out, DIP Facility, DIP Collateral, Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or the Committee (if any), in connection with any of the following: (i) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, causes of action, adversary proceedings, or other litigation against any of the DIP Parties or Prepetition Secured Parties, and each of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof) (each, a "<u>Loan Party Claim</u>"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims, DIP Liens, Prepetition Secured Obligations or Prepetition Liens; (b) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties; (c) investigating or asserting any so-called "lender liability" claims and causes of action against the Prepetition Secured Parties or the DIP Parties; and (d) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Loans or the DIP Loans; (ii) asserting any claims or causes of action against the DIP Parties or the Prepetition Secured Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the Prepetition

22

Liens in accordance with this Interim Order, other than in seeking a determination by the Court during the Remedies Notice Period of whether the DIP Agent and DIP Lenders may exercise any right or remedy described in clauses (e), (f) or (g) of Paragraph 26 of this Interim Order; (iii) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the DIP Agent, DIP Lenders or the Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Credit Documents, in each of the foregoing cases without such applicable parties' prior written consent; (iv) to pay any amount on account of any claims arising prior to the Petition Date unless such payments are (x) approved by an order of the Bankruptcy Court and (y) in accordance with the DIP Credit Agreement; provided, however, that, notwithstanding any of the foregoing, no more than $10,000.00 in the aggregate of the DIP Facility, DIP Collateral, Cash Collateral, Carve-Out or any other amounts may be used by the Committee (if any) solely to investigate any Loan Party Claim.

16.    Reservation of Certain Third Party Rights.  Any party-in-interest (other than the Debtors), including the Committee (if any), with standing, shall have until the earlier of (a) ninety (90) calendar days from the Petition Date, and (b) the date a chapter 11 plan is confirmed by the Bankruptcy Court (in each case, the "Investigation Termination Date") to commence an appropriate contested matter or adversary proceeding (a "Challenge") asserting any Loan Party Claim.  If a Challenge is not filed on or before the Investigation Termination Date (or such other later date as extended by the written consent of the First Lien Agent, at the direction of the Required Lenders (as defined in the First Lien Credit Agreement) and the DIP Agent, at the direction of the Required DIP Lenders), then: (a) the agreements, acknowledgements and stipulations contained in Paragraph C of this Interim Order shall be irrevocably binding on the Debtors, the Committee (if any) and all parties-in-interest and any and

all successors-in-interest as to any of the foregoing, without further action by any party or this Court, and the Committee (if any) and any other party-in-interest and any and all successors-in-interest as to any of the foregoing, shall thereafter be forever barred from bringing any Challenge with respect thereto; (b) the Prepetition First Liens shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition First Lien Obligations shall be deemed to be finally allowed claims for all purposes against each of the Debtors, including in any subsequent chapter 7 cases, in the amounts set forth in Paragraph C, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the First Lien Secured Parties (in each case, whether in their prepetition or postpetition capacity), together with each of their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition First Lien Obligations.  Notwithstanding anything to the contrary herein, if any such Challenge is timely commenced, the stipulations contained in Paragraph C of this Interim Order shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith) except to the extent that such stipulations are successfully challenged in such Challenge.  For the avoidance of doubt, nothing in this Interim Order vests or confers on any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.

17. <u>Landlord Agreements</u>.   Any provision of any lease or other license, contract or other agreement that requires (a) the consent or approval of one or more landlords or

other parties or (b) the payment of any fees or obligations to any governmental entity, in order for any Debtors to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other post-petition collateral related thereto, is hereby deemed unenforceable and shall have no force and effect with respect to the transactions granting post-petition liens in such leasehold interest or the proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Parties or First Lien Secured Parties in accordance with the terms of the DIP Documents, this Interim Order or the Final Order.

18.   Section 506(c) Waiver.  Without limiting the Carve-Out, subject to the entry of the Final Order, the Debtors shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties or Prepetition Secured Parties upon the DIP Collateral or the Prepetition Collateral (as applicable) and no costs or expenses of administration that have been or may be incurred in any of the Chapter 11 Cases at any time shall be charged against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or any of their respective claims or liens (including any claims or liens granted pursuant to this Interim Order).

19.   No Marshaling/Application of Proceeds.  In no event shall the DIP Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable), and all proceeds thereof shall be received and used in accordance with this Interim Order.

20.   Section 552(b).  Upon entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code,

and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties with respect to proceeds, products, offspring, or profits of any of the Prepetition Collateral.

21.     Right to Credit Bid.  Subject to Section 363(k), each of (i) the DIP Agent (at the direction of the Required DIP Lenders), (ii) the First Lien Agent (at the direction of the Required Lenders (as defined in the First Lien Credit Agreement)), and (iii) the Second Lien Agent (subject to the Intercreditor Agreement, and to obtaining any required consent or direction of the Second Lien Lenders), shall have the right to "credit bid" up to the full allowed amount of their respective claims in connection with any sale of all or any portion of the DIP Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii) of the Bankruptcy Code or a sale or disposition by a chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

22.     Disposition of Collateral; Application of Proceeds.  Upon the sale of any, all or substantially all of the DIP Collateral or Prepetition Collateral, the proceeds of such sale shall be immediately used to repay the DIP Obligations and, subsequently, to the extent available, the Prepetition Secured Obligations, subject to the lien priorities set forth in the Intercreditor Agreement and the Prepetition Credit Documents.

23.     Discharge Waiver.  The DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such plan provides for either (x) the indefensible payment in full in cash of all DIP Obligations or (y) such other treatment of the DIP Obligations acceptable to the DIP Lenders in their sole discretion.  The chapter 11 plan of liquidation filed on

26

the Petition Date provides such other treatment of the DIP Obligations that is acceptable to the DIP Lenders for purposes of this paragraph 23.

24.     <u>Restrictions on Granting Postpetition Liens</u>.  Subject to further order of the Court, other than the Carve-Out or as otherwise provided in this Interim Order or the DIP Documents, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order or the DIP Documents to the DIP Parties and Prepetition Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Cases, and the Debtors agree they will not grant any such mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise, while (i) any portion of the DIP Facility, any DIP Loans or any other DIP Obligations are outstanding or (ii) the DIP Lenders have any Commitment under the DIP Credit Agreement.

25.     <u>Automatic Effectiveness of Liens</u>.  The DIP Liens and Replacement Liens shall not be subject to a Challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or the Prepetition Secured Parties, respectively, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions.  If the DIP Agent or First Lien Agent hereafter requests that the Debtors execute and deliver financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the Required DIP Lenders or the Required

Lenders (as defined in the First Lien Credit Agreement) to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Replacement Liens, as applicable, the Debtors are hereby authorized and directed to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents and to pay all fees, taxes, and other governmental charges required to be paid as a result of or as a condition to recording or filing any such agreements, financing statements, instruments and other documents, and the DIP Agent and the First Lien Agent are hereby authorized (but not obligated) to file or record such documents without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date.  The DIP Agent and/or the First Lien Agent may file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to, or in lieu of, such financing statements, notices of liens or similar statements.

26.   <u>Automatic Stay; Rights and Remedies Upon Event of Default</u>.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefit, privileges, remedies and provisions of this Interim Order and the DIP Documents without further notice, motion, application to, order of, or hearing before, this Court, to the extent necessary to permit the DIP Parties (or the First Lien Secured Parties to the extent that the DIP Obligations are paid in full), to exercise, solely upon the occurrence and during the continuance of any Event of Default under the DIP Credit Agreement, all rights and remedies provided for in the DIP Documents (or the First Lien Credit Documents, if applicable) and to take any or all of the following actions without further notice,

motion or application to, order of or hearing before, this Court: (a) immediately terminate the Debtors' rights, if any, under this Interim Order to use Cash Collateral, except to the extent such cash may be used for the Carve-Out; (b) cease making any DIP Loan to the Debtors; (c) terminate, reduce or restrict any commitment to extend credit to the Debtors under the DIP Facility; (d) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and unpaid thereon, and all other DIP Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Debtors; (e) freeze monies or balances in the Debtors' accounts except to the extent that such cash may be used for the Carve-Out; (f) immediately set off any and all amounts in accounts maintained by the Debtors with the DIP Agent or any of the DIP Lenders (or any of their respective agents) against the DIP Obligations except to the extent that such cash may be used for the Carve-Out, enforce all rights and remedies against the DIP Collateral in the possession of any of the DIP Lenders for application towards the DIP Obligations and otherwise proceed to protect, or enforce all rights and remedies of the DIP Parties under the DIP Credit Agreement, any of the other DIP Documents (or the First Lien Secured Parties under the First Lien Credit Documents, if applicable) or applicable law, including, but not limited to, by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in the DIP Credit Agreement and the other DIP Documents or any instrument pursuant to which the DIP Obligations are evidenced (or the First Lien Secured Parties under the First Lien Credit Documents, if applicable), and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the DIP Parties or First Lien Secured Parties, as applicable; and (g) take any other actions or exercise any other rights or remedies permitted under this Interim

Order or the Final Order, as applicable, the DIP Documents or applicable law to effectuate the repayment of the DIP Obligations (including the First Lien Secured Parties' ability to take any such actions under the First Lien Credit Documents to the extent the DIP Obligations have been paid in full); provided, however, that prior to the exercise of any right or remedy described in clauses (e), (f) or (g) of this Paragraph, the DIP Agent (or the First Lien Agent, if applicable) shall be required to provide five (5) Business Days (the "Remedies Notice Period") prior written notice to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee (if any), the other DIP Parties, the Prepetition Secured Parties and the U.S. Trustee.  During the Remedies Notice Period, the Debtors may not use the DIP Collateral and the Prepetition Collateral, including Cash Collateral, except to the extent such cash may be used for the Carve-Out.  Unless the Court determines during the Remedies Notice Period that such Event of Default has not occurred and/or is not continuing, the automatic stay, as to the DIP Parties (and the First Lien Secured Parties upon payment in full of the DIP Obligations), shall automatically be terminated at the end of such notice period, without further notice or order, and, upon expiration of such notice period, the DIP Agent (or First Lien Agent, if applicable) shall be permitted to exercise all rights and remedies set forth in this Interim Order, the DIP Credit Agreement, the DIP Documents, the First Lien Credit Documents and as otherwise available at law without further notice, motion or application to, order of or hearing before, this Court.  The rights and remedies of the DIP Parties and First Lien Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties and First Lien Secured Parties may have under the DIP Documents, First Lien Credit Documents or otherwise.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this Paragraph and relating to the application, re-imposition or continuance of the

automatic stay as provided hereunder.  The delay or failure to exercise rights and remedies under the DIP Documents, First Lien Credit Documents or this Interim Order by the DIP Agent, the DIP Lenders or the First Lien Secured Parties shall not constitute a waiver of any such party's rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Documents.

27.  <u>Binding Effect</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, the DIP Parties, the Prepetition Secured Parties and their respective successors and assigns.  To the extent permitted by applicable law, this Interim Order shall bind any successor to the Debtors, including, without limitation, any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

28.  <u>Survival and Effect of Dismissal or Conversion of Chapter 11 Cases</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive the entry of any order: (a) confirming any plan of reorganization in any of the Chapter 11 Cases (except as otherwise set forth in such order); (b) converting any of the Chapter 11 Cases to a chapter 7 case; or (c) dismissing any of the Chapter 11 Cases, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Documents (and with respect to the entry of any order as set forth in clause (b) or (c) of this Paragraph, the Replacement Liens and Prepetition First Lien Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order, and the rights of the DIP Parties and the Prepetition Secured Parties under their respective DIP Documents, Prepetition Credit Documents, or this Interim Order, shall be

unaffected and all of the respective rights and remedies thereunder of the DIP Parties and the Prepetition Secured Parties shall remain in full force and effect as if the entry of an order as set forth in clause (b) or (c) of this Paragraph had not occurred.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (x) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Interim Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (y) those Replacement Liens and Prepetition First Lien Superpriority Claims granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Secured Obligations shall have been paid and satisfied in full in cash; and (z) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Replacement Liens, DIP Superpriority Claims, and Prepetition First Lien Superpriority Claims referred to herein.

29.    <u>Modifications of DIP Documents</u>.  The Debtors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court, or any other modifications to the DIP Documents.  Any material modification or amendment to the DIP Documents shall only be

permitted pursuant to an order of this Court, after being submitted to this Court upon notice to counsel for the Committee (if any), the U.S. Trustee, the First Lien Agent and the Second Lien Agent.

30.    <u>Insurance Policies</u>.   Upon entry of this Interim Order, on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral: (a) the DIP Agent, on behalf of the DIP Parties, shall be, and shall be deemed to be, without any further action or notice, named as an additional insured; and (b) the DIP Agent, on behalf of the DIP Parties, shall be, and shall be deemed to be, without any further action or noticed, named as a loss payee.   The Debtors are authorized and directed to take any actions necessary to have each of the DIP Agent, on behalf of the DIP Parties, be added as an additional insured and loss payee on each insurance policy maintained by the Debtors which in any way relates to the DIP Collateral.

31.    <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.   The DIP Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.   Based on the record of these Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacatur or stay shall not affect the (a) validity of any DIP Obligations owing to the DIP Parties, or adequate protection obligations owing to the Prepetition Secured Parties incurred prior to the actual receipt by the DIP Agent or Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, or (b) validity or enforceability of any DIP Loans or other advances previously made or any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents

with respect to any DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties.  Notwithstanding any such reversal, modification, vacatur or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or adequate protection obligations owing to the Prepetition Secured Parties by the Debtors prior to the actual receipt by the DIP Agent or Prepetition Agents, as applicable, of written notice of the effective date of such reversal, modification, vacatur or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Parties and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations, and adequate protection obligations owing to the Prepetition Secured Parties.

32.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise,  the DIP Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein.

33.     <u>No Third Party Rights</u>.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the Prepetition Secured Parties.

34.     <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024, any other Bankruptcy Rule or

34

Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

35.     <u>Choice of Law; Jurisdiction</u>.  The DIP Facility and DIP Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code.  The Bankruptcy Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

36.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts with any provision of the Motion or any DIP Document, the provisions of this Interim Order shall control.  The terms of this Interim Order are without prejudice to the rights of any party in interest to object to such terms at the Final Hearing.

37.     <u>Objections</u>.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (Central Time) on August 24, 2016, with a copy served upon: (i) counsel to the Debtors, Baker Botts LLP, 2001 Ross Avenue, Dallas, Texas  75201-2980 (Attn: C. Luckey McDowell, Esq. and Ian E. Roberts, Esq.); (ii) counsel to the DIP Agent and the Prepetition First Lien Agent, Kelley Drye & Warren LLP, 101 Park Avenue, New York, NY 10178 (Attn: James S. Carr, Esq. and Pamela Bruzzese-Szczygiel, Esq.); (iii) counsel to the DIP Lenders and the First Lien Lenders, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Leonard Klingbaum, Esq. and John C. Longmire, Esq.) and 600 Travis Street, Suite 2310, Houston, Texas 77002 (Attn:

Jennifer J. Hardy, Esq.); (iv) counsel to the Prepetition Second Lien Agent, (v) counsel to be selected by the Committee (if any) upon its formation if selected by such date, and (vi) the Office of the United States Trustee (Attn: Nancy Holley.).

        38.   <u>Final Hearing</u>.  A Final Hearing on the Motion shall be heard before this Court on September 19, 2016 at 2:00 pm at the United States Bankruptcy Court, 555 Rusk Street, Houston, Texas, 77002.

**Signed:  August 08, 2016.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

# **EXHIBIT A**

DIP CREDIT AGREEMENT

**SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of August [\_\_], 2016,**

**among**

**GLOBAL GEOPHYSICAL SERVICES, LLC,**
**as Holdings,**

**GLOBAL GEOPHYSICAL SERVICES, INC.**
**as Borrower,**

**THE GUARANTORS PARTY HERETO,**
**as Guarantors,**

**THE LENDERS PARTY HERETO,**

**and**

**WILMINGTON SAVINGS FUND SOCIETY, FSB,**
**as Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

PAGE

ARTICLE I       DEFINITIONS..................................................................................................1
SECTION 1.01    Defined Terms ...............................................................................................1
SECTION 1.02    (Reserved). ...................................................................................................28
SECTION 1.03    Terms Generally............................................................................................28
SECTION 1.04    Accounting Terms; GAAP ............................................................................28
SECTION 1.05    Payments.......................................................................................................29
SECTION 1.06    Resolution of Drafting Ambiguities..............................................................29

ARTICLE II      THE CREDITS ...............................................................................................29
SECTION 2.01    Commitments.................................................................................................29
SECTION 2.02    Loans.............................................................................................................29
SECTION 2.03    Borrowing Procedure ....................................................................................30
SECTION 2.04    Evidence of Debt; Repayment of Loans. ......................................................30
SECTION 2.05    Fees...............................................................................................................31
SECTION 2.06    Interest on Loans...........................................................................................31
SECTION 2.07    Form of Payment...........................................................................................32
SECTION 2.08    (Reserved). ...................................................................................................32
SECTION 2.09    Repayment of Borrowings.............................................................................32
SECTION 2.10    Optional and Mandatory Prepayments of Loans; Reduction of
                Commitments.................................................................................................32
SECTION 2.11    Yield Protection. ...........................................................................................34
SECTION 2.12    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.....................35
SECTION 2.13    Taxes.............................................................................................................37
SECTION 2.14    Mitigation Obligations; Replacement of Lenders..........................................42

ARTICLE III     REPRESENTATIONS AND WARRANTIES...................................................43
SECTION 3.01    Organization; Powers.....................................................................................43
SECTION 3.02    Authorization; Enforceability ........................................................................43
SECTION 3.03    No Conflicts..................................................................................................43
SECTION 3.04    No Liabilities; Material Changes. ..................................................................44
SECTION 3.05    Properties.......................................................................................................44
SECTION 3.06    Intellectual Property.......................................................................................45
SECTION 3.07    Equity Interests and Subsidiaries. ..................................................................46
SECTION 3.08    Litigation; Compliance with Laws.................................................................47
SECTION 3.09    Agreements ...................................................................................................47
SECTION 3.10    Federal Reserve Regulations..........................................................................48
SECTION 3.11    Governmental Regulation ..............................................................................48
SECTION 3.12    Use of Proceeds.............................................................................................48
SECTION 3.13    Taxes.............................................................................................................48
SECTION 3.14    No Material Misstatements ............................................................................48
SECTION 3.15    Labor Matters................................................................................................49
SECTION 3.16    (Reserved). ...................................................................................................49
SECTION 3.17    Employee Benefit Plans.................................................................................49

SECTION 3.18   Environmental Matters...........................................................................50
SECTION 3.19   (Reserved)...........................................................................................51
SECTION 3.20   Sanctions.............................................................................................51
SECTION 3.21   Anti-Corruption Laws & Sanctions. .....................................................51
SECTION 3.22   Material Adverse Effect. Since the Petition Date, there has been no
               Material Adverse Effect. ......................................................................51
SECTION 3.23   (Reserved)...........................................................................................51
SECTION 3.24   Insurance .............................................................................................52
SECTION 3.25   Permits, Etc .........................................................................................52
SECTION 3.26   Canadian Insolvency Event..................................................................52

ARTICLE IV      CONDITIONS TO CREDIT EXTENSIONS....................................52
SECTION 4.01   Conditions to Effectiveness of this Agreement .....................................52
SECTION 4.02   All Credit Extensions ...........................................................................54

ARTICLE V       AFFIRMATIVE COVENANTS ......................................................55
SECTION 5.01   Financial Statements, Reports, etc ........................................................58
SECTION 5.03   Existence; Businesses and Properties; Compliance with Laws. ...................59
SECTION 5.04   Insurance. .............................................................................................60
SECTION 5.05   Taxes and Claims .................................................................................61
SECTION 5.06   Employee Benefits ................................................................................61
SECTION 5.07   Maintaining Records; Access to Properties and Inspections; Annual
               Meetings...............................................................................................62
SECTION 5.08   Use of Proceeds....................................................................................62
SECTION 5.09   Compliance with Environmental Laws; Environmental Reports. ...............63
SECTION 5.10   Additional Collateral; Additional Guarantors........................................63
SECTION 5.11   Security Interests; Further Assurances....................................................64
SECTION 5.12   Information Regarding Collateral. .........................................................65
SECTION 5.13   (Reserved). ...........................................................................................65
SECTION 5.14   MCD Subsidiary ..................................................................................65
SECTION 5.15   Miscellaneous Business Covenants .......................................................65
SECTION 5.16   Financial Advisor .................................................................................66
SECTION 5.17   Cash Management Order ......................................................................66
SECTION 5.18   Bankruptcy Matters..............................................................................66
SECTION 5.19   Security Documents ..............................................................................67
SECTION 5.20   Compliance with Approved Budget.......................................................67
SECTION 5.21   Compliance with Milestones.................................................................67

ARTICLE VI      NEGATIVE COVENANTS..............................................................67
SECTION 6.01   Indebtedness.........................................................................................67
SECTION 6.02   Liens.....................................................................................................69
SECTION 6.03   Sale and Leaseback Transactions...........................................................70
SECTION 6.04   Investment, Loan and Advances ............................................................70
SECTION 6.05   Mergers; Consolidations; Subsidiaries ..................................................71
SECTION 6.06   Asset Sales ...........................................................................................71
SECTION 6.07   Dividends .............................................................................................72
SECTION 6.08   Transactions with Affiliates ..................................................................72

SECTION 6.09     Budget Compliance..............................................................................72
SECTION 6.10     Prepayments of Other Indebtedness; Modifications of Organizational
                 Documents and Other Documents, etc...........................................73
SECTION 6.11     Limitation on Certain Restrictions on Subsidiaries ......................................73
SECTION 6.12     Business; Passive Holding Company; MCD Subsidiary. ..............................73
SECTION 6.13     Limitation on Accounting Changes ...........................................................74
SECTION 6.14     Fiscal Year .............................................................................................74
SECTION 6.15     No Further Negative Pledge.....................................................................74
SECTION 6.16     Sanctions. ...............................................................................................74
SECTION 6.17     Sanctioned Person ...................................................................................75
SECTION 6.18     Deposit Accounts and Securities Accounts ................................................75
SECTION 6.19     (Reserved). ..............................................................................................75
SECTION 6.20     Assets of Global Eurasia..........................................................................75
SECTION 6.21     Cash Payments .......................................................................................75
SECTION 6.22     Use of Proceeds.......................................................................................75
SECTION 6.23     Chapter 11 Cases.....................................................................................75
SECTION 6.24     Canadian Insolvency Event......................................................................76

ARTICLE VII    GUARANTEE ...............................................................................................76
SECTION 7.01     The Guarantee .........................................................................................76
SECTION 7.02     Obligations Unconditional .......................................................................77
SECTION 7.03     Reinstatement..........................................................................................78
SECTION 7.04     Subrogation; Subordination .....................................................................78
SECTION 7.05     Remedies.................................................................................................78
SECTION 7.06     Instrument for the Payment of Money ......................................................78
SECTION 7.07     Continuing Guarantee ..............................................................................78
SECTION 7.08     General Limitation on Guarantee Obligations............................................79
SECTION 7.09     Release of Guarantors ..............................................................................79
SECTION 7.10     Right of Contribution ..............................................................................79
SECTION 7.11     Keepwell .................................................................................................79

ARTICLE VIII  EVENTS OF DEFAULT .................................................................................80
SECTION 8.01     Events of Default .....................................................................................80
SECTION 8.02     Rescission ...............................................................................................86
SECTION 8.03     Application of Proceeds ...........................................................................86

ARTICLE IX     THE AGENTS ...............................................................................................87
SECTION 9.01     Appointment and Authority ......................................................................87
SECTION 9.02     Rights as a Lender ...................................................................................87
SECTION 9.03     Exculpatory Provisions ............................................................................87
SECTION 9.04     Reliance by Agent ...................................................................................89
SECTION 9.05     Delegation of Duties ................................................................................90
SECTION 9.06     Resignation of Agent ...............................................................................90
SECTION 9.07     Non-Reliance on Agent and Other Lenders................................................90
SECTION 9.08     Withholding Tax ......................................................................................90
SECTION 9.09     Collateral Matters....................................................................................91

ARTICLE X      MISCELLANEOUS ........................................................91
   SECTION 10.01  Notices. ..........................................................91
   SECTION 10.02  Waivers; Amendment. ...................................94
   SECTION 10.03  Expenses; Indemnity; Damage Waiver........................96
   SECTION 10.04  Successors and Assigns........................................98
   SECTION 10.05  Survival of Agreement ........................................102
   SECTION 10.06  Counterparts; Integration; Effectiveness....................102
   SECTION 10.07  Severability ......................................................102
   SECTION 10.08  Right of Setoff....................................................102
   SECTION 10.09  Governing Law; Jurisdiction; Consent to Service of Process...............103
   SECTION 10.10  Waiver of Jury Trial ............................................104
   SECTION 10.11  Headings ..........................................................104
   SECTION 10.12  Treatment of Certain Information; Confidentiality...............104
   SECTION 10.13  USA PATRIOT Act Notice ....................................105
   SECTION 10.14  Interest Rate Limitation ........................................105
   SECTION 10.15  Obligations Absolute ..........................................106
   SECTION 10.16  No Advisory or Fiduciary Responsibility...............106

SCHEDULES

Schedule 1.01(a)        Competitors
Schedule 1.01(b)        Guarantors
Schedule 2.01           Commitments
Schedule 3.06(a)        Ownership; No Claims
Schedule 3.06(b)        Seismic Data Library
Schedule 3.06(c)        Proprietary Software
Schedule 3.06(d)        Licensed Software
Schedule 3.07(a)        Equity Interests
Schedule 3.07(c)        Organizational Chart
Schedule 3.08           Litigation; Compliance with Laws
Schedule 3.09           Material Agreements
Schedule 3.18           Environmental Matters
Schedule 4.01(r)        Outstanding Post-Petition Date Indebtedness
Schedule 5.21           Milestones

EXHIBITS

Exhibit A               Form of Assignment and Assumption
Exhibit B               Form of Borrowing Request
Exhibit C               Form of Compliance Certificate
Exhibit D               Form of Approved Budget
Exhibit E               Form of Security Agreement
Exhibit F               Form of Interim DIP Order
Exhibit G               Forms of Non-Bank Tax Certificates

## SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT dated as of August [__], 2016, among GLOBAL GEOPHYSICAL SERVICES, LLC, a Delaware limited liability company ("**Holdings**"), GLOBAL GEOPHYSICAL SERVICES, INC., a Delaware corporation ("**Borrower**"), the GUARANTORS as defined herein, the LENDERS from time to time party hereto and WILMINGTON SAVINGS FUND SOCIETY, FSB, as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders and as collateral agent (in such capacity, "**Collateral Agent**") for the Secured Parties.

### WITNESSETH:

WHEREAS, on August [__], 2016 (the "**Petition Date**"), Holdings, Borrower and the Guarantors (collectively, the "**Debtors**" and each individually, a "**Debtor**") each commenced a case (collectively, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas – Corpus Christi Division (the "**Bankruptcy Court**");

WHEREAS, prior to the Petition Date, the Prepetition First Lien Lenders (as defined below) provided financing to Borrower and the other Loan Parties (as defined in the Prepetition First Lien Credit Agreement) pursuant to that certain First Lien Credit Agreement (as amended, modified or supplemented prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**"), dated as of February 9, 2015, among Holdings, Borrower, the Guarantors (as defined therein) party thereto, Wilmington Savings Fund Society, FSB, as administrative agent (in such capacity, the "**Prepetition First Lien Agent**") and as collateral agent (in such capacity, the "**Prepetition First Lien Collateral Agent**"), and the financial institutions or entities from time to time party thereto (collectively, the "**Prepetition First Lien Lenders**");

WHEREAS, each of the Guarantors (among others) guaranteed Borrower's obligations under the Prepetition First Lien Credit Agreement pursuant to the Guarantees (as defined in the Prepetition First Lien Credit Agreement); and

WHEREAS, the Debtors have requested the Lenders make post-petition loans and advances and provide other financial or credit accommodations to the Debtors, and the Lenders have agreed, subject to the conditions set forth herein, to extend a senior secured revolving loan facility to Borrower, comprised of an up to $2,000,000 revolving loan facility (the "**Facility**").

NOW, THEREFORE, in consideration of the mutual agreements, provisions and covenants contained herein, the parties hereto agree as follows:

### ARTICLE I

### DEFINITIONS

**SECTION 1.01   Defined Terms**.   As used in this Agreement, the following terms shall have the meanings specified below:

"**Adequate Protection Provisions**" shall mean the provisions in the Interim DIP Order or the Final DIP Order, as applicable, providing for adequate protection to the Prepetition First Lien Indebtedness.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as the successor pursuant to Article IX.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in Section 2.05(b).

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in form and substance acceptable to the Administrative Agent.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided, however*, that, for purposes of Section 6.08, the term "Affiliate" shall also include (a) any person that directly or indirectly owns more than 10% of any class of Equity Interests of the person specified or (b) any person that is an executive officer or director of the person specified.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "Agent" shall mean any of them.

"**Aggregate Commitment**" shall mean the aggregate of the Commitments of all of the Lenders, as reduced from time to time pursuant to the terms and conditions hereof. As of the Closing Date, the Aggregate Commitment is $2,000,000.

"**Agreement**" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement dated as of August [___], 2016.

"**Anti-Corruption Laws**" shall mean all laws, rules and regulations of any jurisdiction applicable to Holdings and its Subsidiaries from time to time concerning or relating to bribery or corruption.

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in Section 3.20.

"**Applicable Margin**" shall mean 15.0% per annum.

"**Approved Budget**" shall mean a cash flow forecast setting forth, on a line item basis, the projected cash receipts and expenditures for Holdings and its Subsidiaries on a weekly basis for the succeeding thirteen (13) week period, substantially in the form of the Initial Approved Budget, approved by the Required Lenders in their sole discretion, in accordance with Section 5.01(c). The Initial Approved Budget shall be deemed an Approved Budget.

"**Approved Fund**" shall mean any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender,

(b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition in one transaction or a series of transactions (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property (including Capital Stock), excluding (i) sales of inventory, (ii) non-exclusive licenses of Multi-Client Data, Brazilian Multi-Client Data and other Intellectual Property, (iii) assignments and dispositions of cash and Cash Equivalents and (iv) dispositions of accounts receivable in connection with the compromise, settlement or collection thereof (other than in the case of cash and Cash Equivalents and dispositions constituting Casualty Events), in each case in the ordinary course of business and consistent with past practice, by, or at the direction of, Holdings or any of its Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Holdings, in each case referred to in clauses (a) and (b), to any person other than (i) Borrower or (ii) any Guarantor. For purposes of clarification, "Asset Sale" shall include (a) the sale or other disposition for value of any contracts and (b) any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by Holdings or any of its Subsidiaries.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit A, or any other form approved by the Administrative Agent at the direction of the Required Lenders.

"**Availability Period**" shall mean the period from and including the Closing Date to but excluding the earlier of the Maturity Date and the date of termination of the Commitments.

"**Bankruptcy Code**" shall have the meaning assigned to such term in the recitals hereto.

"**Bankruptcy Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (a) in the case of any corporation, the board of directors of such person, (b) in the case of any limited liability company, the board of managers of such person, the requisite managers or members required under the Organizational Documents of such person or in the event of a sole member-managed limited liability company, the Board of Directors of such sole member, (c) in the case of any partnership, the Board of Directors of the general partner of such person and (d) in any other case, the functional equivalent of the foregoing.

"**Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrower Registered Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Borrowing**" shall mean Loans made on the same date.

"**Borrowing Request**" shall mean a request by Borrower in accordance with the terms of Section 2.03 and substantially in the form of Exhibit B, or such other form as shall be approved by the Administrative Agent and the Required Lenders.

"**Brazilian Multi-Client Data**" shall mean any rights (including ownership or licensing) to seismic data surveys in Brazil and related data collected, compiled, derived, analyzed or acquired by or on behalf of Borrower or any of its Subsidiaries for its multi-client seismic data library or otherwise incorporated or included in such data library whether now existing or hereafter acquired or created.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City, Houston, Texas or Wilmington, Delaware are authorized or required by law to close.

"**Canadian Insolvency Event**" shall have the meaning assigned to such term in the Consent Agreement.

"**Canadian Subsidiaries**" shall mean Global Geophysical Services Canada Inc. and Sensor Geophysical Ltd.

"**Capital Assets**" shall mean, with respect to any person, all equipment, fixed assets and Real Property or improvements of such assets by such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" shall have the meaning assigned to such term in the Orders, as applicable.

"**Cash Equivalents**" shall mean:

(a)     readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof in each case with maturities not more than one year from the date of acquisition thereof;

(b)     time deposits (including eurodollar time deposits) with, or certificates of deposit or bankers' acceptances of, any commercial bank that (i) is organized under the laws of the

United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper (including without limitation promissory notes or other borrowings) rated at least "Prime-l" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, as of the date of acquisition and (iii) has combined capital and surplus of at least $500,000,000, in each case with maturities of not more than one year from the date of acquisition thereof;

(c)     commercial paper issued by any person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P as of the date of acquisition, in each case with maturities of not more than one year from the date of acquisition thereof;

(d)     repurchase obligations of any commercial bank (or any Affiliate thereof) satisfying the requirements of clause (c) above, having a term of not more than 30 days;

(e)     securities issued or fully guaranteed by any state, commonwealth or territory of the United States or by any political subdivision (including any municipality) or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least "A" (or A-1, SP1 or other then equivalent grade) by S&P or at least "A1" (or "Prime-1" or MIG-1 or other then equivalent grade) by Moody's as of the date of acquisition and, in each case, with a maturity of not more than one year from the date of acquisition thereof;

(f)     securities and loans with maturities of one year or less from the date of acquisition issued by, or backed by a standby letter of credit issued by, any commercial bank satisfying the requirements of clause (c) above;

(g)     shares in money market investment programs registered under the Investment Company Act of 1940 substantially all of whose assets are comprised of securities of the types described in clauses (a) through (e) above and which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P; and

(h)     investments by a Foreign Subsidiary of comparable tenure and credit quality to those described in the foregoing clauses (a) through (g), customarily utilized by entities similarly situated and of similar size to such Foreign Subsidiary organized under the laws of the jurisdiction of such Foreign Subsidiary for short-term cash management purposes to the extent reasonably required in connection with any business conducted by such Foreign Subsidiary in such jurisdiction.

"**Cash Management Order**" shall mean, as applicable, that certain (i) Interim Order [_____] or (ii) Final Order [_____], in each case, entered by the Bankruptcy Court, which shall be in form and substance satisfactory to the Required Lenders.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of Holdings or any of its Subsidiaries.

-5-

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq*., and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)     at any time a "change of control" (or similar event) occurs under any Material Indebtedness; or

(b)     the Permitted Holders together directly or indirectly fail to own legally and/or beneficially or to have the power to vote or direct the voting of more than 35% of the issued and outstanding Equity Interests of Holdings, whether voting or non-voting; or

(c)     the Permitted Holders together directly or indirectly fail to possess the right to elect a majority of the Board of Directors of Holdings; or

(d)     Holdings fails to directly own 100% of the combined voting power of all Voting Stock and the economic interests of Borrower.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following: (a) the adoption or taking into effect of any law, treaty, or governmental order, policy, rule or regulation, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation or application thereof by any Governmental Authority, or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"**Charges**" shall have the meaning assigned to such term in <u>Section 10.14</u>.

"**Closing Date**" shall mean August [\_\_], 2016.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"**Collateral**" shall mean all pre-Petition Date and all post-Petition Date assets, rights, entitlements and any other interests of any kind and, in each case, all proceeds therefrom, whether now owned or hereafter acquired by Holdings or its Subsidiaries in or upon which a Lien is granted, or purported to have been granted, by such Person in favor of the Collateral Agent, for the benefit of the Secured Parties, pursuant to the terms hereof and as set forth in the Security Documents.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder, expressed as an amount representing the maximum aggregate amount of such Lender's Credit Exposure hereunder, as such commitment may be (a) reduced or terminated from time to time pursuant to Section 2.10 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.04. The initial amount of each Lender's Commitment is set forth on Schedule 2.01, or in the Assignment and Assumption or other documentation contemplated hereby pursuant to which such Lender shall have assumed its Commitment, as applicable.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Communications**" shall have the meaning assigned to such term in Section 10.01(d).

"**Commodity Exchange Act**" shall mean the Commodity Exchange Act (7 U.S.C. § 1 *et seq.*), as amended from time to time, and any successor statute.

"**Companies**" shall mean Holdings and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Competitor**" shall mean any Person designated by Borrower as a "Competitor" on Schedule 1.01(a).

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit C.

"**Consent Agreement**" shall mean the Consent Agreement to Forbearance Agreement, dated as of May 31, 2016, by and among Borrower, Holdings, the other parties party thereto, the Prepetition First Lien Agent and the Prepetition First Lien Collateral Agent.

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to bankers' acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided, however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business, typical contractual indemnities provided in the ordinary course of business or any product warranties.   The amount of any Contingent Obligation shall be deemed

-7-

to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Agreement**" shall mean a control agreement or other similar agreement with the Collateral Agent, a Loan Party and the depositary bank, securities intermediary or commodity intermediary, as applicable, in form and substance reasonably satisfactory to the Collateral Agent at the direction of the Required Lenders, in order to give the Collateral Agent "control" (within the meaning set forth in Section 9-104) of the UCC) of such account.

"**Credit Exposure**" shall mean, with respect to any Lender at any time, the sum of the outstanding principal amount of such Lender's Loans at such time.

"**Credit Extension**" shall mean the making of a Loan by a Lender.

"**Debt Issuance**" shall mean the incurrence by Holdings or any of its Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Debtors**" shall have the meaning assigned to such term in the preamble hereto.

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

"**Default Rate**" shall have the meaning assigned to such term in Section 2.06(b).

"**Defaulting Lender**" shall mean, subject to Section 2.15(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two (2) Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any Lender any other amount required to be paid by it hereunder within two (2) Business Days of the date when due, (b) has notified Borrower and the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after written request by the Administrative Agent or Borrower, to confirm in writing to the Administrative

Agent and Borrower that it will comply with its prospective funding obligations hereunder (*provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.   The Administrative Agent shall not be deemed to have knowledge of any event or circumstance that would make a Lender a Defaulting Lender, other than pursuant to clause (a)(i) above, unless and until the Administrative Agent has received written notice of such event or circumstance.   Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.15(b)) upon delivery of written notice of such determination to Borrower and each Lender.

"**DIP Liens**" shall mean the Liens and security interests granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the Orders and the other Security Documents, which such Liens and security interests shall have the priorities set forth in the Orders, as applicable.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to 181 days after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests which would otherwise constitute Disqualified Capital Stock pursuant to this definition, in each case at any time on or prior to 181 days after the Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided, however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the 181st day after the Maturity Date shall not constitute Disqualified Capital Stock if the payment upon such redemption is contractually subordinated in right of payment to the Obligations.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration (other than Qualified Capital Stock of such person) any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests).   Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, equity incentive or achievement plans or any similar plans.

"**dollars**" or "**$**" shall mean lawful money of the United States.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia.

"**Eligible Assignee**" shall mean (a) any Lender, (b) an Affiliate of any Lender, (c) an Approved Fund and (d) any other person approved by the Administrative Agent at the direction of the Required Lenders (such approval not to be unreasonably withheld or delayed); *provided* that "Eligible Assignee" shall not include (1) Holdings or any of its Affiliates (including, without limitation, any Permitted Holder) or Subsidiaries, (2) any natural person or (3) any Competitor or any of its Affiliates.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any written claim, notice, or demand, or any order, action, suit, proceeding or other written communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (a) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (b) any violation or alleged violation of any Environmental Law, and shall include any claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all present and future treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health, and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the Closing Date or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity. Without limiting the foregoing, for purposes of Section 6.07, Equity Interests shall include stock appreciation rights, or rights with respect to equity incentive or achievement plans or any similar plans.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) with respect to a Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (c) the failure to timely make a required contribution with respect to any Plan or Multiemployer Plan; (d) the filing pursuant to Section 412(c) of the Code and Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan or any Multiemployer Plan; (e) a determination that a Plan is, or is reasonably expected to be, in "at-risk status" (as defined in Section 303(i)(4) of ERISA); (f) a determination that a Multiemployer Plan is, or is reasonably expected to be, in "endangered status" or in "critical status" (each as defined in Section 305(b) of ERISA); (g) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (h) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (i) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (j) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (k) the "substantial cessation of operations" within the meaning of Section 4062(e) of ERISA with respect to a Plan; (l) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (m) the occurrence of a

nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8.01</u>.

"**Excluded Swap Obligation**" shall mean, with respect to any Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Guarantee of such Guarantor of, or the grant by such Guarantor of a security interest to secure, such Swap Obligation (or any Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Guarantee of such Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation.   If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Guarantee or security interest is or becomes illegal.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder (each a "recipient" for purposes of this definition), (a) Taxes imposed on or measured by its net income (however denominated), franchise Taxes and branch profits Taxes, in each case imposed on it, by a jurisdiction (or any political subdivision thereof) as a result of the recipient being organized or having its principal office or, in the case of any Lender, its applicable lending office in such jurisdiction, (b) Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transactions pursuant to or enforced any Loan Document or sold or assigned any interest in any Loan or any Loan Document), (c) in the case of a Lender (other than an assignee pursuant to a request by any Loan Party under <u>Section 2.14</u>), with respect to any payment made by or on account of any obligation of any Loan Party, any U.S. federal withholding Tax imposed pursuant to a law in effect at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts with respect to such withholding Tax pursuant to <u>Section 2.13(a)</u>, (d) Taxes resulting from a Lender's failure to comply with <u>Section 2.13(e)</u> and (e) any U.S. federal withholding Tax imposed under FATCA.

"**Extraordinary Receipts**" shall mean any cash received by Holdings or any of its Subsidiaries not in the ordinary course of business (and not consisting of Net Cash Proceeds described in clauses (a) through (c) of the definition thereof), including, without limitation, (a) foreign, United States, state or local tax refunds, (b) pension plan reversions, (c) judgments or proceeds of settlements in connection with any cause of action (including any settlement payments in connection with actual or threatened legal actions or assertions of breach of contract claims), excluding any such judgments or proceeds of settlements arising in connection with contracts providing for payments in the ordinary course of business, and (d) indemnity payments;

-12-

*provided*, that Extraordinary Receipts shall exclude cash receipts from proceeds of insurance or indemnity payments to the extent such proceeds, awards or payments are received by Holdings or any of its Subsidiaries in respect of any claim by a third party that is not an Affiliate against Holdings or any of its Subsidiaries and actually applied by Holdings or any of its Subsidiaries to pay (or reimburse such third party that is not an Affiliate for its prior payment of) such claim and the reasonable and documented out-of-pocket expenses of such third party that is not an Affiliate with respect thereto.

"**Facility**" shall have the meaning assigned to such term in the recitals hereto.

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the Closing Date, (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to such intergovernmental agreement.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Final DIP Order**" shall mean the order entered by the Bankruptcy Court approving this Facility (including the Liens and rights of the Lenders) on a final basis, which shall be substantially in the form of the Interim DIP Order and otherwise in form and substance acceptable to the Required Lenders in their sole discretion, which Final DIP Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Required Lenders.

"**Financial Advisor**" shall have the meaning assigned to such term in <u>Section 5.16</u>.

"**Financial Officer**" of any person shall mean the chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financial Plan**" shall have the meaning assigned to such term in the Prepetition First Lien Credit Agreement.

"**FIRREA**" shall mean the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**Foreign Lender**" shall mean any Lender that is not, for U.S. federal income tax purposes, (a) an individual who is a citizen or resident of the United States, (b) a corporation,

-13-

partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any state thereof or the District of Columbia, (c) an estate whose income is subject to U.S. federal income taxation regardless of its source or (d) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more U.S. Persons have the authority to control all substantial decisions of such trust; *provided* that for purposes of the definition of Excluded Taxes, with respect to any payment made by or on account of any obligation of any Loan Party, a Foreign Lender shall include a partnership, or other entity treated as a partnership for U.S. federal income tax purposes, that is created or organized in or under the laws of the United States, or any political subdivision thereof, but only to the extent the beneficial owners for U.S. federal income tax purposes of such entity (including indirect partners if the direct partners are partnerships or other entities treated as partnerships for U.S. federal income tax purposes created or organized in or under the laws of the United States, or any political subdivision thereof) are treated as Foreign Lenders under subclauses (a) through (d) of the preceding clause. For purposes of this definition, the United States, each state thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by any Company with respect to employees employed outside the United States.

"**Foreign Subsidiary**" shall mean any direct or indirect Subsidiary of Holdings which is not a Domestic Subsidiary.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis.

"**GGS Seismic Data Library**" shall have the meaning assigned to such term in the Prepetition First Lien Credit Agreement.

"**Global Eurasia**" shall mean Global Eurasia, LLC, a Delaware limited liability company.

"**Governmental Authority**" shall mean the government of the United States or any other nation, or of any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Authorization**" shall mean any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any

-14-

Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article VII by the Guarantors.

"**Guarantors**" shall mean Holdings and each other Company listed on Schedule 1.01(b).

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies; *provided* that the term "Hedging Agreement" shall not include any Excluded Swap Obligation.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Holdings**" shall have the meaning assigned to such term in the preamble hereto.

"**Implemented Compliance Enhancements**" shall mean the OFAC and related compliance policies and procedures set forth on Schedule 1.01(c) of the Prepetition First Lien Credit Agreement.

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money or advances; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (d) all obligations of such person issued or assumed as the deferred purchase price of property or services, including, without limitation, earn-outs (excluding trade accounts payable, accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 30 days (as determined by the date due upon issuance of the invoice or similar statement of amounts due)); (e) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property; (f) all Capital Lease Obligations and synthetic lease obligations of such person; (g) all Hedging Obligations to the extent required

to be reflected on a balance sheet of such person; (h) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions; (i) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above; and (j) Disqualified Capital Stock. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.   The amount of Indebtedness of any person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such person) be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the fair market value of the property encumbered thereby as determined by such person in good faith.

"**Indemnified Taxes**" shall mean all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Initial Approved Budget**" shall mean the Approved Budget attached hereto as Exhibit D. The Initial Approved Budget shall constitute the Approved Budget under this Agreement for the initial thirteen (13) week period commencing as of the Petition Date until a new Approved Budget becomes effective in accordance with Section 5.01(c).

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Real Property with respect to such Real Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Real Property and applicable to such Real Property or any use or condition thereof.

"**Intellectual Property Rights**" shall mean any and all worldwide (a) rights associated with all works of authorship, including exclusive exploitation rights, copyrights, mask work rights, and moral rights relating to writings, designs, database structure, software (including source code, object code, programming tools, specifications and data) ("**Copyrights**"); (b) trademark, service mark, trade name, trade dress, and product configuration  rights, and other rights relating to indications of origin ("**Trademarks**"); (c) rights associated with trade secrets, know how, databases, and other confidential information having commercial value ("**Trade Secrets**"); (d) patents and other rights associated with inventions, discoveries, ideas and industrial property ("**Patents**"); (e) rights associated with Internet web sites, domain names, and

-16-

associated content; and (f) registrations, applications, renewals, extensions, continuations, divisions, or reissues with respect to the foregoing.

"**Intercompany Note**" shall mean the intercompany promissory note, dated as of February 9, 2015, by and among the Company payors and the Company payees signatory thereto.

"**Intercreditor Agreement**" shall mean the intercreditor agreement, dated as of February 9, 2015, by and between the Prepetition First Lien Agent and the Prepetition Second Lien Agent.

"**Interest Payment Date**" shall have the meaning assigned to such term in Section 2.06(c).

"**Interim DIP Order**" shall mean the interim order entered by the Bankruptcy Court on August [__], 2016, in the form of Exhibit F and entered upon a motion filed by the Loan Parties that is in form and substance reasonably acceptable to the Required Lenders.

"**Interim Hearing**" shall have the meaning assigned to such term in the Interim DIP Order.

"**Investments**" shall have the meaning assigned to such term in Section 6.04.

"**Lenders**" shall mean (a) the financial institutions party hereto on the Closing Date and (b) any financial institution that has become a party hereto after the Closing Date pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**Licensed Software**" shall have the meaning assigned to such term in Section 3.06(d).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothecation, security interest or encumbrance of any kind or any option, trust or other arrangement to provide priority or preference, including any easement, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan**" shall mean the loans made by the Lenders to Borrower pursuant to Section 2.01.

"**Loan Documents**" shall mean this Agreement, the Notes (if any) and the other Security Documents and any other agreement, document or instrument relating to or accompanying the foregoing.

"**Loan Parties**" shall mean Borrower and the Guarantors.

-17-

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) or liabilities of Holdings and its Subsidiaries, taken as a whole; (b) the ability of the Loan Parties to perform any of their obligations under any Loan Document; (c) the remedies available to the Lenders or the Collateral Agent under any Loan Document or the Lenders' or Collateral Agent's rights to enforce any material provision of the Loan Documents; (d) the legality, validity, binding effect, or enforceability of any Loan Document on Borrower or the Loan Parties, taken as a whole; or (e) the Collateral or the validity, perfection or priority of the Collateral Agent's Liens on the Collateral, in each case, other than as a result of the commencement or continuation of the Chapter 11 Cases.

"**Material Agreement**" shall mean each of (a) any contract or other arrangement to which Holdings or any of its Subsidiaries is a party (other than the Loan Documents, the Prepetition First Lien Loan Documents and the Prepetition Second Lien Loan Documents) for which breach, non-performance, cancellation or failure to renew could reasonably be expected to have a Material Adverse Effect, (b) any contract or agreement governing Material Indebtedness, (c) any contract or agreement, to the extent enforcement actions may be commenced on or after the Petition Date, to which Holdings or any of its Subsidiaries is a party involving the aggregate consideration payable to or by Holdings or any of its Subsidiaries of $5,000,000 (or, in the case of customer contracts, $15,000,000) or more in any Fiscal Year (other than (i) purchase orders in the ordinary course of business of Holdings or any of its Subsidiaries and (ii) contracts that by their terms may be terminated by Holdings or any of its Subsidiaries in the ordinary course of business upon less than 60 days' notice without penalty or premium, (d) the SEI-GPI Agreement and (e) any licensing agreement with customers relating to Multi-Client Data or Brazilian Multi-Client Data pursuant to which Holdings or any Subsidiary have payment obligations to such customer.

"**Material Foreign Intellectual Property**" shall mean all Intellectual Property that is established or registered in any country other than the United States and is material to the business, results of operations, prospects or condition (financial or otherwise) of Holdings and its Subsidiaries, taken as a whole.

"**Material Indebtedness**" shall mean any one or more items of Indebtedness (other than the Loans, the Prepetition First Lien Indebtedness and the Prepetition Second Lien Indebtedness) of Holdings or any of its Subsidiaries in an individual principal amount of $500,000 or more or with an aggregate principal amount of $1,000,000 or more.

"**Maturity Date**" shall mean the earliest of (a) November [__], 2016[1], (b) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a plan of reorganization or liquidation filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court and (c) the acceleration of the Loans and termination of the Commitments in accordance with Article VIII.

---

[1] NTD: To be the date that is 90 days after the Petition Date.

"**Maximum Permitted Variance**" shall mean, with respect to any calculation set forth in the Approved Budget in effect at such time, an amount equal to (i) 10% of the amount set forth in such Approved Budget (for the avoidance of doubt, other than the line item "Payroll Reimbursement") *plus* (ii) with respect to <u>Section 6.09(b)(i)</u>, the Rollover Disbursement Amount, if any, and (B) with respect to <u>Section 6.09(b)(ii)</u>, the Rollover Receipts Amount, if any.

"**Maximum Rate**" shall have the meaning assigned to such term in <u>Section 10.14</u>.

"**MCD Subsidiary**" shall mean Global Geophysical (MCD), LLC.

"**Moody's**" shall mean Moody's Investors Service, Inc. and any successor to its rating agency business.

"**Mortgage**" shall mean an agreement, including a mortgage, deed of trust, leasehold mortgage, leasehold deed of trust, assignment of leases and rents or any other document, creating and evidencing a Lien on any Real Property, which shall be substantially in form reasonably satisfactory to the Collateral Agent at the direction of Required Lenders, in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Multi-Client Data**" shall mean any rights (including ownership or licensing) to seismic data surveys worldwide (other than Brazil) and related data collected, compiled, derived, analyzed or acquired by or on behalf of Borrower or any of its Subsidiaries for its multi-client seismic data library or otherwise incorporated or included in such data library whether now existing or hereafter acquired or created.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any of its ERISA Affiliate is then making or accruing an obligation to make contributions; (b) to which any Company or any ERISA Affiliate has within the preceding five plan years made contributions; or (c) with respect to which any Company or any of its ERISA Affiliates could incur liability.

"**Net Cash Proceeds**" shall mean:

(e)      with respect to any Asset Sale (other than any issuance or sale of Equity Interests of Holdings), the cash proceeds received by Holdings or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Holdings or any of its Subsidiaries) in respect of non-cash consideration initially received), net of (i) selling expenses (including reasonable brokers' fees or commissions, reasonable incentive bonuses paid to officers and employees, legal, accounting and other professional and transactional fees, transfer and similar taxes, and Holdings' good faith estimate of income taxes actually paid or payable in connection with such sale and, with respect to any Asset Sale by a Foreign Subsidiary, taxes actually incurred and payable in connection with the repatriation of such cash proceeds to the United States); (ii) amounts required as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by Holdings or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such

reserve, such amounts shall constitute Net Cash Proceeds); and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than the Obligations) which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(f)     with respect to any Debt Issuance, capital contribution or issuance of Equity Interests by Holdings or any of its Subsidiaries, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses actually incurred in cash in connection therewith;

(g)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable and documented costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event; and

(h)     with respect to any Extraordinary Receipts, the cash received by Holdings or any of its Subsidiaries.

"**Non-Defaulting Lender**" shall mean, at any time, any Lender that is not a Defaulting Lender at such time.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this agreement, if any, in form and substance acceptable to the Required Lenders.

"**Obligations**" shall mean (a) obligations of Borrower and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, (ii) all other monetary obligations, including fees (including attorney fees), costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of Borrower and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrower and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents; *provided* that the term "Obligations" shall not include any Excluded Swap Obligation.

"**OFAC**" shall mean the Office of Foreign Assets Control of the U.S. Treasury Department.

"**Officer's Certificate**" shall mean a certificate executed by a Responsible Officer, in his or her official (and not individual) capacity.

"**Orders**" shall mean, as applicable, the Interim DIP Order or the Final DIP Order or both.

"**Organizational Documents**" shall mean, with respect to any person, (a) in the case of any corporation, the certificate of incorporation and by-laws (or similar documents) of such person, (b) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (c) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (d) in the case of any general partnership, the partnership agreement (or similar document) of such person and (e) in any other case, the functional equivalent of the foregoing.

"**Other Taxes**" shall mean all present or future stamp, court or documentary taxes and any other excise, property, intangible, recording, filing or similar taxes, charges or levies which arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document.

"**Participant**" shall have the meaning assigned to such term in Section 10.04(d).

"**Participant Register**" shall have the meaning assigned to such term in Section 10.04(d).

"**Patriot Act**" shall mean the United States PATRIOT Act (Title III of Pub. L. 107-56).

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Perfection Certificate**" shall have the meaning assigned to such term in the Security Agreement.

"**Permitted Holders**" shall mean Achievement Master Fund Ltd. (f/k/a PEAK6 Achievement Master Fund Ltd.), Barclays Bank PLC, Candlewood Special Situations Master Fund, Ltd., CWD OC 522 Master Fund, Ltd., Credit Suisse Loan Funding LLC, Credit Suisse Securities (USA) LLC, Litespeed Master Fund Ltd., Third Avenue Focused Credit Fund, Wingspan Master Fund, LP, Flagler Master Fund SPC Ltd. - Class A Portfolio, and any of their Affiliates or direct or indirect wholly-owned Subsidiaries, whether acting individually or in a group of any or all of the foregoing entities.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Prior Liens**" shall mean Liens of the type described in, and permitted by the Prepetition First Lien Credit Agreement (solely to the extent any such permitted Liens (x) were incurred and valid, binding, enforceable, properly perfected, and nonavoidable as of the Petition Date and (y) are junior to the Liens securing the Obligations and the Obligations (as defined in the Prepetition First Lien Credit Agreement) to the extent required thereunder.

"**Person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" shall have the meaning assigned to such term in the recitals hereto.

"**PIK Interest**" shall mean interest that is added to the outstanding principal balance of the Loans on the applicable Interest Payment Date.

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or any of its ERISA Affiliates or with respect to which any Company or any of its ERISA Affiliates could incur liability (including under Section 4069 of ERISA).

"**Plan of Reorganization**" shall mean the joint prepackaged plan of reorganization for the Debtors pursuant to Chapter 11 of the Bankruptcy Code filed in the Chapter 11 Cases, in form and substance satisfactory to the Required Lenders.

"**Platform**" shall have the meaning assigned to such term in Section 10.01(d).

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prepetition First Lien Agent**" shall have the meaning assigned to such term in the recitals hereto.

"**Prepetition First Lien Collateral Agent**" shall have the meaning assigned to such term in the recitals hereto.

"**Prepetition First Lien Credit Agreement**" shall have the meaning assigned to such term in the recitals hereto.

"**Prepetition First Lien Indebtedness**" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower and the Guarantors to the Prepetition First Lien Agent, the Prepetition First Lien Collateral Agent and the Prepetition First Lien Lenders, including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Prepetition First Lien Loan Documents (including to the extent arising on or after the Petition Date).

"**Prepetition First Lien Lenders**" shall have the meaning assigned to such term in the recitals hereto.

"**Prepetition First Lien Loan Documents**" shall mean each "Loan Document" as defined in the Prepetition First Lien Credit Agreement, as amended, supplemented, modified, restated, renewed, refinanced or replaced.

"**Prepetition Second Lien Agent**" shall mean Wilmington Trust, National Association, in its capacity as Administrative Agent and Collateral Agent under the Prepetition Second Lien Loan Documents.

"**Prepetition Second Lien Credit Agreement**" shall mean the Second Lien Credit Agreement, dated as of February 9, 2015, by and among Borrower, Holdings, the other guarantors party thereto, the lenders party thereto and Wilmington Trust, National Association, as administrative agent and collateral agent, as the same may have been amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the Intercreditor Agreement, on or prior to the Petition Date.

"**Prepetition Second Lien Indebtedness**" shall mean all obligations, liabilities and indebtedness of every kind, nature and description owing by Borrower and the Guarantors to the Prepetition Second Lien Agent and the Lenders (as defined in the Prepetition Second Lien Credit Agreement), including principal, interest, charges, fees, premiums, indemnities, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Prepetition Second Lien Loan Documents.

"**Prepetition Second Lien Loan Documents**" shall mean the Prepetition Second Lien Credit Agreement and the other Loan Documents as defined in the Prepetition Second Lien Credit Agreement, all as amended, restated, supplemented or otherwise modified from time to time or refinanced or replaced in accordance with the Intercreditor Agreement.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Proprietary Software**" shall have the meaning assigned to such term in Section 3.06(c).

"**Purchase Money Obligations**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any person) or the cost of installation, construction or improvement of any property and any Refinancing thereof; *provided, however*, that (a) such Indebtedness is incurred within 180 days after such acquisition, installation, construction or improvement of such property by such person and (b) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement plus fees and expenses reasonably related thereto.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Qualified ECP Guarantor**" shall mean, in respect of any Swap Obligation, each Guarantor that has total assets exceeding $10,000,000 at the time the relevant guaranty under Section 7.11 becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

-23-

"**Real Property**" shall mean, collectively, all right, title and interest (including any fee, leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Registered Intellectual Property**" shall mean all Intellectual Property Rights that are registered or filed with any Governmental Authority, including all patents, registered copyrights, registered trademarks and registered domain names and all applications for any of the foregoing.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Required Lenders**" shall mean Lenders having more than 50% of the sum of all Loans outstanding and unused Commitments.

"**Requirements of Law**" shall mean, collectively, any and all requirements of any Governmental Authority including any and all laws, judgments, orders, decrees, ordinances, rules, regulations, statutes or case law.

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with

-24-

responsibility for the administration of the obligations of such person in respect of this Agreement.

"**Rollover Disbursement Amount**" shall have the meaning assigned to such term in Section 6.09(b)(i).

"**Rollover Receipts Amount**" shall have the meaning assigned to such term in Section 6.09(b)(ii).

"**S&P**" shall mean Standard & Poor's Financial Services LLC and any successor to its rating agency business.

"**Sale and Leaseback Transaction**" shall have the meaning assigned to such term in Section 6.03.

"**Sanctioned Country**" shall mean, at any time, a country or territory which is the subject or target of any Sanctions that would prohibit or restrict business dealings with any Person operating, organized or resident in such country (currently, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"**Sanctioned Person**" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the or by the United Nations Security Council, the European Union or any EU member state, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person.

"**Sanctions**" shall mean economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"**SEC**" shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to its principal functions.

"**Secured Obligations**" shall mean (a) the Obligations, (b) the due and punctual payment and performance of all obligations of Borrower and the other Loan Parties under each Hedging Agreement entered into with any counterparty that is a Secured Party and (c) the due and punctual payment and performance of all obligations of Borrower and the other Loan Parties (including overdrafts and related liabilities) under each Treasury Services Agreement existing on or entered into after the Closing Date, in each case with any counterparty that is a Secured Party; *provided*, that, with respect to clauses (b) and (c), the applicable Secured Party shall notify the Administrative Agent of such arrangements with the Company and the amounts owing to such Secured Party thereunder; *provided*, *further*, that the term "Secured Obligations" shall not include any Excluded Swap Obligation.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent, the Lenders and each counterparty to a Hedging Agreement or Treasury Services Agreement existing on or entered into after the Closing Date if such person was an Agent or a Lender or an Affiliate of an Agent or a Lender (a) on the Closing Date, in the case of a Hedging Agreement or Treasury Services Agreement existing on the Closing Date or (b) at the date of entering into such Hedging Agreement or Treasury Services Agreement, in the case of a Hedging Agreement or Treasury Services Agreement entered into after the Closing Date.

"**Security Agreement**" shall mean a Superpriority First Lien Security Agreement substantially in the form of Exhibit E among the Loan Parties and Collateral Agent for the benefit of the Secured Parties.

"**Security Documents**" shall mean the Security Agreement and such other documents and instruments as may be required by the Required Lenders to create or perfect the Liens securing the Secured Obligations.

"**SEI-GPI Agreement**"   shall mean the Amended and Restated Licensing Agreement dated as of December 4, 2014 by and between SEI-GPI JV LLC, a Texas limited liability company, and Borrower.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (a) any corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the Voting Stock (other than securities or interests having voting power only by reason of the occurrence of a contingency) are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (b) any partnership (i) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (ii) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (c) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of Holdings; *provided*, *however*, that so long as the Canadian Insolvency Event is in existence, the Canadian Subsidiaries and their Subsidiaries shall be deemed not to be Subsidiaries of Holdings for the purposes of this Agreement.

"**Superpriority Claim**" shall mean a claim against a Loan Party in any of the Chapter 11 Cases that is a superpriority administrative expense claim having priority over any or all administrative expenses and other claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546, 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"**Swap Obligation**" shall mean, with respect to any Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"**Tax Return**" shall mean all original and amended returns, declarations, claims for refund reports, estimates, information returns and statements required to be filed with a taxing authority in respect of any Taxes, including any schedules, forms or other required attachments thereto.

"**Tax**" or "**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Test Period**" shall mean each one-week period, commencing on a Sunday and ending on a Saturday, except that the Test Period first occurring after the Closing Date shall be from the Petition Date through and including the second Saturday thereafter.

"**Transactions**" shall mean, collectively, (a) entry of the Orders, as applicable, (b) the entering into the Loan Documents and (c) the payment of fees and expenses in connection with the foregoing.

"**Transferred Guarantor**" shall have the meaning assigned to such term in Section 7.09.

"**Treasury Services Agreement**" shall mean any agreement relating to treasury, depositary and cash management services (including, for the avoidance of doubt, credit cards, merchant cards, purchase cards and debit cards) or automated clearinghouse transfer of funds; *provided* that the term "Treasury Services Agreement" shall not include any Excluded Swap Obligation.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" shall mean the United States of America.

"**U.S. Person**" shall mean a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" shall have the meaning given to it in Section 2.13(e)(iii).

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.

"**Wholly Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) is at the time owned by such person and/or one or more Wholly Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such person and/or one or more Wholly Owned Subsidiaries of such person have a 100% equity interest at such time.

-27-

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**SECTION 1.02**   **(Reserved).**

**SECTION 1.03**   **Terms Generally**.   The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.   Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.   The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) "on," when used with respect to the Real Property or any property adjacent to the Real Property, means "on, in, under, above or about."

**SECTION 1.04**   **Accounting Terms; GAAP**.   Except as otherwise expressly *provided* herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature shall be construed and interpreted in accordance with GAAP as in effect from time to time; *provided* that, if Holdings or the Required Lenders notify the Administrative Agent that they request an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision, regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Lenders and Holdings shall negotiate in good faith to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders) and until so amended, (a) accounting terms used in any ratio or requirement and not otherwise defined in this Agreement shall continue to be computed in accordance with GAAP prior to such change therein and (b) Holdings shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP; *provided, further,* that all terms of an accounting or financial nature (including, without limitation, the definitions of Capital Lease Obligations and Indebtedness) shall be construed without giving effect to (i) any changes to the current GAAP accounting model for leases of the type described in the FASB and IASB joint exposure draft published on August 17, 2010 entitled "Leases (Topic 840)" or

otherwise arising out of the FASB project on lease accounting described in such exposure draft, (ii) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities), or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Loan Parties at "fair value", as defined therein and (iii) any treatment of Indebtedness relating to convertible or equity-linked securities under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) requiring the valuation of any such Indebtedness in a reduced or bifurcated manner as described therein.

**SECTION 1.05   Payments**.  All payments made under this Agreement shall be made in cash in immediately available funds unless expressly provided otherwise.

**SECTION 1.06   Resolution of Drafting Ambiguities**.   Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

# ARTICLE II

# THE CREDITS

**SECTION 2.01   Commitments**.   Subject to the terms and conditions of this Agreement, each Lender agrees to make Loans to Borrower in Dollars from time to time during the Availability Period in an aggregate principal amount that will not result in (i) the amount of such Lender's Credit Exposure exceeding such Lender's Commitment or (ii) the sum of the total Credit Exposures exceeding the Aggregate Commitment, each determined at the time of such Borrowing. Within the foregoing limits and subject to the terms and conditions set forth in this Agreement, Borrower may borrow, repay and reborrow Loans.

**SECTION 2.02   Loans**.

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender).   Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $100,000 and not less than $100,000 or (ii) equal to the remaining available balance of the applicable Commitments.

(b)      Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 12:00 noon, New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by

Borrower in the applicable Borrowing Request or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

**SECTION 2.03   Borrowing Procedure**.   To request a Credit Extension, Borrower shall deliver, by facsimile, a duly completed and executed Borrowing Request to the Administrative Agent not later than 12:00 noon, New York City time, three (3) Business Days before the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(a)    (reserved);

(b)    the aggregate amount of such Borrowing which, when added to the Loans outstanding as of such date, (i) until entry of the Final DIP Order, shall be in an aggregate amount not to exceed the lesser of the amount permitted to be borrowed pursuant to the Interim DIP Order and the amount set forth in the Approved Budget for such period and (ii) following entry of the Final DIP Order, shall be in an aggregate amount not to exceed the lesser of the amount permitted to be borrowed pursuant to the Final DIP Order and the amount set forth in the Approved Budget for such period;

(c)    the date of such Borrowing, which shall be a Business Day;

(d)    the location and number of Borrower's account to which funds are to be disbursed; and

(e)    that the conditions set forth in Sections 4.02(b) through 4.02(d), 4.02(f) and 4.02(g) have been satisfied as of the date of the Borrowing Request.

Promptly following receipt of a Borrowing Request in accordance with this Section 2.03, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

**SECTION 2.04   Evidence of Debt; Repayment of Loans**.

(a)    Promise to Repay.   Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section 2.09.

(b)    Lender and Administrative Agent Records.   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.   The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder; (ii) the amount of any principal or interest due and payable or to become due and payable from Borrower to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof. The entries made in the accounts maintained pursuant to this paragraph shall be prima facie evidence of the existence and amounts of the obligations

therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of Borrower to repay the Loans in accordance with their terms. The Register shall be available for inspection by Borrower, the Administrative Agent and its affiliates and, with respect to its own position, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(c)     <u>Promissory Notes</u>.   Any Lender may request that Loans made by it be evidenced by a promissory note.   In such event, Borrower shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in form and substance acceptable to the Required Lenders. Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to <u>Section 10.04</u>) be represented by one or more promissory notes in such form payable to the payee named therein.

**SECTION 2.05   Fees**.

(a)     Borrower agrees to pay to the Administrative Agent for the account of each Lender an unused commitment fee ("**Commitment Fee**") in an amount equal to 2.5% of the average daily amount of the unused Commitment of such Lender during the period from and including the Closing Date to but excluding the date on which the Commitment of such Lender terminates. Accrued Commitment Fees shall be payable in arrears on the last day of each calendar month of each year and on the date on which the Commitments terminate, commencing on the first such date to occur after the date hereof. All Commitment Fees shall be (x) payable-in-kind by adding such amount to the outstanding principal balance of the Loans, (y) computed on the basis of a year of 360 days and (z) payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     Borrower agrees to pay to the Administrative Agent and the Collateral Agent, for its own account in cash, the administrative fees payable in the amounts and at the times separately agreed upon between Borrower and the Administrative Agent and the Collateral Agent (collectively, the "**Administrative Agent Fees**"). The Administrative Agent Fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent and the Collateral Agent, respectively. Once paid, none of the Administrative Agent Fees shall be refundable under any circumstances.

(c)     Borrower agrees to pay to the Administrative Agent for the account of each Lender an upfront fee in an amount equal to 1.00% of an amount equal to the Commitments of such Lender as of the Closing Date, on the Closing Date. Such upfront fee shall be payable-in-kind by adding such amount to the outstanding principal balance of the Loans.

(d)     (reserved).

(e)     All fees payable hereunder shall be paid on the dates due, in kind or in Dollars and immediately available funds, as specified herein, to the Administrative Agent for distribution, in the case of Commitment Fees and participation fees, to the Lenders. Any fees paid shall not be refundable under any circumstances.

**SECTION 2.06   Interest on Loans**.

(a)     <u>Loans and other Obligations</u>.   Subject to the provisions of <u>Section 2.06(b)</u>, the Loans shall bear interest (whether payable in cash or PIK Interest[2]) at a rate per annum equal to the Applicable Margin.

(b)     <u>Default Rate</u>.   Notwithstanding the foregoing, upon the occurrence and during the continuance of an Event of Default, all principal of or interest on any Loan or any fee or other amount payable by Borrower hereunder shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of amounts constituting principal of or interest on any Loan, 2% plus the rate otherwise applicable to such Loan as provided in <u>Section 2.06(a)</u> or (ii) in the case of any other amount, 2% (in either case, the "**Default Rate**").

(c)     <u>Interest Payment Dates</u>.   Interest on all outstanding Loans and any overdue Obligations shall be payable (w) in arrears, on the last Business Day of each calendar month for the month then-ending; (x) on the Maturity Date, for the period from (but not including) the date when interest was last paid (or required to be paid in accordance with the foregoing clause (w)) to (and including) the Maturity Date; (y) on the date of any prepayment or repayment of any Loans; and (z) on demand by the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) to the extent of any interest accruing pursuant to <u>Section 2.06(b)</u>. The required date of payment of interest pursuant to this <u>Section 2.06(c)</u> shall be an "**Interest Payment Date**".

(d)     <u>Interest Calculation</u>.   All interest hereunder shall be computed on the basis of a year of 360 days, and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

**SECTION 2.07   Form of Payment.**   On each Interest Payment Date occurring pursuant to <u>Section 2.06(c)(w)</u>, all accrued interest shall be payable in PIK Interest. On each other Interest Payment Date, all accrued interest shall be payable in cash.

**SECTION 2.08   (Reserved).**

**SECTION 2.09   Repayment of Borrowings**.   To the extent not previously paid, all Loans shall be due and payable on the Maturity Date.

**SECTION 2.10   Optional and Mandatory Prepayments of Loans; Reduction of Commitments**.   Subject to Section 2.05(d):

(a)     <u>Optional Prepayments</u>.   Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, subject to the requirements of this <u>Section 2.10</u>; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000 or, if less, the outstanding principal amount of such Borrowing.

---

[2]  Under MS review.

(b)     Unless previously terminated, the Commitments shall terminate on the Maturity Date.

(c)     Borrower may at any time terminate, or from time to time reduce, the Commitments; *provided* that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $1,000,000 and not less than $1,000,000 (unless the Commitments will be reduced to zero) and (ii) Borrower shall not terminate or reduce the Commitments if and to the extent that, after giving effect to any concurrent prepayment of the Loans in accordance with this Section 2.10, the amount of the sum of the Credit Exposures would exceed the Aggregate Commitment.

(d)     Borrower shall notify the Administrative Agent of any election to terminate or reduce the Commitments under Section 2.10(c) at least three (3) Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by Borrower pursuant to this Section 2.10(d) shall be irrevocable.  Any termination or reduction of the Commitments shall be permanent. Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

(e)     In the event and on each occasion on or prior to the Maturity Date that the sum of the Credit Exposures exceeds the Aggregate Commitment, Borrower shall prepay Loans in an aggregate amount equal to such excess.

(f)     Asset Sales.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Asset Sale by Holdings or any of its Subsidiaries consummated on or after the Closing Date, Borrower shall make or cause to be made prepayments in accordance with Sections 2.10(l) and (m) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(g)     Debt Issuance.  Not later than one (1) Business Day following the receipt of any Net Cash Proceeds of any Debt Issuance by Holdings or any of its Subsidiaries, Borrower shall make or cause to be made prepayments in accordance with Section 2.10(l) and (m) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(h)     Equity Issuance.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds from a capital contribution to, or the issuance of Equity Interests of, Holdings or any of its Subsidiaries, Borrower shall make or cause to be made prepayments in accordance with Section 2.10(l) and (m) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(i)     Casualty Events.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by Holdings or any of its Subsidiaries, Borrower shall make or cause to be made prepayments in accordance with Section 2.10(l) and (m) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(j)     (Reserved).

-33-

(k)     Extraordinary Receipts.  Not later than three (3) Business Days following the receipt of any Net Cash Proceeds of any Extraordinary Receipts by Holdings or any of its Subsidiaries, Borrower shall make or cause to be made prepayments in accordance with Section 2.10(l) and (m) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(l)     Application of Prepayments.  Each prepayment of Loans pursuant to Section 2.10(f), (g), (h), (i) or (k) shall be applied to the Loans pursuant to Section 8.03, as applicable, and without a reduction of the Commitments. Subject to the foregoing, Borrower shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to Section 2.10(m), subject to the provisions of Section 2.10(l).  For the avoidance of doubt, any prepayments of Loans pursuant to Section 2.10(a) shall be applied as specified by Borrower.

(m)     Notice of Prepayment.  Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 12:00 noon, New York City time, one (1) Business Days before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing and otherwise in accordance with this Section 2.10. Prepayments shall be accompanied by accrued interest to the extent required by Section 2.06.

## SECTION 2.11   Yield Protection.

(a)     Increased Costs Generally.   If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender;

(ii)     subject the Administrative Agent or any Lender to any Taxes (other than (A) Indemnified Taxes, (B) Other Taxes, (C) Taxes described in clauses (a) and (c) through (e) of the definition of Excluded Taxes, and (D) Taxes described in clause (b) of the definition of Excluded Taxes that are imposed on or measured by net income (however denominated) or that are franchise or branch profit taxes) on its loans, loan principal, letters of credit, commitments, or other obligations or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)     impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to the Administrative Agent or such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by the Administrative Agent or such Lender hereunder (whether of principal, interest or otherwise), in each case by or in an amount which the Administrative Agent or such Lender in its sole judgment deems

material in the context of this Agreement and its Loans hereunder, then Borrower will pay to the Administrative Agent or such Lender, as the case may be, such additional amount or amounts as will compensate the Administrative Agent or such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.    If any Lender determines that any Change in Law regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), by an amount which such Lender in its sole judgment deems to be material in the context of this Agreement and its Loans and Commitments hereunder, then from time to time Borrower will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>.    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to Borrower and shall be conclusive absent manifest error.   Borrower shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

(d)    <u>Delay in Requests</u>.    If any Lender becomes entitled to claim any amounts pursuant to clauses (a) or (b) or this <u>Section 2.11</u>, such Lender shall use reasonable efforts to notify Borrower (with a copy to the Administrative Agent) as promptly as practicable of the event by reason of which it has become so entitled; *provided* that any failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; *provided, further,* that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

### SECTION 2.12    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    <u>Payments Generally</u>.    Borrower shall make each payment required to be made by it hereunder or under any other Loan Document (whether of principal, interest or fees or amounts payable under <u>Sections 2.11</u>, <u>2.13</u> or <u>10.03</u>, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim, other than for Taxes as set forth in <u>Section 2.13</u>.   Any amounts received after such time on any date may be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.   All such payments shall be made to the Administrative Agent at its offices at 500

Delaware Avenue, 11th Floor, Wilmington, DE 19801, except that payments pursuant to Sections 2.11, 2.13 and 10.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein.  The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars, except as expressly specified otherwise.

(b)  <u>Pro Rata Treatment</u>.  Except as expressly provided otherwise,

(i)  each payment by Borrower of interest in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders *pro rata* according to the respective amounts then due and owing to such Lenders.

(ii)  each payment on account of principal of the Loans shall be allocated among the Lenders *pro rata* based on the principal amount of the Loans held by such Lenders.

(c)  <u>Insufficient Funds</u>.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties.  It is understood that the foregoing does not apply to any adequate protection payments under any federal, state or foreign bankruptcy, insolvency, receivership or similar proceeding, and that the Administrative Agent may, subject to any applicable federal, state or foreign bankruptcy, insolvency, receivership or similar orders, distribute any adequate protection payments it receives on behalf of the Lenders to the Lenders at the direction of the Required Lenders (i.e., whether to pay the earliest accrued interest, all accrued interest on a *pro rata* basis or otherwise).

(d)  <u>Sharing of Setoff</u>.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other Obligations greater than its *pro rata* share thereof as *provided* herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; *provided* that, unless otherwise permitted in this Agreement:

(i)      if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Holdings or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.   If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.12(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.12(d) to share in the benefits of the recovery of such secured claim.

(e)      Borrower Default.  Unless the Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, the Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may (but shall not be obligated to), in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

**SECTION 2.13   Taxes**.

(a)      Payments Free of Taxes.   Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes except as required by any applicable Requirements of Law.   If any applicable Requirements of Law require (as determined in the good faith discretion of an applicable withholding agent) the deduction or withholding of any Taxes by any Loan Party or the Administrative Agent from such payments, then (i) if such Taxes are Indemnified Taxes or Other Taxes, the sum payable by the applicable Loan Party shall be increased as necessary so that after making all required deductions or withholdings (including deductions or withholdings for Indemnified Taxes or Other Taxes applicable to additional sums payable under this Section 2.13) the Administrative Agent or Lender, as the case may be,

receives an amount equal to the sum it would have received had no such deductions or withholdings for Indemnified Taxes or Other Taxes been made, (ii) the applicable withholding agent shall make such deductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     <u>Payment of Other Taxes by Borrower</u>.   Without limiting the provisions of paragraph (a) above, Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(c)     <u>Indemnification by Borrower</u>.   Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.13</u>) imposed on or asserted against the Administrative Agent or such Lender by any Governmental Authority or otherwise payable by the Administrative Agent or such Lender (as determined in the good faith sole discretion of the Administrative Agent or such Lender) and reasonable expenses arising therefrom or with respect thereto, regardless of whether such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Government Authority.   A certificate as to the amount of such payment or liability delivered to Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, along with a reasonably detailed explanation or calculation of such payment or liability, or such other evidence that such Indemnified Taxes or Other Taxes have been imposed or assessed or otherwise become payable as Borrower may reasonably request, shall be conclusive absent manifest error.

(d)     <u>Evidence of Payments</u>.   As soon as practicable after any payment of Indemnified Taxes or Other Taxes by Borrower to a Governmental Authority under this <u>Section 2.13</u>, the applicable Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent at the direction of the Required Lenders.

(e)     <u>Status of Lenders</u>.

(i)     Any Lender (which, solely for purposes of this <u>Section 2.13(e)</u>, shall include the Administrative Agent) that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable Requirements of Law or reasonably requested by Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.   In addition, any Lender, if requested by Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or the Administrative Agent as will enable Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.   Notwithstanding anything

to the contrary in the preceding two sentences, in the case of any withholding tax other than U.S. federal withholding taxes, the completion, execution and submission of such forms shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person shall deliver to Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or the Administrative Agent), executed originals of Internal Revenue Service Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax.

(B)      Each Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)      executed copies of Internal Revenue Service Form W-8BEN, Form W-8BEN-E or any successor form claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)      executed copies of Internal Revenue Service Form W-8ECI,

(iii)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a non-bank tax certificate, in substantially the form of Exhibit G-1 to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code related to Borrower (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of Internal Revenue Service Form W-8BEN, Form W-8BEN-E or any successor form,

(iv)      to the extent a Foreign Lender is not the beneficial owner for U.S. federal income tax purposes (for example, where the Foreign Lender is a partnership or participating Lender granting a typical participation), executed copies of Internal Revenue Service Form W-8IMY, accompanied by a Form W-8ECI, Form W-8BEN, Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit G-3 or Exhibit G-4, Form W-9, and/or other certification documents from

each beneficial owner, as applicable; *provided* that, if the Foreign Lender is a partnership (and not a participating Lender) and one or more beneficial owners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate, in substantially the same form of <u>Exhibit G-2</u>, on behalf of such beneficial owner(s), or

(v)     any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrower to determine the withholding or deduction required to be made.

(C)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 147 1 (b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or the Administrative Agent as may be necessary for Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (C), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(D)     In addition, each Lender agrees that from time to time after the date it becomes a Lender, when a lapse in time or change in the Lender's circumstances renders the previous certification expired, obsolete or inaccurate in any material respect, it will, to the extent legally able to do so, deliver to Borrower and the Administrative Agent two new accurate and executed copies of Internal Revenue Service Form W-8ECI, Form W-8BEN (or Form W-8BEN-E) (with respect to the benefits of any income tax treaty), a non-bank tax certificate and a Form W-8BEN (or Form W-8BEN-E) (with respect to the portfolio interest exemption) or Internal Revenue Service Form W-8IMY, as the case may be, and such other forms as may be required in order to confirm or establish the entitlement of such Lender to a continued exemption from or reduction in United States federal withholding tax with respect to payments under the Loan Documents or promptly notify Borrower and the Administrative Agent of any change in the Non-U.S. Lender's circumstances which would modify or render invalid any previously claimed exemption or reduction.

(f)      Treatment of Certain Refunds.    If the Administrative Agent or a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by a Loan Party or with respect to which a Loan Party has paid additional amounts pursuant to this Section 2.13, it shall promptly pay to the applicable Loan Party an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by Loan Parties under this Section 2.13 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Loan Party, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.   This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its Tax Returns (or any other information relating to its taxes that it deems confidential) to Borrower or any other person.   Notwithstanding anything to the contrary, in no event will any Lender be required to pay any amount to a Loan Party pursuant to this paragraph (f) the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

(g)      Indemnification by the Lenders.    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes or Other Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.04(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.   A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.   Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (g).

(h)      Survival.    Each party's obligations under this Section 2.13 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)      Defined Terms.    For purposes of this Section 2.13, the terms "Requirements of Law" and "applicable law" include FATCA.

-41-

**SECTION 2.14    Mitigation Obligations; Replacement of Lenders**.

(a)    _Designation of a Different Lending Office_.   Before or reasonably promptly after any Lender requests compensation under Section 2.11, or requires Borrower to pay any Indemnified Tax, Other Tax or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, or if any Lender has become a Defaulting Lender, then, at the request of Borrower, such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the good faith judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.11 or 2.13, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.   Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.   A certificate setting forth such costs and expenses submitted by such Lender to Borrower shall be conclusive absent manifest error.

(b)    _Replacement of Lenders_.   If (i) any Lender requests compensation under Section 2.11, (ii) any Loan Party is required to pay any Indemnified Tax, Other Tax or additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.13, (iii) any Lender defaults in its obligation to fund Loans hereunder or (iv) any Lender shall decline to consent to any modification or waiver hereunder requiring 100% of the Lenders affected thereby (or of an affected type or the type set forth in clauses (i) through (xiv) of Section 10.02(b) to consent thereto) and, in such case the Required Lenders have already consented thereto, then Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.11 or Section 2.13) and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); _provided_ that:

(i)    Borrower shall have paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrower (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.11 or payments required to be made pursuant to Section 2.13, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    such assignment does not conflict with applicable Requirements of Law.

Upon receipt by the applicable Lender of all amounts required to be paid to such Lender pursuant to this <u>Section 2.14(b),</u> the Administrative Agent shall be entitled (but not obligated) and authorized to execute an Assignment and Assumption on behalf of such Lender, and any such Assignment and Assumption so executed by the Administrative Agent and assignee shall be effective for purposes of this <u>Section 2.14(b)</u> and <u>Section 10.04</u>.   A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrower to require such assignment and delegation cease to apply.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES**

On the Closing Date and the date of each Credit Extension, each Loan Party represents and warrants to the Administrative Agent, the Collateral Agent and each of the Lenders that:

**SECTION 3.01** **Organization; Powers**.  Each Company (a) is duly organized and validly existing under the laws of the jurisdiction of its organization, (b) upon entry of the Orders, as applicable, has all requisite power and authority to carry on its business as now conducted and to own and lease its property, and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction) to do business in every jurisdiction where such qualification is required, except to the extent that any failure under clause (b) or this clause (c) to comply therewith, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.02** **Authorization; Enforceability**.  The Transactions to be entered into by each Loan Party are, upon entry of the Orders, as applicable, within such Loan Party's powers and have been duly authorized by all necessary action on the part of such Loan Party. Subject to the entry of the Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**SECTION 3.03** **No Conflicts**.   Upon entry of the Orders, as applicable, the Transactions (a) do not require any material consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) filings necessary to perfect Liens created by the Loan Documents, (iii) routine Tax filings or (iv) one or more filings with the SEC describing the Transactions (b) will not violate the Organizational Documents of any Company, (c) will not violate any Requirement of Law, (d) will not violate or result in a default or require any consent or approval under any indenture or financing agreement or instrument, or any other material agreement binding upon any Company or its property which will give rise to an ability to exercise any remedies, or give rise to a right thereunder to require any payment to be made by

-43-

any Company, (e) except as set forth in the Orders, as applicable, will not result in the creation or imposition of any Lien on any property of any Company, except DIP Liens or (f) result in any default, non-compliance, suspension, revocation, impairment, forfeiture or non-renewal of any material permit, license, authorization or approval applicable to its operations or any of its properties.

**SECTION 3.04    No Liabilities; Material Changes**.

(a)    <u>(Reserved)</u>.

(b)    <u>No Liabilities; Material Changes</u>.   Other than the Chapter 11 Cases, as of the Closing Date, there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.05    Properties**.

(a)    <u>Generally</u>.   Each Company has good, valid, marketable title to, or leasehold interests in, all its property material to its business, free and clear of all Liens except for Permitted Liens and minor irregularities or deficiencies in title that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. The tangible property of the Companies, taken as a whole, is in good operating order, condition and repair (ordinary wear and tear excepted).

(b)    <u>Real Property</u>.   Schedule 17 to the Perfection Certificate contains a true and complete list of each interest in Real Property (i) owned by any Loan Party as of the Closing Date and describes the type of interest therein held by such Loan Party and (ii) leased, licensed, subleased or otherwise occupied or utilized by any Loan Party, as lessee, sublessee, franchisee or licensee, as of the Closing Date and describes the type of interest therein held by such Loan Party. With respect to the Real Property referenced in <u>Section 3.05(b)(ii)</u>, such schedules to the Perfection Certificate also set forth a complete and accurate list of all leases, licenses, subleases, or other occupancy agreements, including all amendments, guarantees, and agreements by which any Person other than the Company or any of its Subsidiaries may occupy such space (including, without limitation, subleases, sub-subleases, licenses, or other occupancy agreements whereby a Loan Party is a landlord, lessor, licensor, sublandlord, sublessor, sublicensor, or other similar party) (individually or collectively, as the context may require, "<u>Lease</u>"), a copy of each of which have been made available to the Agents and Lenders prior to the date hereof.  No other Real Property owned or leased by any Loan Party other than the Real Property set forth on <u>Schedule 17</u> to the Perfection Certificate, is reasonably necessary to for the Loan Parties to conduct the business of the Loan Parties as same is presently being conducted and presently anticipated to be conducted.  The Loan Parties have the right to use such Real Property for the purposes such Real Property are currently being used and same are being used materially in compliance with applicable Laws.  No Loan Party or any Subsidiary thereof has the right or option to purchase, possess, use, or occupy any real property other than the Real Property set forth on <u>Schedule 17</u> to the Perfection Certificate. None of the Loan Parties nor any of their Subsidiaries are obligated to pay any brokerage commission or fee in connection with any of the Real Property set forth on <u>Schedule 17</u> to the Perfection Certificate.

(c)    <u>No Casualty Event</u>.  No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any material portion of its property.  No Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development or the Federal Emergency Management Agency (or any successor agency) as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto) unless flood insurance available under such Act has been obtained in accordance with <u>Section 5.04</u>.

(d)    <u>Collateral</u>.  Each Loan Party owns or has rights to use all of the Collateral (other than Intellectual Property) and all rights with respect to any of the foregoing used in, necessary for or material to such Loan Party's business as currently conducted.  The use by such Loan Party of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made in writing and remains outstanding that such Loan Party's use of any Collateral (other than Intellectual Property) does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.06    Intellectual Property**.

(a)    <u>Ownership/No Claims</u>.  Each Loan Party owns or is validly licensed to use all Intellectual Property Rights necessary for the conduct of its business as presently conducted. Each item of Registered Intellectual Property identified on <u>Schedule 11</u> to the Perfection Certificate is exclusively owned by one or more of the Loan Parties ("**Borrower Registered Intellectual Property**"). Except as set forth in <u>Schedule 3.06(a)</u>, as of the Closing Date, there are no pending proceedings by any person challenging the validity or enforceability of any Borrower Registered Intellectual Property. The use of such Intellectual Property by each Loan Party does not infringe, misappropriate or otherwise violate the rights of any person.

(b)    One or more of the Loan Parties exclusively owns all rights in and to the GGS Seismic Data Library, free and clear of all Liens (except as set forth in <u>Schedule 3.06(b)</u> and subject to the terms of the SEI-GPI Agreement).   Each Loan Party has taken all reasonable steps to safeguard and maintain the secrecy and confidentiality of, and proprietary rights of the Loan Parties in, the GGS Seismic Data Library and its contents.   All third parties (other than customers) with possession of one or more copies of the GGS Seismic Data Library have entered into contractual arrangements pursuant to which such third party has agreed to safeguard and maintain the secrecy and confidentiality of, and proprietary rights in, the GGS Seismic Library and its contents.  Except as provided for in the SEI-GPI Agreement, each copy of the GGS Seismic Data Library is within the possession or control of a Loan Party, and, to the knowledge of the Loan Parties, no Person has misappropriated, misused, or otherwise violated a Loan Party's rights in or to any part of the GGS Seismic Data Library.

(c)    <u>Schedule 3.06(c)</u> sets forth a true, accurate, and complete list of all material computer software owned, or purported to be owned by the Companies (the "**Proprietary Software**") as of the Closing Date.  The Companies exclusively own all right, title and interest in the Proprietary Software free and clear of all Liens (other than the rights of custodians and

security companies under agreement set forth in Schedule 3.06(b)).   No Proprietary Software is the subject of any Proceeding before any governmental, registration or other authority in any jurisdiction, including any office action or other form of preliminary or final refusal of registration.

(d)     Schedule 3.06(d) sets forth a true, accurate, and complete list of all material computer software and databases used, reproduced, modified, or redistributed by a Loan Party, excluding shrink-wrap click-wrap or similar nonexclusive, royalty-free licenses to off-the-shelf software on similar standard terms (the "**Licensed Software**") as of the Closing Date.   Any use, reproduction, modification, distribution, and sublicensing of the Licensed Software by the Loan Party is authorized pursuant to the terms of the license to which the Loan Party is a party.

(e)     Registrations.   Except (i) pursuant to licenses and other user agreements entered into by each Loan Party in the ordinary course of business and (ii) licenses and other user agreements that are listed in Schedule 11 to the Perfection Certificate, on and as of the Closing Date, each Loan Party possesses all rights to use or grant licenses in respect of the GGS Seismic Data Library, the Proprietary Software, and Borrower Registered Intellectual Property owned by such Loan Party.   To the knowledge of each Loan Party, all registrations for Borrower Registered Intellectual Property listed in Schedule 11 to the Perfection Certificate owned by such Loan Party, other than pending applications, are valid and enforceable.

(f)     No Violations or Proceedings.   To each Loan Party's knowledge, on and as of the Closing Date, there is no violation by others of any right of such Loan Party with respect to the GGS Seismic Data Library, the Proprietary Software, or any Borrower Registered Intellectual Property listed in Schedule 11 to the Perfection Certificate, pledged by it under the name of such Loan Party.

(g)     Ownership of Material Foreign Intellectual Property.   The Loan Parties collectively own all Material Foreign Intellectual Property except to the extent the transfer of any such Material Foreign Intellectual Property owned by a Foreign Subsidiary that is not a Loan Party to a Loan Party would or could reasonably be expected to (i) result in a material increase in the amounts included in the gross income of a United States shareholder of such Foreign Subsidiary pursuant to Section 951 (or a successor provision) of the Code, (ii) result in a material amount of transfer Taxes or a material non-U.S. Tax liability of such Foreign Subsidiary that would not be incurred absent such transfer or (iii) materially increase the future Taxes of Holdings and its Subsidiaries (taking into account any offsetting Tax savings or other benefits), in each case as reasonably determined by Holdings.

**SECTION 3.07    Equity Interests and Subsidiaries**.

(a)     Equity Interests.   Schedule 3.07(a) sets forth a list of (i) Holdings and each of its Subsidiaries and their jurisdictions of organization (as to each Loan Party) as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date.   Except as set forth on Schedule 3.07(a), all Equity Interests of each Company are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of Holdings, are owned by Holdings,

directly or indirectly through Wholly Owned Subsidiaries. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests such Loan Party owns, free of any and all Liens, rights or claims of other persons, except the security interests created by the Orders or the Security Documents, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)    No Consent of Third Parties Required.   No consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or first priority status of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the Orders or the Security Documents or the exercise by the Collateral Agent of the voting or other rights provided for in the Security Documents or the exercise of remedies in respect thereof.

(c)    Organizational Chart.   An accurate organizational chart, showing the ownership structure of Holdings and each Subsidiary on the Closing Date and after giving effect to the Transactions, is set forth on Schedule 3.07(c).

**SECTION 3.08    Litigation; Compliance with Laws**.   Other than the Chapter 11 Cases and as set forth on Schedule 3.08, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened in writing against or affecting any Company or any business, property or rights of any Company (i) that involve any Loan Document or the Transactions or (ii) in which there is a reasonable likelihood of an adverse determination that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.   Except for matters covered by Section 3.18, no Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.09    Agreements**.   No Company is a party to any agreement or instrument or subject to any restriction in its Organizational Documents that has resulted or could reasonably be expected to result in a Material Adverse Effect.   Schedule 3.09, together with any updates pursuant to Section 5.02(g), contains a true, correct and complete list of all Material Agreements. All Material Agreements are in full force and effect and are enforceable in accordance with their terms and no Company is in default in any manner under any provision of any Material Agreement, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default, in each case other than as a result of the commencement of the Chapter 11 Cases or related to the entry or terms of the Orders. Each Company is in compliance with its Organizational Documents.

**SECTION 3.10    Federal Reserve Regulations**.   No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.   No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X.

**SECTION 3.11    Governmental Regulation**.   No Company is subject to regulation under the Public Utility Holding Company Act of 2005, the Federal Power Act or under any other federal or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.   No Company is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

**SECTION 3.12    Use of Proceeds**.   Borrower will use the proceeds of the Loans only to the extent permitted by the Approved Budget then applicable, or as otherwise consented to in a prior writing by the Required Lenders (but will not use any Loans to fund development costs associated with Brazilian Multi-Client Data).

**SECTION 3.13    Taxes**.   All Federal and all other material tax returns and reports of each Company required to be filed have been timely filed, and all material taxes due and payable and all assessments, fees and other governmental charges upon any Company and upon their respective properties, assets, income, business and franchises which are due and payable have been paid when due and payable.   No Company knows of any proposed tax assessment against any Company in excess of $500,000 in the aggregate which (i) is not being actively contested by a Company in good faith and by appropriate proceedings or which is not being treated under the Plan of Reorganization or (ii) the payment or enforcement of which is not stayed as a result of the Chapter 11 Cases; provided, such reserves or other appropriate provisions, if any, as shall be required in conformity with GAAP shall have been made or provided therefor.

**SECTION 3.14    No Material Misstatements**.    No written information, report, financial statement, certificate, Borrowing Request, exhibit or schedule furnished by or on behalf of any Company to the Administrative Agent or any Lender (excluding information of a general economic or general industry nature, projected financial information or other forward looking information but including the Approved Budget) in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole with all such information, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule, it being recognized by the Lenders that such projections and forecasts as they relate to future events are not to be viewed as fact and that factual results during the period or periods covered by such projections and forecasts may differ from such projections and forecasts and such differences may be material. There are no facts known to any Company (other than matters of a general economic or general

industry nature) that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and that have not been disclosed herein or in such other documents, certificates and statements furnished to the Administrative Agent or the Lenders for use in connection with the transactions contemplated hereby.

**SECTION 3.15   Labor Matters**.   As of the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened in writing except as in the aggregate could not reasonably be expected to result in a Material Adverse Effect.   The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect.   All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.   The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

**SECTION 3.16   (Reserved)**.

**SECTION 3.17   Employee Benefit Plans**.   To the extent applicable, each Company and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder.   No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect or the imposition of a Lien on any of the property of any Company or its ERISA Affiliates.   As of the Closing Date, the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the property of all such underfunded Plans by a material amount.   Using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, no material Withdrawal Liability would be incurred by any Company or its ERISA Affiliates to any Multiemployer Plan in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan.

To the extent applicable, each Foreign Plan is in material compliance with its terms and with the requirements of any and all applicable Requirements of Law and, where required, is in good standing with applicable regulatory authorities.   No Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan.   The present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan by a material amount, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

**SECTION 3.18   Environmental Matters**.

(a)     Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

(i)     The Companies and their businesses, operations and Real Property are in compliance with, and the Loan Parties have no liability under, any applicable Environmental Law;

(ii)     The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing;

(iii)     There is no Environmental Claim pending or, to the knowledge of the Companies, threatened, against the Companies, relating to the Real Property currently or formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and there are no actions, activities, circumstances, conditions, events or incidents that could form the basis of such an Environmental Claim; and

(iv)     No person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)     Except as set forth in Schedule 3.18:

(i)     No Company is obligated to perform any material action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract, agreement or operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location;

(ii)     No property owned, operated or leased by the Companies and, to the knowledge of the Companies, no property formerly owned, operated or leased by the Companies or any of their predecessors in interest is (i) listed or formally proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (ii) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (iii) included on any similar list maintained by any Governmental Authority including any such list relating to Releases of petroleum;

(iii)     No Lien has been recorded or, to the knowledge of any Company, threatened, under any Environmental Law with respect to any Real Property or other assets of the Companies;

(iv)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant

-50-

to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)     The Companies have made available to the Lenders all material records and files in the possession, custody or control of, or otherwise reasonably available to, the Companies concerning compliance with or liability of the Companies under Environmental Law, including those concerning the actual or suspected Release or threatened Release of Hazardous Material at, on under or from any Real Property or other facilities currently or formerly owned, operated, leased or used by the Companies.

(c)     The representations and warranties contained in this <u>Section 3.18</u> are the sole and exclusive representations and warranties of the Companies with respect to Environmental Laws and Hazardous Materials.

**SECTION 3.19   (Reserved)**.

**SECTION 3.20   Sanctions**.

(a)     No Loan Party nor its Affiliates is in violation of any Sanctions.

(b)     No Loan Party, Affiliate or broker or other agent of such Loan Party acting or benefiting in any capacity in connection with the Loans is a Sanctioned Person.

(c)     No Loan Party (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or Sanctioned Country, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to Sanctions, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, Sanctions.

**SECTION 3.21   Anti-Corruption Laws & Sanctions**.   Borrower has implemented and maintained in effect policies and procedures (including, without limitation, the Implemented Compliance Enhancements) designed to ensure compliance by Borrower, its Subsidiaries and its respective directors, officers, employees and agents with Anti-Corruption Laws and Sanctions, and Borrower, its Subsidiaries and its respective directors, officers and employees and to the knowledge of Borrower its agents, are in compliance with Anti-Corruption Laws and Sanctions. None of (a) Borrower, any Subsidiary, their respective directors, officers or employees, or (b) to the knowledge of Borrower, after due inquiry, any agent of Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing, use of proceeds or other transaction contemplated by the Credit Agreement will violate Anti-Corruption Laws or Sanctions.

**SECTION 3.22   Material Adverse Effect**. Since the Petition Date, there has been no Material Adverse Effect.

**SECTION 3.23   (Reserved)**.

**SECTION 3.24   Insurance**.  Each Company keeps its property adequately insured and maintains (a) insurance to such extent and against such risks as is customary with companies in the same or similar businesses, (b) workmen's compensation insurance in the amount required by applicable law, (c) public liability insurance, in the amount customary with companies in the same or similar business against claims for personal injury or death on properties owned, occupied or controlled by it, and (d) such other insurance as may be required by law.

**SECTION 3.25   Permits, Etc**.  Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred, which, in itself or with the giving of notice or laps of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any such permit, license, authorization, approval, entitlement or accreditation is not in full force and effect, except, as to the extent any such condition, event or claim could not reasonably be expected to have a Material Adverse Effect.

**SECTION 3.26   Canadian Insolvency Event**.  There exists no Lien or claim of any Canadian Subsidiary, any of their Subsidiaries or any of their respective creditors against any Company that could be senior in right of claim or payment to the Obligations.

## ARTICLE IV

## CONDITIONS TO CREDIT EXTENSIONS

**SECTION 4.01   Conditions to Effectiveness of this Agreement**.  The obligations of the Lenders to make Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 10.02):

(a)  The Administrative Agent (or its counsel) shall have received (i) from each party hereto a counterpart of this Agreement signed on behalf of such party and (ii) duly executed copies of the Loan Documents and such other certificates, documents, instruments and agreements as the Lenders shall reasonably request in connection with the Transactions, all in form and substance satisfactory to the Required Lenders and their respective counsel.

(b)  (Reserved).

(c)  The Administrative Agent and the Lenders shall have received the Initial Approved Budget.

(d)  The Administrative Agent shall have received such documents and certificates as the Lenders or their respective counsel may reasonably request relating to the organization, existence and good standing of the Loan Parties, the authorization of the Transactions and any other legal matters relating to the Loan Parties, the Loan Documents or the Transactions, all in form and substance satisfactory to the Required Lenders.

(e)     Other than the Chapter 11 Cases, there shall not be any investigation or review pending (or to the knowledge of Holdings, threatened) by any Governmental Authority with respect to Holdings or any of its Subsidiaries, that could reasonably be expected to have a Material Adverse Effect and there are no actions, suits, inquiries, investigations or proceedings pending (or to the knowledge of Holdings, threatened) against or affecting Holdings or any of its Subsidiaries, or any of their respective properties at law or in equity before, and there are no orders, judgments or decrees of, or before any governmental entity, in each case that could reasonably be expected to have a Material Adverse Effect.

(f)     The Administrative Agent shall have received all Administrative Agent Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including the legal fees and expenses of Willkie Farr & Gallagher LLP and Kelley Drye & Warren LLP), and the fees and expenses of any counsel, local counsel, foreign counsel, appraisers, consultants and other advisors required to be reimbursed or paid by Borrower hereunder or under any other Loan Document.

(g)     The conditions set forth in Sections 4.02(b) through 4.02(d), 4.02(f) and 4.02(g) of this Agreement shall be satisfied on and as of the Closing Date with respect to any Credit Extensions to be made on the Closing Date by the Lenders.

(h)     The Security Agreement shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect on the Closing Date.

(i)     (Reserved).

(j)     (Reserved).

(k)     Borrower shall have paid (or, upon the Closing Date, deemed to have paid) an upfront fee equal to one percent (1%) of the Aggregate Commitment which shall be earned and due on the date hereof and payable-in-kind by adding such amount to the outstanding principal balance of the Loans.

(l)     The Lenders shall have received, to the extent requested at least three (3) Business Days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

(m)     (Reserved).

(n)     (Reserved).

(o)     Plan of Reorganization.  The Required Lenders shall have reviewed, and be satisfied in form and substance with, the Plan of Reorganization and the disclosure statement related thereto.

(p)     Solicitation of Votes.  The Debtors shall have conducted a full solicitation of votes on the Plan of Reorganization in compliance with all applicable Requirements of Law in all material respects prior to the Petition Date.

-53-

(q)     After giving effect to the Transactions, there shall be no outstanding post-Petition Date Indebtedness other than the Secured Obligations or as set forth on Schedule 4.01(r).

(r)     Holdings and its Subsidiaries and the Transactions shall be in compliance, in all material respects, with all applicable U.S., foreign, federal, state and local laws and regulations. All governmental and third party consents and approvals necessary in connection with the Transactions shall have been obtained and be effective and all applicable waiting periods shall have expired without any adverse action being taken by any competent authority.

(s)     The Lenders shall have received unaudited interim consolidated financial statements of Holdings for each quarterly period ended subsequent to the date of the latest audited financial statements delivered to the Lenders and each monthly period ended thereafter, but not less than thirty (30) days prior to the Closing Date.

(t)     The Collateral Agent shall have, for the benefit of the Secured Parties, a valid and perfected first priority security interest in and Lien on the assets of the Loan Parties, subject only to the Carve-Out.

(u)     The Bankruptcy Court shall have entered the Interim DIP Order within three (3) Business Days following the Petition Date, and thereafter the Interim DIP Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed or subject to any appeal, leave to appeal or reconsideration in any respect without the prior written consent of the Required Lenders.

(v)     The Borrowing shall not cause the aggregate amount of the Loans to exceed the amount then authorized by the Interim DIP Order.

(w)     except such items referred to in the succeeding clause (ii), all first day motions filed by the Loan Parties shall be in form and substance reasonably satisfactory to the Required Lenders, and each related order (including the Cash Management Order) shall have been entered by the Bankruptcy Court in the Chapter 11 Cases, in form and substance reasonably satisfactory to the Required Lenders.

(x)     all motions and other documents to be filed with and submitted to the Bankruptcy Court by the Loan Parties related to the Facility and the approval thereof, and all orders entered by the Bankruptcy Court approving such motions and other documents, shall be in form and substance satisfactory to the Required Lenders in their sole discretion.

**SECTION 4.02   All Credit Extensions**.  The obligation of each Lender to fund any Credit Extension requested to be made shall be subject to the prior or concurrent satisfaction of each of the conditions precedent set forth in this Section 4.02.

(a)     Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03) if Loans are being requested.

(b)     No Default.  Borrower and each other Loan Party shall be in compliance in all material respects with all the terms and provisions set forth herein and in each other Loan

Document on its part to be observed or performed, and, at the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default shall have occurred and be continuing on such date.

(c)     <u>Representations and Warranties</u>.   Each of the representations and warranties made by any Loan Party set forth in <u>Article III</u> hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(d)     <u>No Legal Bar</u>.   No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making the Loans to be made by it.   No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

(e)     <u>Use of Proceeds</u>.   The Administrative Agent shall have received an Officer's Certificate certifying that the proceeds of such Borrowing will be used in compliance with <u>Section 5.08</u> and are not being used for any speculative purpose.

(f)     <u>Orders</u>. The Interim DIP Order or, if such Loan is requested after twenty (20) days following the entry of the Interim Order, the Final DIP Order, as applicable, shall be in full force and effect and shall not have been vacated, reversed, modified, amended, stayed or subject to any request or application for appeal, leave to appeal or motion for reconsideration in any respect without the consent of the Required Lenders.

(g)     <u>Approved Budget</u>. The amount of the Borrowing shall comply with the terms of the Approved Budget as then in effect.

The delivery of a Borrowing Request and the acceptance by Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by Borrower and each other Loan Party that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof) the conditions contained in <u>Sections 4.02(b)</u> through <u>4.02(d)</u>, <u>4.02(f)</u> and <u>4.02(g)</u> have been satisfied. Borrower shall provide such information (including, if applicable, calculations in reasonable detail of the covenants in <u>Section 6.09</u>) as the Required Lenders may reasonably request to confirm that the conditions in <u>Sections 4.02(b)</u> through <u>4.02(d)</u>, <u>4.02(f)</u> and <u>4.02(g)</u> have been satisfied.

**ARTICLE V**

**AFFIRMATIVE COVENANTS**

Each Loan Party covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the

principal of and interest on each Loan and all Administrative Agent Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full (other than contingent indemnification obligations for which no claim has been asserted) unless the Required Lenders shall otherwise consent in writing, each Loan Party will, and will cause each of its Subsidiaries to:

**SECTION 5.01   Financial Statements, Reports, etc**.  Furnish to the Administrative Agent (who shall promptly make available to the Lenders):

(a)   Monthly Reports.

(i)   As soon as available, and in any event within 15 days after the end of each month, a sales report for the preceding calendar month;

(ii)   As soon as available, and in any event within 30 days after the end of each calendar month ending after the Closing Date, the consolidated and consolidating balance sheet of Holdings and its Subsidiaries as at the end of such month and the related consolidated and consolidating statements of income, consolidated statements of stockholders' equity and consolidated statements of cash flows of Holdings and its Subsidiaries for such month and for the period from the beginning of the then current fiscal year to the end of such month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year (beginning with the month ending July 31, 2016) and the corresponding figures from the Financial Plan for fiscal year 2016, all in reasonable detail, together with a schedule of reconciliations for any reclassifications with respect to prior months or periods (and, in connection therewith, copies of any restated financial statements for any impacted month or period), certified by a Financial Officer as fairly presenting, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and cash flows for the periods indicated;

(b)   Quarterly Financial Statements.   As soon as available, and in any event within 45 days after the end of each fiscal quarter of each fiscal year ending after the Closing Date, the consolidated and consolidating balance sheets of Holdings and its Subsidiaries as at the end of such fiscal quarter and the related consolidated (and with respect to statements of income, consolidating) statements of income, stockholders' equity and cash flows of Holdings and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous fiscal year (beginning with the fiscal quarter ending September 30, 2016) and the corresponding figures from the Financial Plan for fiscal year 2016, all in reasonable detail, certified by a Financial Officer as fairly presenting, in all material respects, the financial condition of Holdings and its Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated;

(c)   Budgets and Variance Reports.

-56-

(i) Commencing with the fourth calendar week following the Petition Date and every fourth calendar week thereafter, not later than the second Business Day of such week, a proposed update to the then-applicable Approved Budget (each, an "Updated Budget") substantially in the form of the Initial Approved Budget setting forth the projected cash receipts and expenditures of Holdings and its Subsidiaries during the period commencing at the start of such week through and including thirteen (13) weeks thereafter (such that the Updated Budget shall contain projections for thirteen (13) weeks, the first nine (9) of which shall be the same as those included in the then-applicable Approved Budget and four (4) of which shall be proposed). If acceptable to the Required Lenders in their sole discretion, such Updated Budget shall become the "Approved Budget" and shall govern for the period set forth therein until such time as a new Updated Budget shall be approved by the Required Lenders (if at all). If an Updated Budget is not acceptable to the Required Lenders in their sole discretion, the then-applicable Approved Budget shall continue to apply until such time as an Updated Budget is acceptable to the Required Lenders in their sole discretion; *provided* that it shall be an Event of Default if the Borrower shall have failed to provide the Administrative Agent an Updated Budget acceptable to the Required Lenders in their sole discretion prior to the termination of the then-applicable Approved Budget; *provided further* that in connection with an express request by the Borrower set forth in any proposed Updated Budget which is thereafter deemed by the Required Lenders in their sole discretion as the Approved Budget, to the extent the Lenders expressly agree to any modification of, or amendment to, any basket or exception contained in any of the covenants set forth in Article VI, such agreement shall constitute, and be deemed, a modification of, or amendment to, such covenant pursuant to Section 10.02 (which modification or amendment (x) shall be subject to further adjustments by future Approved Budgets (in accordance with the foregoing terms) and (y) may be limited in duration to the extent required by the Required Lenders).

(ii) Commencing for the first full Test Period following the Closing Date and for every Test Period thereafter, not later than the second Business Day of each week after each Test Period, a report, in form and substance satisfactory to the Required Lenders, prepared by Borrower for the immediately preceding Test Period, comparing on a line-by-line basis, the actual cash receipts and disbursements and Borrowings of Loans to the corresponding amounts projected in the Initial Approved Budget or Approved Budget, as applicable;

(d) Compliance Certificate. Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Section 5.01(b), a duly executed and completed Compliance Certificate;

(e) Statements of Reconciliation after Change in Accounting Principles. If, as a result of any change in accounting principles and policies after the Closing Date, the consolidated financial statements of Holdings and its Subsidiaries delivered pursuant to Section 5.01(b) will differ in any material respect from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance reasonably satisfactory to Required Lenders;

(f)      (Reserved);

(g)      (Reserved);

(h)      (Reserved);

(i)      Aging Reports.    Together with each delivery of financial statements of Holdings and its Subsidiaries pursuant to Section 5.01(b), (i) a summary of the accounts receivable aging report of Holdings and its Subsidiaries (prepared on a consolidated basis) as of the end of such period, (ii) a summary of accounts payable aging report of Holdings and its Subsidiaries (prepared on a consolidated basis) as of the end of such period and (iii) such other information as the Required Lenders may reasonably request, in each case, all in detail and in form and substance reasonably satisfactory to the Required Lenders;

(j)      Seismic Crew Information.    Concurrently with the delivery of the financial statements required to be delivered pursuant to Section 5.01(a) and Section 5.01(b), (i) a copy of the report prepared by Holdings consistent with past practice, showing the projected usage of any and all seismic crews owned or operated by Holdings and its Subsidiaries for the ensuing three calendar months and (ii) a copy of the backlog reports and summary of the location of each seismic crew and the status of each ongoing project for such crews prepared by Holdings consistent with past practice;

(k)      Public Reports.    Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Holdings or any of its Subsidiaries with the SEC, or any Governmental Authority succeeding to any or all of the functions of the SEC, or with any national securities exchange;

(l)      Management Letters.    Promptly after the receipt thereof by Holdings or any of its Subsidiaries, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

(m)      Insurance.    Promptly after the request thereof by any Lender, a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a customary lender's loss payable endorsement and to name the Collateral Agent as additional insured, in form and substance satisfactory to the Lenders; and

(n)      Other Information.    Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Holdings or any of its Subsidiaries, or compliance with the terms of any Loan Document, as any Lender may reasonably request.

**SECTION 5.02**    Litigation and Other Notices.    Furnish to the Administrative Agent written notice of the following promptly (and, in any event, within three (3) Business Days of any Responsible Officer of Holdings or any of its Subsidiaries becoming aware thereof):

(a)      any Event of Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)      the filing or commencement of, or any threat in writing of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, (i) against any Company or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)      any development that has resulted in, or could reasonably be expected to result, in a Material Adverse Effect;

(d)      the occurrence of any Casualty Event affecting Collateral having value in excess of $250,000;

(e)      the incurrence of any material Lien (other than Permitted Liens) on, or claim asserted against, any of the Collateral;

(f)      any change in the Board of Directors (or similar governing body) of Holdings or any of its Subsidiaries;

(g)      (i) termination or amendment to any Material Agreement of Holdings or any of its Subsidiaries in a manner that is materially adverse to Holdings or such Subsidiary, as the case may be, or (ii) entry into any new Material Agreement, together with a written statement describing such event, with copies of such material amendments or new contracts, delivered to Collateral Agent, and an explanation of any actions being taken with respect thereto; and

(h)      any environmental matter which resulted in or would reasonably be expected to have a Material Adverse Effect, together with copies of all environmental audits and reports with respect thereto.

### SECTION 5.03   Existence; Businesses and Properties; Compliance with Laws.

(a)      Except as otherwise permitted under Section 6.06, at all times preserve and keep in full force and effect its existence and all rights and Governmental Authorizations, qualifications, franchises, licenses and permits material to its business and to the conduct of its business in each jurisdiction in which its business is conducted; *provided*, no Loan Party or any of its Subsidiaries shall be required to preserve any such right or Governmental Authorizations, qualifications, franchise, licenses and permits if such Person's Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders; *provided further*, that for the avoidance of doubt, Holdings, Borrower and the MCD Subsidiary shall be required to maintain their existence.

(b)      (i) Maintain or cause to be maintained in good repair, working order and condition, consistent with industry practice and ordinary wear and tear excepted, all material properties necessary in the business of Holdings and its Subsidiaries and from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof, and (ii) comply at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder where non-compliance could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(c)     Each Loan Party will comply, shall cause each of its Subsidiaries to comply and shall use commercially reasonable efforts to cause all other Persons, if any, on or occupying any premises owned by such Loan Party to comply, with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Real Property), non-compliance with which could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**SECTION 5.04**    **Insurance**.

(a)     _Generally_.   Maintain or cause to be maintained, with financially sound and reputable insurers, casualty insurance, such public liability insurance, third-party property damage insurance or such other insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Loan Parties as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons and satisfactory to Required Lenders.   Without limiting the generality of the foregoing, the Loan Parties will maintain or cause to be maintained (i) flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System and (ii) replacement value casualty insurance on the Collateral under such policies of insurance, with such insurance companies, in such amounts, with such deductibles, and covering such risks as are at all times carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses.   Each such policy of insurance shall (i) name Collateral Agent, on behalf of the Secured Parties as an additional insured thereunder as its interests may appear, and (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to the Required Lenders, that names Collateral Agent, on behalf of Secured Parties as the loss payee thereunder.

(b)     _Requirements of Insurance_.   Each of the insurance policies required to be maintained under this _Section 5.04_ shall provide for at least thirty (30) days' prior written notice to Collateral Agent of the cancellation or substantial modification thereof (or ten (10) days' prior written notice of cancellation for nonpayment of premiums).   Receipt of such notice shall entitle Collateral Agent (but Collateral Agent shall not be obligated) to renew any such policies, cause the coverages and amounts thereof to be maintained at levels required pursuant to this _Section 5.04_ or otherwise to obtain similar insurance in place of such policies, in each case at the expense of the Loan Parties.

(c)     _Broker's Report_.   Deliver to the Administrative Agent and the Collateral Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Required Lenders may from time to time reasonably request.

(d)     _Real Property_.   No Loan Party that is an owner of Real Property shall take any action that is reasonably likely to be the basis for termination, revocation or denial of any

insurance coverage required to be maintained under such Loan Party's respective Mortgage or that could reasonably be expected to be the basis for a defense to any claim under any Insurance Policy maintained in respect of the Premises, and each Loan Party shall otherwise comply in all material respects with all Insurance Requirements in respect of the Premises; *provided, however*, that each Loan Party may, at its own expense and after written notice to the Administrative Agent, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under this Section 5.04 or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of this Section 5.04.

(e)     Insurance Report.  As soon as practicable and in any event by May 30 of each year (or such other date as may be agreed to by Borrower and the Required Lenders from time to time), a report in form and substance satisfactory to the Required Lenders outlining all material insurance coverage maintained as of the date of such report by the Companies and all material insurance coverage planned to be maintained by the Companies in the immediately succeeding annual period.

**SECTION 5.05   Taxes and Claims**.  File all foreign, federal, state, and other material tax returns required to be filed by Holdings or any of its Subsidiaries and pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon (other than Taxes that do not exceed $100,000 in the aggregate), and all claims (including claims for labor, services, materials and supplies) for sums that have become due and payable and that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; *provided* no such Tax or claim need be paid (x) to the extent such payment is stayed by the Chapter 11 Cases or (y) if it is being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, so long as (a) adequate reserve or other appropriate provision, as shall be required in conformity with GAAP shall have been made therefor, and (b) in the case of a Tax or claim which has or may become a Lien against any of the Collateral, such contest proceedings conclusively operate to stay imposition of any penalty, fine or Lien resulting from the non-payment thereof.   No Loan Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than Holdings or any of its Subsidiaries).

**SECTION 5.06   Employee Benefits**.  (a) Comply in all material respects with the applicable provisions of ERISA and the Code and (b) furnish to the Administrative Agent (i) as soon as possible after, and in any event within 5 Business Days after any Responsible Officer of any Company or any ERISA Affiliates of any Company knows or has reason to know that, any ERISA Event has occurred or, is reasonably expected to occur, that, alone or together with any other ERISA Event that has occurred in the past twelve months could reasonably be expected to result in any material liability to the Companies or any of their ERISA Affiliates or the imposition of a Lien, a statement of a Financial Officer of Holdings setting forth details as to such ERISA Event and the action, if any, that the Companies propose to take with respect thereto; (ii) upon request by the Required Lenders, copies of (A) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any ERISA Affiliate of any Company with the Internal Revenue Service with respect to each Plan; (B) the

most recent actuarial valuation report for each Plan; (C) all notices received by any Company or any ERISA Affiliate of any Company from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (D) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan (as such term is defined in Section 3(3) of ERISA) sponsored or contributed to by any Company or any ERISA Affiliate of any Company) as the Required Lenders shall reasonably request and (iii) promptly following any request therefor, copies of (A) any documents described in Section 101(k) of ERISA that any Company or its ERISA Affiliate may request with respect to any Multiemployer Plan and (B) any notices described in Section 101 (1) of ERISA that any Company or its ERISA Affiliate may request with respect to any Multiemployer Plan; *provided* that if any Company or its ERISA Affiliate has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the applicable Company or ERISA Affiliate shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

**SECTION 5.07   Maintaining Records; Access to Properties and Inspections; Annual Meetings**.

(a)       Keep proper books of record and account in which materially full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities.  Holdings will permit any representatives designated by the Administrative Agent or the Required Lenders (in coordination with the Administrative Agent), at Borrower's expense, to visit and inspect the financial records and the property of Holdings and its Subsidiaries at reasonable times during normal business hours and as often as reasonably requested upon reasonable notice and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or the Required Lenders to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants)  Without limiting the foregoing, the Loan Parties agree that the Collateral Agent shall have the right (but not the obligation) to conduct patent, trademark and copyright searches with respect to the Loan Parties from time to time, and the Loan Parties agree to pay all out-of-pocket expenses incurred by Collateral Agent in connection with such searches.

(b)       (i) Upon the request of Required Lenders, participate (including causing the Financial Advisor to participate) in a meeting of Lenders once during each calendar month to be held at Borrower's corporate offices (or at such other location as may be agreed to by Borrower and Required Lenders) at such time as may be reasonably agreed to by Borrower and Required Lenders.   (ii) Within 30 days of delivery of financial statements and other information required to be delivered pursuant to Section 5.01(b), Borrower shall cause its chief financial officer and the Financial Advisor to participate in a conference call with the Agents and, subject to compliance with the confidentiality requirements set forth in Section 10.12, all Lenders who choose to participate in such conference call during which conference call the chief financial officer shall review the financial condition of Holdings and its Subsidiaries and such other matters as any Lender may reasonably request.

**SECTION 5.08   Use of Proceeds**.   Use the proceeds of the Loans only for the purposes set forth in Section 3.12. No part of the proceeds of any Loan will be used, whether

directly or indirectly, for any purpose that entails a violation of any of the Regulations of the Board, including Regulations T, U and X. Borrower will not request any Borrowing, and Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing (i) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, in violation of Sanctions or (iii) in any manner that would result in the violation of Sanctions.

**SECTION 5.09    Compliance with Environmental Laws; Environmental Reports**.

(a)      Comply, and use commercially reasonable efforts to cause all lessees and other persons occupying Real Property owned, operated or leased by any Company to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew all material Environmental Permits applicable to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)      If a Default caused by reason of any representation or warranty set forth in Section 3.18 being false in any respect when made or deemed made or any breach of Section 5.09(a) shall have occurred and be continuing for more than 20 days without the Companies commencing activities reasonably likely to cure such Default in accordance with Environmental Laws, at the written request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of Borrower, an environmental assessment report regarding the matters which are the subject of such Default, including, where appropriate, air, soil and/or groundwater sampling, prepared by an environmental consulting firm and, in the form and substance, reasonably acceptable to the Required Lenders and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or Response to address them.

**SECTION 5.10    Additional Collateral; Additional Guarantors**.

(a)      Subject to this Section 5.10, with respect to any property owned or acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, promptly (and in any event within 30 days after the acquisition thereof or such later time as the Required Lenders may agree) cause such property to be encumbered by, and subject to, the DIP Liens, including by (i) executing and delivering to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Required Lenders shall deem necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a Lien on such property subject to no Liens other than Permitted Liens and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document in accordance with all applicable Requirements of Law, including the filing of financing statements

-63-

in such jurisdictions as may be reasonably requested by the Required Lenders. Holdings shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Required Lenders shall require to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties. Notwithstanding the foregoing, any required filings with the United States Patent and Trademark Office and United States Copyright Office shall be made within 30 days after the acquisition of the related property.

(b)     (Reserved).

(c)     If requested by the Required Lenders, promptly grant to the Collateral Agent, within 60 days of the acquisition thereof (unless sooner disposed of in an Asset Sale permitted by Section 6.06), a security interest in and Mortgage on each Real Property owned in fee by such Loan Party as is acquired by such Loan Party after the Closing Date as additional security for the Secured Obligations. Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent (in each case, at the direction of the Required Lenders) and shall constitute valid and enforceable perfected Liens subject only to Permitted Liens. Any such Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. Such Loan Party shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Required Lenders shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including, if requested by the Required Lenders, a title policy, a survey in form and substance acceptable to the Required Lenders prepared by a surveyor or engineer licensed to perform surveys in the jurisdiction where such Real Property is located, a life of loan flood hazard determination and local counsel opinion (in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent (in each case at the direction of the Required Lenders) in respect of such Mortgage).

**SECTION 5.11   Security Interests; Further Assurances**.   Promptly, upon the reasonable request of the Required Lenders, at Borrower's expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent and the Collateral Agent (in each case, at the direction of the Required Lenders) reasonably necessary or desirable for the continued validity, perfection and priority of the Liens on the Collateral covered thereby subject to no other Liens except as permitted by the applicable Security Document or this Agreement, or use reasonable commercial efforts to obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent (in each case, at the direction of the Required Lenders) as the Required Lenders shall reasonably deem necessary to perfect or maintain the DIP Liens pursuant to the Security Documents. Upon the exercise by the Administrative Agent, the Collateral Agent or the Required Lenders of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent,

approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lenders may require.   If the Administrative Agent, the Collateral Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of any Loan Party constituting Collateral, Holdings shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance satisfactory to the Administrative Agent and the Collateral Agent (in each case, at the direction of the Required Lenders).

**SECTION 5.12    Information Regarding Collateral**.

(a)    Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number, if any, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Collateral Agent and the Administrative Agent not less than thirty (30) days' prior written notice (in the form of an Officer's Certificate), or such lesser notice period agreed to by the Required Lenders, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Required Lenders may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Collateral Agent at the direction of the Required Lenders to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence.  Each Loan Party also agrees to promptly notify the Collateral Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it.

(b)    Concurrently with the delivery of financial statements required by Section 5.01(b), Company shall deliver to each Lender (i) a list of locations in which any Loan Party maintains Collateral having an aggregate book value in excess of $500,000 (other than locations temporarily occupied by a Loan Party for the purpose of acquiring seismic data, and excluding Collateral in-transit), and (ii) a list of locations in which the Loan Parties are acquiring seismic data (or expect to acquire seismic data for more than 30 days during the next six months), in each case, reasonably identifying the assets maintained (or to be maintained) in each such location.

**SECTION 5.13    (Reserved)**.

**SECTION 5.14    MCD Subsidiary**.  At all times on and after the Closing Date, the MCD Subsidiary shall own all Multi-Client Data, including any Multi-Client Data created after the Closing Date.

**SECTION 5.15    Miscellaneous Business Covenants**.  Unless otherwise consent to by the Required Lenders:

(a)    <u>Non-Consolidation</u>.   Company will and will cause each of its Subsidiaries to maintain entity records and books of account separate from those of any other entity which is an Affiliate of such entity.

(b)    <u>Cash Management Systems</u>.   Holdings and its Subsidiaries shall establish and maintain cash management systems reasonably acceptable to Required Lenders, including, without limitation, with respect to blocked account arrangements; *provided*, that, to the extent the Required Lenders shall request any modification to the cash management systems of Holdings and its Subsidiaries from such cash management systems as in effect on the Closing Date, the Company shall only be required to use commercially reasonable efforts to effect such modifications and shall be provided a reasonable period of time in which to do so; *provided*, *however*, that the foregoing proviso shall in no way limit the right of the Required Lenders to require blocked account arrangements in form and substance reasonably acceptable to the Required Lenders.

(c)    <u>Communication with Accountants</u>.   Each Loan Party executing this Agreement shall authorize and instruct its independent certified public accountants to deliver copies of all management letters to Collateral Agent at the same time such letters are delivered to the Company.

**SECTION 5.16    Financial Advisor**.   Maintain at all times (other than as a result of not being approved by the Bankruptcy Court after good faith attempts to obtain approval), a financial advisor (the "**Financial Advisor**") acceptable to the Required Lenders (it being understood that Jon Goulding of Alvarez & Marsal LLC is acceptable to Required Lenders) with responsibilities reasonably satisfactory to the Required Lenders.

**SECTION 5.17    Cash Management Order**.   Keep the Cash Management Order in effect at all times on and after the Closing Date and not reversed, stayed, modified or amended in any manner without the Required Lenders' prior written consent.

**SECTION 5.18    Bankruptcy Matters.**

(a)    The Chapter 11 Cases shall be commenced on the Petition Date in accordance with applicable law and proper notice thereof under the circumstances, and proper notice shall have been given of (x) the motion or application (as applicable) seeking approval of the Loan Documents and entry of the Orders, as applicable and (y) the hearings for the approval of the Interim DIP Order shall be held by the Bankruptcy Court.

(b)    After the entry of the Orders, as applicable, and pursuant to and to the extent permitted in the Orders, as applicable, the Obligations shall constitute allowed superpriority administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against Borrower and the other Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 326, 330, 331, 503(b), 506(c) (upon entry of the Final DIP Order), 507(a), 507(b), 726, or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject, in all respects, to the Carve-Out.

(c)     Each of the Interim DIP Order (with respect to the period prior to the entry of the Final DIP Order) or the Final DIP Order (from and after the date the Final DIP Order is entered) are, and shall continue to be, in full force and effect and shall not be vacated, reversed or rescinded or, without the prior written consent of the Required Lenders, in their sole discretion, amended or modified, and no appeal or leave to appeal of such order has been timely filed or, if timely filed, no stay pending such appeal or leave to appeal is currently effective.

(d)     The Initial Approved Budget, and each budget that becomes an Updated Budget or an Approved Budget hereunder, has been and shall be, as applicable, prepared in good faith by Holdings and is and shall be, as applicable, based on estimates and assumptions believed by Holdings to be reasonable and fair in light of the facts and circumstances known to Holdings at the time of preparation thereof.

**SECTION 5.19    Security Documents**. The Orders and the Security Documents are, and shall be at all times prior to the payment in full of the Obligations, effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, legal, valid and enforceable perfected first priority Liens on, and security interests in, the Collateral, in each case subject to no Liens other than the applicable Permitted Prior Liens and Liens permitted hereunder.

**SECTION 5.20    Compliance with Approved Budget**. Except as permitted by Section 6.09, Borrower shall be in compliance with the Approved Budget in all respects.

**SECTION 5.21    Compliance with Milestones**.   Each Loan Party shall achieve the milestones set forth on Schedule 5.21 by the dates specified therein (or such later date as the Required Lenders may, in their sole discretion, agree to).

## ARTICLE VI

## NEGATIVE COVENANTS

Each Loan Party covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all fees and all other expenses or amounts payable under any Loan Document have been paid in full (other than contingent indemnification obligations for which no claim has been asserted), unless (x) expressly permitted by the Approved Budget or (y) the Required Lenders shall otherwise consent in writing, no Loan Party will, nor will they cause or permit any Subsidiaries to:

**SECTION 6.01    Indebtedness**.   Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except:

(a)     the Obligations;

(b)     Prepetition First Lien Indebtedness and, solely to the extent incurred prior to the Petition Date and to the extent repayment thereof is subject to the automatic stay of section 362 of the Bankruptcy Code, Indebtedness existing as of the Petition Date that was permitted pursuant to Section 6.01 of the Prepetition First Lien Credit Agreement;

(c)      Indebtedness of any Guarantor to Borrower or to any other Guarantor, or of Borrower to any Guarantor; *provided* (i) all such Indebtedness (other than Guarantees of the Obligations) shall be evidenced by the Intercompany Note, which shall be subject to a first priority lien in favor of the Collateral Agent pursuant to the Security Agreement and the Orders, as applicable, and (ii) all such Indebtedness shall be unsecured and subordinated in right of payment to the payment in full of the Obligations pursuant to the terms of the Intercompany Note;

(d)      (reserved);

(e)      (reserved);

(f)      Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal or similar obligations incurred after the Petition Date in the ordinary course of business and Indebtedness constituting guaranties in the ordinary course of business of the obligations of suppliers, customers, franchisees and licensees of Holdings and its Subsidiaries;

(g)      Indebtedness in respect of netting services, overdraft protections and otherwise in connection with deposit accounts, in each case, arising after the Petition Date and consistent with past practice; *provided*, *however*, such Indebtedness shall not exceed $25,000 in the aggregate at any time;

(h)      (reserved);

(i)      (reserved);

(j)      (reserved);

(k)      guarantees of Holdings or any Subsidiary (other than the MCD Subsidiary) in respect of Indebtedness otherwise permitted hereunder;

(l)      Indebtedness incurred after the Petition Date to finance the purchase of property, casualty, liability, or other insurance to the Loan Parties, so long as such Indebtedness (i) is not in an amount in excess of the amount of the unpaid cost of such insurance for the year in which such Indebtedness is incurred, (ii) is incurred in the ordinary course of business and only to finance such insurance, (iii) is outstanding only during the year in which such insurance is in effect and (iv) is unsecured (or secured only by unearned premiums on the insurance so financed); *provided* that in no event shall the aggregate principal amount of such Indebtedness exceed $[2,500,000] at any time outstanding;

(m)      (reserved);

(n)      obligations in respect of letters of credit; *provided* that (i) the aggregate amount of such letters of credit does not exceed $[10,000,000] at any time outstanding, (ii) such letters of credit are issued in respect of performance, surety or similar obligations and (iii) such reimbursement obligations are not incurred by the MCD Subsidiary; and

(o)      Indebtedness incurred after the Petition Date with respect to (i) credit or debit card services provided by Bank of America, N.A. or an Affiliate thereof in an aggregate principal amount not to exceed (x) $400,000 *less* (y) the amount outstanding for such Indebtedness as of the Petition Date, at any time outstanding and (ii) the Company's fuel card with WEX Fuel Management or an Affiliate thereof in an aggregate principal amount not to exceed (x) $300,000 *less* (y) the amount outstanding for such Indebtedness as of the Petition Date, at any time outstanding, in each case, consistent with past practice.

**SECTION 6.02   Liens**.   Create, incur, assume or permit to exist, directly or indirectly, any Lien on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)      DIP Liens;

(b)      Liens granted to the Prepetition First Lien Collateral Agent on the Collateral to secure the obligations under the Prepetition First Lien Credit Agreement;

(c)      Liens for Taxes incurred after the Petition Date if obligations with respect to such Taxes are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted and reserves required by GAAP have been made or if such Taxes are not due and payable; *provided*, that, the DIP Liens shall have priority over any Liens securing such Taxes;

(d)      statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by law (other than any such Lien imposed pursuant to Section 401 (a)(29) or 412(n) of the Internal Revenue Code or by ERISA), in each case incurred after the Petition Date and in the ordinary course of business and consistent with past practice for (i) amounts not yet overdue or (ii) amounts that are being contested in good faith by appropriate proceedings promptly instituted and diligently conducted, reserves for which required by GAAP have been made and in respect of which such contest operates to stay the exercise of remedies with respect to the Lien resulting from the non-payment thereof; *provided*, that the aggregate amount of obligations that are due (or overdue) pursuant to this clause (d) that are secured by Liens having priority over the Collateral Agent's Liens shall not exceed $500,000;

(e)      Liens provided for in the Orders as adequate protection with respect to the Prepetition First Lien Indebtedness and the Prepetition Second Lien Indebtedness;

(f)      Permitted Prior Liens;

(g)      (reserved);

(h)      Liens solely on any cash earnest money deposits made by Borrower or any of its Subsidiaries (other than the MCD Subsidiary) after the Petition Date in connection with any letter of intent or purchase agreement permitted hereunder;

(i)      purported Liens evidenced by the filing of precautionary UCC financing statements after the Petition Date relating solely to operating leases of personal property entered into in the ordinary course of business and consistent with past practice;

(j)      Liens in favor of customs and revenue authorities arising after the Petition Date as a matter of law to secure payment of customs duties in connection with the importation of goods;

(k)      any zoning or similar law or right reserved to or vested in any governmental office or agency to control or regulate the use of any real property;

(l)      (reserved);

(m)      (reserved);

(n)      (reserved);

(o)      (reserved);

(p)      Liens securing judgments not constituting an Event of Default under Section 8.01(i);

(q)      Liens incurred after the Petition Date on cash or Cash Equivalents securing reimbursement obligations under letters of credit permitted by Section 6.01(n) in an aggregate amount not to exceed 105% of the amount of all such letters of credit outstanding at such time;

(r)      (reserved);

(s)      (reserved);

(t)      (reserved);

(u)      (reserved); and

(v)      (reserved).

**SECTION 6.03   Sale and Leaseback Transactions**.  Directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Loan Party (a) has sold or transferred or is to sell or to transfer to any other Person or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Loan Party to any Person in connection with such lease (a "**Sale and Leaseback Transaction**").

**SECTION 6.04   Investment, Loan and Advances**.  Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person, or purchase or acquire any stock, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person (all of the foregoing, collectively, "**Investments**") except that the following shall be permitted:

-70-

(a)      Investments in cash and Cash Equivalents;

(b)      (reserved);

(c)      Investments (i) in any securities received in satisfaction or partial satisfaction thereof from financially troubled account debtors, (ii) constituting deposits, prepayments and other credits to suppliers made in the ordinary course of business consistent with the past practices of Holdings and its Subsidiaries and (iii) constituting extensions of trade credit in the ordinary course of business;

(d)      intercompany loans to the extent permitted under Section 6.01(c);

(e)      loans and advances to employees of Holdings and its Subsidiaries made in the ordinary course of business in an aggregate amount not to exceed $100,000; *provided*, *however*, that no loans or advances shall be extended by any Loan Party to any employee of a non-Loan Party;

(f)      (reserved); and

(g)      guarantees permitted pursuant to Section 6.01(k).

**SECTION 6.05   Mergers; Consolidations; Subsidiaries**.   (i) Other than in connection with the Plan of Reorganization in the Chapter 11 Cases, wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation (or agree to do any of the foregoing at any future time) or (ii) form or acquire any Subsidiary.

**SECTION 6.06   Asset Sales**.   Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)      sales or other dispositions of assets that do not constitute Asset Sales;

(b)      Asset Sales (including disposals of obsolete or worn out property); *provided* (i) the consideration received for such assets shall be in an amount at least equal to the fair market value thereof, (ii) no less than 100% thereof shall be paid in cash, (iii) the Net Cash Proceeds thereof shall be applied as required by Section 2.10(f) and (iv) such Asset Sale is not made by or of the MCD Subsidiary or its assets; *provided*, *further*, that any Asset sale under this clause (b) shall not be consummated unless (x) the Required Lenders have consented (prior to the filing of any motion to approve such Asset Sale) and (y) the motion seeking approval of such Asset Sale shall be in form and substance satisfactory to the Required Lenders;

(c)      (reserved);

(d)      any Foreign Subsidiary of Holdings may convey, sell, lease or sub lease, exchange, transfer or otherwise dispose of any of its assets or property to Holdings or any other Subsidiary of Holdings;

(e)      (reserved);

(f)      Asset Sales solely between or among Loan Parties; and

(g)      (reserved).

Notwithstanding anything to the contrary contained above, no Loan Party shall, nor shall it permit any of its Subsidiaries to, (a) directly or indirectly sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to qualify directors if required by applicable law or pursuant to the Plan of Reorganization; or (b) permit any of its Subsidiaries directly or indirectly to sell, assign, pledge or otherwise encumber or dispose of any Capital Stock of any of its Subsidiaries, except to another Loan Party or, with respect to any Subsidiary that is not a Loan Party, to any other Subsidiary that is not a Loan Party, or to qualify directors if required by applicable law.

**SECTION 6.07**   **Dividends**.  Authorize, declare, make or pay, directly or indirectly, any Dividends with respect to its Equity Interests, except that the following shall be permitted:

(a)      (reserved); and

(b)      each Subsidiary of Holdings may make Dividends to Loan Parties, ratably according to their respective holdings of the type of Equity Interests in respect of which such Dividend is being made.

**SECTION 6.08**   **Transactions with Affiliates**.  Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company, other than any transaction on terms and conditions at least as favorable to such Company as would reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)      any transaction solely among the Loan Parties; and

(b)      any transaction solely among Subsidiaries that are not Loan Parties.

**SECTION 6.09**   **Budget Compliance**.

(a)      (i) For each Test Period, permit actual total cash disbursements set forth in the Total Disbursements line item as set forth in the Approved Budget for such Test Period to exceed total cash disbursements for such Test Period as set forth in the Approved Budget by an amount in excess of the Maximum Permitted Variance or (ii) for each Test Period, permit the actual cash receipts set forth in the Total Receipts line item as set forth in the Approved Budget for such Test Period to be less than the cash receipts for such Test Period as set forth in the Approved Budget by an amount in excess of the Maximum Permitted Variance.

(b)      Notwithstanding the foregoing clause (a), (i) to the extent that actual disbursements (calculated individually for each line item) set forth in each of the (A) "Total Outflows" (without giving effect to the "Payroll Reimbursement" line item) and (B) "Total Funding" line items for such Testing Period to exceed the disbursements for each of such line items (calculated individually for each line item) for any Test Period as set forth in the Approved

-72-

Budget then-applicable for such Test Period, the amount of the difference between such budgeted disbursements and such actual disbursements (the "**Rollover Disbursement Amount**") may be carried forward and added to the Maximum Permitted Variance permitted for such line item for the next succeeding Test Period and (ii) to the extent that actual cash receipts for any Test Period set forth in the Total Receipts line item for such Test Period are greater than the cash receipts for such Test Period as set forth in the Approved Budget then-applicable for such Test Period, the amount of the difference between such actual cash receipts and such budgeted cash receipts (the "**Rollover Receipts Amount**") may be carried forward and added to the Maximum Permitted Variance for succeeding Test Periods.

**SECTION 6.10    Prepayments    of    Other    Indebtedness;    Modifications    of Organizational Documents and Other Documents, etc**.    Directly or indirectly:

(a)    (i) Amend or permit any amendments to the Organizational Documents of any Loan Party or any Subsidiary of any Loan Party; or (ii) amend or permit any amendments to, or terminate or waive any provision of, any Material Agreement or any Indebtedness of any Loan Party or any Subsidiary of any Loan Party.

(b)    Directly or indirectly, voluntarily purchase, redeem, defease or prepay any principal of, premium, if any, interest or other amount payable in respect of any Indebtedness prior to its scheduled maturity during the term of this Agreement, other than (i) the Obligations or (ii) Capital Lease Obligations or Purchase Money Obligations if the assets securing such Indebtedness have been sold or otherwise disposed of in accordance with Section 6.06.

**SECTION 6.11    Limitation on Certain Restrictions on Subsidiaries**.    Create or otherwise cause to exist or become effective after the Closing Date any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Holdings to (a) pay dividends or make any other distributions on any of such Subsidiary's Equity Interests owned by Holdings or any other Subsidiary of Holdings, (b) repay or prepay any Indebtedness owed by such Subsidiary to any Loan Party, (c) make loans or advances to any Loan Party or (d) transfer any of its property or assets to any Loan Party.

**SECTION 6.12    Business; Passive Holding Company; MCD Subsidiary**.

(a)    From and after the Closing Date, engage in any business other than (a) the businesses engaged in by such Person on the Closing Date or any business incidental or reasonably related thereto, and (b) such other lines of business as may be consented to by Required Lenders.

(b)    With respect to Holdings, engage in any business activities or have any material properties or liabilities, other than (i) its ownership of the Equity Interests of its Subsidiaries and the making of Investments therein and contributions thereto to the extent permitted under this Agreement, (ii) the payment of dividends and other amounts in respect of its equity interests otherwise permitted under this Agreement, (iii) obligations under the Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents, the Orders and any other documents governing Indebtedness permitted hereby, (iv) maintenance of its existence (including the ability to incur fees, costs and expenses relating to such maintenance),

(v) as expressly contemplated by this Agreement, the other Loan Documents or the Orders, (vi) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and, as applicable, its Subsidiaries, (vii) the issuance of Equity Interests to the extent permitted under this Agreement, (viii) providing indemnification to officers and directors and (ix) activities and properties incidental to the foregoing.

(c)     With respect to the MCD Subsidiary, engage in any business activities or have any material properties or liabilities, other than (i) its ownership of all Multi-Client Data and any activities relating to the licensing thereof, the maintenance, use and enhancement of the Multi-Client Data in the ordinary course of business and the liabilities under the SEI-GPI Agreement, (ii) obligations under the Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition Second Lien Loan Documents and the Orders, (iii) maintenance of its existence (including the ability to incur fees, costs and expenses relating to such maintenance), (iv) as expressly contemplated by this Agreement, the other Loan Documents or the Orders, (v) if applicable, participating in tax, accounting and other administrative matters as a member of the consolidated group of Holdings and its Subsidiaries, (vi) providing indemnification to officers and directors, (vii) Tax liabilities and (viii) activities and properties incidental to the foregoing.

**SECTION 6.13    Limitation on Accounting Changes**.  Make or permit any material change in accounting policies or reporting practices, except changes that are required by GAAP (including any such changes that are adopted earlier than the date required by GAAP).

**SECTION 6.14    Fiscal Year**.    Change its fiscal year-end to a date other than December 31.

**SECTION 6.15    No Further Negative Pledge**.  Except with respect to (a) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to any sale or disposition permitted under Section 6.06, (b) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be, (c) any restrictions in agreements entered into in the ordinary course of business in accordance with customary industry practice and (d) the Loan Documents, the Prepetition First Lien Loan Documents or the Prepetition Second Lien Loan Documents, enter into any agreement prohibiting the creation or assumption of any Lien in favor of the Collateral Agent to secure the Obligations upon any of its properties or assets, whether now owned or hereafter acquired.

**SECTION 6.16    Sanctions**.

(a)     Directly or indirectly, (i) conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any Sanctioned Person or Sanctioned Country, (ii) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Sanctions, or (iii) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, Sanctions (and the Loan Parties shall deliver to the Lenders any certification or other

evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this <u>Section 6.16</u>).

**SECTION 6.17   Sanctioned Person**.   Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any Sanctioned Person or Sanctioned Country, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by Sanctions, or the Loans made by the Lenders would be in violation of Sanctions, or (b) any Sanctioned Person or Sanctioned Country to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by Sanctions.

**SECTION 6.18   Deposit Accounts and Securities Accounts**.   Establish or maintain a Deposit Account or a Securities Account in the United States that is not subject to a Control Agreement or a Control Agreement in favor of the Prepetition First Lien Collateral Agent.

**SECTION 6.19   Foreign Payroll**.   Cause or permit any of the funds or properties of the Loan Parties to be used to fund any payroll obligations of Global Serviços Geofisicos Ltda unless such Loan Party has received funds in an equal amount from Global Serviços Geofisicos Ltda for such purpose.

**SECTION 6.20   Assets of Global Eurasia**.   Permit the aggregate value of property and assets (including but not limited to cash and Cash Equivalents, Real Property or equipment) of Global Eurasia to exceed, in the aggregate, $25,000.

**SECTION 6.21   Cash Payments**.   Cause or permit any cash payments to be made or payable by (x) any Loan Party to any Canadian Subsidiary or any of their Subsidiaries or (y) any Loan Party to any Subsidiary that is not a Loan Party.

**SECTION 6.22   Use of Proceeds**.   Cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Requirement of Law.

**SECTION 6.23   Chapter 11 Cases**.

(a)   Other than the Carve-Out and for adequate protection to the extent required by the Orders, suffer to exist or permit, or file any motion seeking, any other Superpriority Claim which is *pari passu* with, or senior to the DIP Liens or any other claims of the Administrative Agent, the Collateral Agent and Lenders.

(b)   Make or permit to be made any change to the Orders, as applicable, without the consent of the Required Lenders.

(c)   Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent, the Collateral Agent, any Lender, the Prepetition First Lien Agent, the Prepetition First Lien Collateral Agent or any Prepetition First Lien Lender with respect to this Agreement, the other Loan Documents, the transactions contemplated hereby or thereby, the Prepetition First Lien Credit Agreement, the

Prepetition First Lien Loan Documents, the other documents or agreements executed or delivered in connection therewith or the transactions contemplated thereby, as applicable.

(d)     Make or file any motion seeking to make (i) any prepetition "critical vendor" payments or other payments on account of any prepetition claim or obligation, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code or (iii) payments under any management incentive plan or on account of claims or expenses arising under section 503(c) of the Bankruptcy Code, except in amounts and on terms and conditions that (a) are approved by an order, in form and substance satisfactory to the Required Lenders, of the Bankruptcy Court after notice and a hearing and (b) are expressly permitted by the terms of the Loan Documents and within the limits, including the Maximum Permitted Variance, of the Approved Budget.

(e)     File any motion or application with the Bankruptcy Court with regard to actions taken outside the ordinary course of business of the Debtors without consulting with the Required Lenders and providing the Required Lenders prior (in any case, not less than two (2) Business Days' (or such lesser time as may be acceptable to Required Lenders in their sole discretion)) notice and the opportunity to review and comment on each such motion.

**SECTION 6.24    Canadian Insolvency Event**.   Create, incur, assume or permit to exist, directly or indirectly, any Lien or claim of any Canadian Subsidiary, any of their Subsidiaries or any of their respective creditors against any Loan Party that could be senior in right of claim or payment to the Obligations.

## ARTICLE VII

## GUARANTEE

**SECTION 7.01    The Guarantee**.   The Guarantors hereby jointly and severally guarantee, as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Loans made by the Lenders to, and the Notes held by each Lender of, Borrower, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document or any Hedging Agreement or Treasury Services Agreement entered into with a counterparty that is a Secured Party, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"; *provided* that the term "Guaranteed Obligations" shall not include any Excluded Swap Obligation).   The Guarantors hereby jointly and severally agree that if Borrower or other Guarantor(s) shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

-76-

**SECTION 7.02    Obligations Unconditional**.  The obligations of the Guarantors under Section 7.01 shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full).   Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with;

(iv)    any Lien or security interest granted to, or in favor of, any Secured Party or Agent as security for any of the Guaranteed Obligations shall fail to be perfected; or

(v)    the release of any other Guarantor pursuant to Section 7.09.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against any Loan Party under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations.   The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings between the Loan Parties and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee.   This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the

obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against any Loan Party or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto.   This Guarantee shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Secured Parties, and their respective successors and assigns.

**SECTION 7.03    Reinstatement**.   The obligations of the Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

**SECTION 7.04    Subrogation; Subordination**.   Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against Borrower or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations.   Any intercompany Indebtedness of any Loan Party permitted pursuant to this Agreement or the Prepetition First Lien Credit Agreement shall be subordinated to such Loan Party's Secured Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

**SECTION 7.05    Remedies**.   The Guarantors jointly and severally agree that, as between the Guarantors and the Secured Parties, the obligations of Borrower under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrower) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

**SECTION 7.06    Instrument for the Payment of Money**.   Each Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Secured Party or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

**SECTION 7.07    Continuing Guarantee**.   The guarantee in this Article VII is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

**SECTION 7.08   General Limitation on Guarantee Obligations**.   In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

**SECTION 7.09   Release of Guarantors**.   If, in compliance with the terms and provisions of the Loan Documents, the Equity Interests of any Guarantor are sold or otherwise transferred such that such Guarantor no longer constitutes a Subsidiary that would be required to be a Guarantor hereunder (a "**Transferred Guarantor**") to a person or persons, none of which is Holdings or a Subsidiary, such Transferred Guarantor shall, upon the consummation of such sale or transfer, be automatically released from its obligations under this Agreement (including under Section 10.03 hereof) and its obligations to pledge and grant any Collateral owned by it pursuant to the Orders or any Security Document and the pledge of such Equity Interests to the Collateral Agent pursuant to the Orders or any Security Document shall be automatically released, and, so long as Holdings shall have provided the Agents such certifications or documents as any Agent or the Required Lenders shall reasonably request, the Collateral Agent shall take such actions within 30 days after notice to the Collateral Agent of such transfer, as are reasonably requested by Borrower, at Borrower's expense, to effect each release described in this Section 7.09 in accordance with the relevant provisions of the Orders or the Security Documents, so long as Holdings shall have provided the Agents such certifications or documents as any Agent or the Required Lenders shall reasonably request in order to demonstrate compliance with this Agreement.

**SECTION 7.10   Right of Contribution**.   Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.   Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 7.04. The provisions of this Section 7.10 shall in no respect limit the obligations and liabilities of any Guarantor to the Agents and the Secured Parties, and each Guarantor shall remain liable to the Agents and the Secured Parties for the full amount guaranteed by such Guarantor hereunder.

**SECTION 7.11   Keepwell**.   Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Guarantor to honor all of its obligations under the guaranty under this Article VII in respect of Swap Obligations (*provided, however*, that each Qualified ECP Guarantor shall only be liable under this Section 7.11 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section 7.11, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).   The obligations of each Qualified ECP

-79-

Guarantor under this <u>Section 7.11</u> shall remain in full force and effect until all of the Guaranteed Obligations shall have been indefeasibly paid in full.  Each Qualified ECP Guarantor intends that this <u>Section 7.11</u> constitute, and this <u>Section 7.11</u> shall be deemed to constitute, a "keepwell, support or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

**ARTICLE VIII**

**EVENTS OF DEFAULT**

**SECTION 8.01   Events of Default**.   Upon the occurrence and during the continuance of the following events ("**Events of Default**"):

(a)      default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)      default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of three (3) Business Days;

(c)      any representation or warranty made or deemed made in any Loan Document or in connection with any Credit Extension hereunder, or any representation, warranty or certification contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)      default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in <u>Section 5.02</u>, <u>Section 5.03(a)</u>, <u>Section 5.08</u>, <u>Section 5.14</u>, <u>Section 5.15(d)</u>, <u>Section 5.21</u> or in <u>Article VI</u>;

(e)      default shall be made in the due observance or performance by any Loan Party of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of twenty (20) days;

(f)      any Company shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any post-Petition Date Material Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period with respect thereto, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such post-Petition Date Material Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such post-Petition Date Material Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such post-Petition Date Material Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor; *provided* that, in the

-80-

case of Hedging Obligations, the amount counted for the purpose of this clause (f) shall be the amount payable by all Companies if such Hedging Obligations were terminated at such time;

(g)      (reserved);

(h)      (reserved);

(i)      one or more post-Petition Date judgments, orders or decrees in an individual amount in excess of $1,000,000 or in an aggregate amount in excess of $2,000,000 (to the extent not covered by independent third party insurance as to which the insurer is rated at least "A" by A.M. Best Company and has not denied coverage) shall be rendered against any Company or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 45 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Company to enforce any such judgment;

(j)      one or more ERISA Events or similar events with respect to Foreign Plans shall have occurred that, (i) in the good faith opinion of the Required Lenders, when taken together with all other such ERISA Events and similar events with respect to Foreign Plans that have occurred, could reasonably be expected to result in a Material Adverse Effect or (ii) result in the imposition of a Lien on any properties of a Company or any of its ERISA Affiliates;

(k)      any security interest and Lien purported to be created by the Orders or any Security Document with respect to any Collateral shall cease to be, or shall be asserted in writing by Holdings or any Loan Party not to be, in full force and effect and have the priority set forth in the Orders, in each case except in accordance with the terms thereof;

(l)      (i) any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or (ii) a proceeding shall be commenced by (A) any Loan Party or by any Governmental Authority or (B) any other Person, in each case, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), and, solely in the case of a proceeding commenced by any Person referred to in clause (ii)(B) above, such proceeding shall continue undismissed for 45 days or (iii) any Loan Party shall repudiate or deny in writing any portion of its liability or obligation for the Obligations;

(m)      there shall have occurred a Change in Control;

(n)      (i) Holdings or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting all or any material part of the business of Borrower or Holdings and its Subsidiaries, taken as a whole, for more than fifteen (15) days; (ii) any other cessation of a substantial part of the business of Holdings or any of its Subsidiaries for a period which materially and adversely affects Borrower or Holdings and its Subsidiaries, taken as a whole or (iii) any material damage to, or loss, theft or destruction of, any Collateral whether or not insured or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than fifteen (15) consecutive days, the cessation or substantial curtailment of revenue producing activities of the business of Borrower or Holdings and its Subsidiaries, taken as a whole; or

-81-

(o)      there shall have occurred any of the following in the Chapter 11 Cases:

(i)      the bringing of a motion or application or taking of any action in each case by any Company in the Chapter 11 Cases or the entry of any order by the Bankruptcy Court in the Chapter 11 Cases: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement or that does not provide for the repayment of all Obligations under this Agreement in full in cash; (ii) to grant any Lien or charge other than DIP Liens or charges expressly permitted under this Agreement upon or affecting any Collateral; (iii) except as provided in this Agreement or the Orders, as the case may be, to use cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Required Lenders; or (iv) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court on account of a request by any Loan Party) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent, the Collateral Agent and the Lenders hereunder or their interest in the Collateral;

(ii)      the filing of any plan of reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party which does not provide for either (x) the repayment of all Obligations under this Agreement in full in cash on the "Effective Date" of such plan or (y) such other treatment of the Obligations in a manner acceptable to the Required Lenders;

(iii)      the termination of any Loan Party's exclusive right to file and solicit acceptances of a plan of reorganization;

(iv)      the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not (i)(a) contain a provision for repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans and (b) provide for the continuation and priority of the DIP Liens until the Obligations have been paid in full or (ii) provide for such other treatment of the Obligations in a manner acceptable to the Required Lenders;

(v)      the entry of an order in the Chapter 11 Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document or the Orders, as applicable, in any case without the prior written consent of the Required Lenders;

(vi)      the payment of, or application by any Loan Party for authority to pay, any prepetition claim without the Required Lenders' prior written consent other than (i) as provided in any "first day order" in form and substance acceptable to the Required Lenders, (ii) as set forth in the Approved Budget (subject to the Maximum Permitted Variance) or (iii) unless otherwise expressly permitted under this Agreement;

(vii)      the entry of an order by the Bankruptcy Court appointing, or the filing of an application by any Loan Party, for an order seeking the appointment of, in either case without the consent of the Required Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of

the Bankruptcy Code in the Chapter 11 Cases with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of Borrower or with the power to conduct an investigation of (or compel discovery from) the Administrative Agent, the Collateral Agent or the Lenders or against the Prepetition First Lien Agent, the Prepetition First Lien Collateral Agent or Prepetition First Lien Lenders under the Prepetition First Lien Loan Documents;

(viii)   the sale without the Required Lenders' prior written consent, of all or substantially all of any Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not provide for payment in full in cash of the Obligations;

(ix)   the dismissal of the Chapter 11 Cases in a manner which does not provide for payment in full in cash of all noncontingent monetary Obligations of Borrower hereunder, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of Borrower hereunder;

(x)   the conversion of one or more of the Chapter 11 Cases from cases under chapter 11 to cases under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(xi)   the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy (x) to allow any creditor to execute upon or enforce a Lien on any Collateral or (y) with respect to any Lien of, or the granting of any Lien on, any Collateral to any state, provincial or local environmental or regulatory agency or authority having priority over the Lien in favor of the Administrative Agent, the Collateral Agent, the Prepetition First Lien Collateral Agent and the Prepetition First Lien Agent;

(xii)   the entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents;

(xiii)   the failure of any Loan Party to perform any of its obligations under the Interim DIP Order or the Final DIP Order or any violation of any of the terms of the Interim DIP Order or the Final DIP Order, subject to any applicable grace or cure periods;

(xiv)   the challenge by any Company, a holder of Equity Interests in any Company, the Prepetition Second Lien Agent or any Lender (as defined in the Prepetition Second Lien Credit Agreement) to, or the entry of an order permitting any other Person to challenge, the validity, extent, perfection or priority of any Liens granted under the Prepetition First Lien Loan Documents;

(xv)   the remittance, use or application of cash collateral of the Loan Parties other than in accordance with any Cash Management Orders and agreements approved by the Bankruptcy Court and the Orders;

(xvi)   the entry of an order in any of the Chapter 11 Cases granting any other superpriority administrative claim (other than the Carve-Out), Lien or charge equal or superior to that granted to the Collateral Agent, on behalf of itself and the other Secured Parties without the consent in writing of the Required Lenders, or as otherwise expressly permitted in this Agreement;

(xvii)   the filing of a motion by any Loan Party requesting, or the entry of any order granting, any superpriority claim which is senior or *pari passu* with the Lenders' claims or with the Prepetition First Lien Lenders under the Prepetition First Lien Loan Documents except (i) in connection with the Permitted Prior Liens, (ii) in respect of the Carve-Out, (iii) under the Adequate Protection Provisions or (iv) to the extent the claim relates to new financing that provides for the repayment of all Obligations under this Agreement irrevocably in full in cash on the closing of such new financing;

(xviii)   the entry of an order precluding the Administrative Agent, the Collateral Agent, the Prepetition First Lien Collateral Agent or the Prepetition First Lien Agent from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties;

(xix)   any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement) avoid, set off or subordinate the Obligations or the DIP Liens to any other debt;

(xx)   any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement) avoid, set off or subordinate the Obligations (as defined in the Prepetition First Lien Credit Agreement) or the Liens securing such Obligations to any other debt;

(xxi)   the reversal, vacatur or stay of the effectiveness of any of the Interim DIP Order, the Final DIP Order or any provision thereof without the prior written consent of the Required Lenders;

(xxii)   the payment of or granting adequate protection (except pursuant to the Adequate Protection Provisions) with respect to any pre-Petition Date Indebtedness (other than with respect to payment permitted under any "first day order" in form and substance satisfactory to the Required Lenders or as set forth in the Interim DIP Order or the Final DIP Order);

(xxiii)   an application for any of the orders described in this Section 8.01(o) including, without limitation, clauses (i), (iii), (iv), (vii), (viii), (ix), (x) or (xiv) shall be made by a Person other than the Administrative Agent or the Lenders and such application is not, to the extent requested by the Required Lenders, contested by any Loan Party in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(xxiv) the DIP Liens or superpriority claims granted with respect to this Agreement shall cease to be valid, perfected or enforceable in any respect; or

(xxv) the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Orders, the DIP Liens and the Collateral;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent or Collateral Agent, as the case may be, in each case, at the direction of the Required Lenders, shall, by notice to Holdings, take any or all of the following actions, at the same or different times:

(i) the Administrative Agent may terminate forthwith the Commitments;

(ii) the Administrative Agent may declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Commitment Fees and Administrative Agent Fees and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable;

(iii) the Collateral Agent may direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Required Lenders pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code and, at the direction of the Required Lenders, the Collateral Agent (on behalf of the Lenders) shall have the right to "credit bid" the allowed amount of the Lenders' claims during any sale of all or substantially all of the Collateral, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization subject to confirmation under section 1129 of the Bankruptcy Code (and, without limiting the foregoing, direct any Loan Party to assume or assign any lease or executory contract included in the Collateral to the Collateral Agent's designees in accordance with and subject to section 365 of the Bankruptcy Code); and

(iv) the Collateral Agent may exercise any rights and remedies provided to the Collateral Agent under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code and, pursuant to the Interim DIP Order and the Final DIP Order, the automatic stay of section 362 of the Bankruptcy Code shall be modified and vacated to permit the Collateral Agent and Secured Parties to exercise their remedies under this Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court.

Upon the occurrence and during the continuance of an Event of Default and the exercise by the Collateral Agent, on behalf of the Secured Parties, of their rights and remedies under this Agreement and the other Loan Documents, Borrower shall assist the Agent and the Lenders in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the Required Lenders. Except as expressly provided above in this Section 8.01, presentment, demand, protest and any other notice of any kind are hereby expressly waived by Borrower and the

Guarantors, anything contained herein or in any other Loan Document to the contrary notwithstanding.

**SECTION 8.02    Rescission**.  If at any time after termination of the Commitments or acceleration of the maturity of the Loans, Borrower shall pay all arrears of interest and all payments on account of principal of the Loans owing by it that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to Section 10.02, then upon the written consent of the Required Lenders and written notice to Holdings, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled; but such action shall not affect any subsequent Default or impair any right or remedy consequent thereon.  The provisions of the preceding sentence are intended merely to bind the Lenders to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit Borrower and do not give Borrower the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

**SECTION 8.03    Application of Proceeds**.  The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

(a)    *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Administrative Agent, Collateral Agent and their agents and counsel, and all expenses, liabilities and advances made or incurred by the Administrative Agent and Collateral Agent in connection therewith and all amounts for which the Administrative Agent and Collateral Agent is entitled to indemnification pursuant to the provisions of any Loan Document and all other amounts owing to the Agents under the Loan Documents, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(b)    *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(c)    *Third*, without duplication of amounts applied pursuant to clauses (a) and (b) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations in respect of Loans (other than principal) and any fees, premiums and scheduled periodic payments due under Hedging Agreements or Treasury Services Agreements constituting Secured Obligations and any interest accrued thereon, in each case equally and ratably in accordance with the respective amounts thereof then due and owing;

(d)      *Fourth*, to the indefeasible payment in full in cash, *pro rata*, of principal amount of (i) Obligations in respect of Loans and any premium thereon and (ii) any breakage, termination or other payments under Hedging Agreements and Treasury Services Agreements constituting Secured Obligations and any interest accrued thereon; and

(e)      *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (e) of this Section 8.03, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE IX

## THE AGENTS

**SECTION 9.01   Appointment and Authority**.      Each of the Lenders hereby irrevocably appoints Wilmington Savings Fund Society, FSB (and any successor Administrative Agent appointed as *provided* herein), to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents to which such Agent is a party, respectively, and authorizes such Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agents by the terms hereof or thereof, together with such powers as are reasonably incidental thereto.   With the exception of the second and fifth sentences of Section 9.06, provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent and the Lenders, and neither Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.   The Lenders hereby direct the Agents to execute the Loan Documents to which they are parties, respectively, on the Closing Date.

**SECTION 9.02   Rights as a Lender**.   Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender, as the case may be, and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders", shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity.   Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holdings or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 9.03   Exculpatory Provisions**.   No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents to which such Agent is a party, and their duties hereunder and thereunder shall be ministerial and administrative in nature.   Without limiting the generality of the foregoing, no Agent:

(i)      shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii)     shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly provided hereby or by the other Loan Documents to which such Agent is a party that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law; and

(iii)     shall, except as expressly set forth herein and in the other Loan Documents to which such Agent is a party, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings or any of its Affiliates that is communicated to or obtained by the person serving as such Agent or any of its Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request or direction of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.02) or (y) in the absence of its own gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.   No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default and stating that it is a "notice of Default" is given to such Agent by Borrower or a Lender.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, recital, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or any Collateral, or the perfection or priority of any Lien or security interest created or purported to be created by the Loan Documents or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.   Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.   Instead, such term us used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

Notwithstanding any provision of this Agreement or the other Loan Documents to the contrary, neither Agent shall be required to (i) make or give any determination (including whether a matter is satisfactory to such Agent or whether to deem a matter necessary, desirable, proper or advisable), agreement, consent, approval, request, notice, consultation, designation, appointment, election, judgment or direction, (ii) file any UCC financing or continuation statements or similar documents or instruments, (iii) make any inspection or (iv) release or sell

-88-

Collateral or otherwise exercise any rights or remedies of a secured party (including voting rights), in each case, without the written direction of the Required Lenders.

Notwithstanding any provision of this Agreement or the other Loan Documents to the contrary, before taking or omitting any action to be taken or omitted by the Administrative Agent and/or the Collateral Agent under the terms of this Agreement and the other Loan Documents, the Administrative Agent and/or the Collateral Agent, as the case may be, may seek the written direction of the Required Lenders (which written direction may be in the form of an e-mail), and such Agent shall be entitled to rely (and shall be fully protected in so relying) upon such direction. The Agents shall not be liable with respect to any action taken or omitted to be taken by it in accordance with such direction. If the Agents shall request such direction with respect to any action, the Agents shall be entitled to refrain from such action unless and until the Agents shall have received such direction, and the Agents shall not incur liability to any Person by reason of so refraining. Any provision of this Agreement or the other Loan Documents authorizing the Administrative Agent and/or the Collateral Agent to take any action shall not obligate the Administrative Agent or the Collateral Agent to take such action.

In no event shall the Administrative Agent or the Collateral Agent have any duty, responsibility, obligation or liability with respect to monitoring the Collateral or the conditions thereof, or to preserve the Collateral, except for the exercise of reasonable care in the custody and preservation of any Collateral in its possession by according such Collateral treatment substantially equal to that accorded its own property.

In acting under the Loan Documents to which it is a party, each of the Administrative Agent and the Collateral Agent shall be entitled to all of the rights, protections, immunities and indemnities set forth in this Agreement.

In no event shall either Agent be responsible, under any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.

**SECTION 9.04   Reliance by Agent**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, including pursuant to Sections 4.01 and 4.02, the Administrative Agent may presume that such condition is satisfactory to each Lender unless the Administrative Agent shall have received notice to the contrary from any Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**SECTION 9.05   Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent.

**SECTION 9.06   Resignation of Agent**.  Each Agent may at any time give notice of its resignation to the Lenders and Holdings.  Upon receipt of any such notice of resignation, the Required Lenders shall appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.   If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations *provided* to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.   Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as *provided* above in this paragraph).  The fees payable by Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between Borrower and such successor.   After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.03 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

**SECTION 9.07   Non-Reliance on Agent and Other Lenders**.   Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**SECTION 9.08   Withholding Tax**.  To the extent required by any applicable law, the Agents may withhold from any payment to any Lender an amount equivalent to any applicable

withholding tax.  If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that an Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective), such Lender shall indemnify and hold harmless the Agent (to the extent that the Agent has not already been reimbursed by Borrower and without limiting the obligation of Borrower to do so) for all amounts paid, directly or indirectly, by the Agent as taxes or otherwise, including any interest, additions to tax or penalties thereto, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

**SECTION 9.09   Collateral Matters**.  The Lenders irrevocably agree that any Lien on any property granted to or held by the Administrative Agent or the Collateral Agent under the Orders or any Loan Document shall be automatically released (a) upon termination of the Commitments and payment in full of all Secured Obligations (other than (i) Hedging Obligations not yet due and payable, (i) obligations under Treasury Services Agreements not yet due and payable and (iii) contingent indemnification obligations not yet accrued and payable), (b) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder or under any other Loan Document or the Orders (and the Administrative Agent or Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Loan Party upon its reasonable request without further inquiry) to any person other than a Loan Party, (c) subject to Section 10.02, if the release of such Lien is approved, authorized or ratified in writing by the Required Lenders, or (d) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty pursuant to Section 7.09.

In each case as specified in this Section 9.09, the Administrative Agent will (and each Lender irrevocably authorizes the Administrative Agent to), at Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the security interest granted under the Security Documents or the Orders, in each case in accordance with the terms of the Loan Documents, Section 7.09 and this Section 9.09.

## ARTICLE X

## MISCELLANEOUS

**SECTION 10.01  Notices**.

(a)     _Generally_.  Except as provided in paragraph (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)     if to any Loan Party, to Holdings at:

Global Geophysical Services, LLC
13927 S. Gessner Road
Missouri City, TX 77489
Attention: Sean M. Gore Chief Financial Officer
Telecopier No.: (713) 808-7764
Email: sean.gore@globalgeophysical.com

with a copy to:

Baker Botts LLP
910 Louisiana Street
Houston, TX 77002
Attention: Andrew Thomison
Telecopier No.: (713) 229-7764
Telephone: (713) 229-1864

(ii)     if to the Administrative Agent or the Collateral Agent, to it at:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue, 11th Floor
Wilmington, DE 19801
Attention: Loan Agency - Global Geophysical Services
Telecopier No.: (302) 421-9137
Email: glewis@wsfsbank.com

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:   Leonard Klingbaum
Telecopier No.: (212) 728-9290
Email: lklingbaum@willkie.com

and

Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attention: Pamela Bruzzese-Szczygiel
Telecopier No.: (212) 808-7897
Email: pbruzzese-szczygiel@kelleydrye.com

(iii)    if to a Lender, to it at its address (or telecopier number) set forth on its
signature page hereto.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall
be deemed to have been given when received; notices sent by telecopier shall be deemed to have

been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b)    Electronic Communications.  Notices and other communications to the Lenders hereunder may (subject to Section 10.01(d)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, the Collateral Agent or Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including as set forth in Section 10.01(d)); *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Change of Address, etc.  Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

(d)    Posting.  Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing, the issuance, amendment, or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at KMoore@wsfsbank.com or at such other e-mail address(es) *provided* to Borrower from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document

or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require.  Nothing in this Section 10.01 shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

To the extent consented to by the Administrative Agent in writing from time to time, Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents; *provided* that Holdings upon request shall also deliver to the Administrative Agent an executed original of each Compliance Certificate required to be delivered hereunder.

Each Loan Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on IntraLinks or a substantially similar electronic transmission system (the "**Platform**"). The Platform is *provided* "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

### SECTION 10.02  Waivers; Amendment.

(a)     Generally.  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.   The rights and remedies of each Agent, and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.   No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent, any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances.

(b)     Required Consents.   Subject to 10.02(c), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrower and the Administrative Agent or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document) and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)     increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)     reduce the principal amount or premium, if any, of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(b)), or reduce any Administrative Agent Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender (or the Agents, in the case of the Administrative Agent Fees) directly affected thereby (it being understood that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (ii));

(iii)     (A) change the scheduled final maturity of any Loan or any scheduled date of payment (or permitted prepayment), or (B) change the amount of, waive or excuse any such payment (other than waiver of any increase in the interest rate pursuant to Section 2.06(b)), in any case, without the written consent of each Lender directly affected thereby;

(iv)     permit the assignment or delegation by Borrower of any of their rights or obligations under any Loan Document, without the written consent of each Lender;

(v)     release all or substantially all of the Guarantors from their Guarantee (except as expressly provided in Article VII), or limit their liability in respect of such Guarantee, without the written consent of each Lender ;

(vi)     release all or a substantial portion of the Collateral from the DIP Liens or alter the relative priorities of the Secured Obligations entitled to the DIP Liens, in each case without the written consent of each Lender;

(vii)     change Section 2.12(b), (c) or (d) or Section 8.03 in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby or any other provision in a manner that would alter the *pro rata* allocation among the Lenders of Loan disbursements, including the requirements of Section 2.02(a), without the written consent of each Lender directly affected thereby;

(viii)     change any provision of this Section 10.02(b) or (c), without the written consent of each Lender directly affected thereby;

-95-

(ix)    change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document (including this <u>Section 10.02</u>) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(x)    subordinate the Obligations to any other obligation, without the written consent of each Lender;

(xi)    (reserved);

(xii)    apply by its express terms to the interests, rights or obligations of the Lenders in a manner substantially different and adverse from any application of such agreement on the other Lenders, unless consented to by the Required Lenders;

(xiii)    change or waive any provision of <u>Article IX</u> as the same applies to any Agent, or any other provision hereof or any other Loan Document as the same applies to the rights or obligations of any Agent, in each case without the written consent of such Agent; or

(xiv)    change the definition of "Secured Obligations" without the written consent of each Secured Party directly affected thereby.

(c)    <u>Collateral</u>.   Without the consent of any other person, the applicable Loan Party or Loan Parties and the Administrative Agent and/or Collateral Agent may enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law or to effect the release of any Collateral upon disposition thereof by the applicable Loan Party or Loan Parties to the extent the disposition thereof is not prohibited by the Loan Documents.   In addition, the Lenders irrevocably authorize the Agents (and the Agents may agree) upon the request of Borrower to subordinate any Lien on any property granted to or held by either Agent under the Orders or any Loan Document to the holder of any Lien on such property that is permitted by <u>Section 6.01(o)</u>.

(d)    <u>Approved Budget Controls</u>.   To the extent the Required Lenders expressly agree in writing, in connection with the approval of any Updated Budget that becomes an Approved Budget, to any waiver of or departure from any provision contained in any Loan Document, such agreement shall constitute a waiver of, or consent to the departure from, such provision pursuant to this <u>Section 10.02</u>.

**SECTION 10.03  Expenses; Indemnity; Damage Waiver**.

(a)     Costs and Expenses.    Borrower shall pay in cash (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Lenders, and their respective Affiliates (including the reasonable and documented fees, charges and disbursements of (A) one counsel for the Administrative Agent, (B) one counsel for the Collateral Agent; *provided*, that to the extent the Administrative Agent and the Collateral Agent are the same Person, Borrower shall only be required to pay for one counsel to the Administrative Agent and the Collateral Agent collectively, (C) one counsel to the Lenders and (D) one additional local counsel in each applicable jurisdiction) in connection with the syndication of the credit facilities provided for herein (including the obtaining and maintaining of CUSIP numbers for the Loans), the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made, (ii) all reasonable out-of-pocket expenses incurred by any Agent or any Lender (including the reasonable and documented fees, charges and disbursements of (A) one counsel for the Administrative Agent, (B) one counsel for the Collateral Agent; *provided*, that to the extent the Administrative Agent and the Collateral Agent are the same Person, Borrower shall only be required to pay for one counsel to the Administrative Agent and the Collateral Agent collectively, (C) one counsel for the Lenders (and, in the event of a conflict of interest between any Lenders, one additional counsel for each affected Lender) and (D) one additional local counsel in each applicable jurisdiction), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during the Chapter 11 Cases, any workout, restructuring or negotiations in respect of such Loans and (iii) all documentary and similar taxes and charges in respect of the Loan Documents.

(b)     Indemnification by Borrower.    Borrower shall indemnify in cash the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), each Lender and each Related Party of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all fees, losses, claims, damages, liabilities and related expenses (including the reasonable fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any party hereto or any third party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release or threatened Release of Hazardous Materials on, at, under or from any property owned, leased or operated by any Company at any time, or any Environmental Claim related in any way to any Company, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any other Loan Party or by any other person, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be

available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.  This <u>Section 10.03(b)</u> shall not apply to Taxes other than Taxes that represent losses, claims, damages, etc. arising from a non-Tax claim.

(c)      <u>Reimbursement by Lenders</u>.   To the extent that Borrower for any reason fails to indefeasibly pay any amount required under <u>Section 2.05</u> or paragraph (a) or (b) of this <u>Section 10.03</u> to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount (such indemnity shall be effective whether or not the related losses, claims, damages, liabilities and related expenses are incurred or asserted by any party hereto or any third party); *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) or the Collateral Agent (or any sub-agent thereof) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) or the Collateral Agent (or any sub-agent thereof) in connection with such capacity.   The obligations of the Lenders under this paragraph (c) are subject to the provisions of <u>Section 2.12</u>.

(d)      <u>Waiver of Consequential Damages, Etc</u>.   To the fullest extent permitted by applicable Requirements of Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.   No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent any such damages incurred by a Loan Party are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(e)      <u>Payments</u>.   All amounts due under this <u>Section 10.03</u> shall be payable not later than ten (10) Business Days after demand therefor.

(f)      Each party's obligations under this <u>Section 10.03</u> shall survive the resignation or replacement of either Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**<u>SECTION 10.04  Successors and Assigns</u>**.

(a)    <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section) and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    <u>Assignments by Lenders</u>.

(i)    Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld or delayed) of Borrower; *provided* that no consent of Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if an Event of Default has occurred and is continuing, any other assignee; and

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless Borrower otherwise consents (such consent not to be unreasonably withheld or delayed); *provided* that no such consent of Borrower shall be required if an Event of Default has occurred and is continuing;

(B)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, such fee to be paid by either the assigning Lender or the assignee Lender or shared between such Lenders; and

(D)    the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about Borrower and their

respective affiliates and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 10.04, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.11, 2.14, 2.13 and 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment.   Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 10.04.

(c)      Register.  The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at the Administrative Agent's office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and related interest amounts) of the Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "Register").   The entries in the Register shall be conclusive, absent manifest error, and Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.   The Register shall be available for inspection by Borrower, the Administrative Agent and its affiliates and, with respect to its own position, any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Participations.   Any Lender may at any time, without the consent of, or notice to, Borrower or the Administrative Agent, sell participations to any person (other than a natural person or Holdings or any of Holdings' Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) Borrower, the Agents and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver

described in clause (i), (ii) or (iii) of the first proviso to <u>Section 10.02(b)</u> that affects such Participant.  Subject to paragraph (e) of this <u>Section 10.04</u>, Borrower agrees that each Participant shall be entitled to the benefits of <u>Sections 2.11</u> and <u>2.13</u> (subject to the requirements and limitations of those Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this <u>Section 10.04</u>; *provided* that such Participant agrees to be subject to the provisions of this <u>Section 10.04</u> as if it were an assignee under paragraph (b) of this Section.   Each Lender that sells a participation agrees, at Borrower's request and expense, to use reasonable efforts to cooperate with Borrower to effectuate the provisions of <u>Section 2.14(b)</u> with respect to any Participant.   To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, *provided* such Participant agrees to be subject to <u>Section 2.12</u> as though it were a Lender.   In addition, each Lender selling a participation to one or more Participants under this <u>Section 10.4(d)</u> (i) shall, acting as a non-fiduciary agent of Borrower, keep a register, specifying each such Participant's entitlement to payments of principal and stated interest with respect to such participation (the "Participant Register"), and (ii) shall collect from each such Participant the appropriate forms, certificates and statements described in <u>Section 2.13</u> as if such Participant were a Lender under <u>Section 2.13(e)</u>.   The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.   No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person except to the extent such disclosure is necessary to establish that such Commitment, Loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(e)   <u>Limitations on Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Sections 2.11</u> and <u>2.13</u> than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrower's prior written consent, not to be unreasonably withheld or delayed.

(f)   <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.   In the case of any Lender that is a fund that invests in bank loans, such Lender may, without the consent of Borrower or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

(g)   <u>Electronic Execution of Assignments</u>.   The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any

applicable Requirement of Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**SECTION 10.05  Survival of Agreement**.   All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated.   The provisions of Sections 2.11, 2.12, 2.13 and Article X shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof; *provided, however*, that Section 10.12 shall survive and remain in full force and effect until the date that is one year following the repayment of the Loans or the termination of this Agreement.

**SECTION 10.06  Counterparts; Integration; Effectiveness**.   This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which when taken together shall constitute a single contract.   This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Agents, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.   Subject to satisfaction of the conditions precedent referred to in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.   Delivery of an executed counterpart of a signature page of this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 10.07  Severability**.   Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.08  Right of Setoff**.   If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower or any

other Loan Party against any and all of the obligations of Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this <u>Section 10.08</u> are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have.  Each Lender agrees to notify Borrower and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

**SECTION 10.09   Governing Law; Jurisdiction; Consent to Service of Process**.

(a)   <u>Governing Law</u>.  This Agreement shall be construed in accordance with and governed by the law of the State of New York and as may be applicable the Bankruptcy Code, without regard to conflicts of law principles that would require the application of the laws of another jurisdiction.

(b)   <u>Submission to Jurisdiction</u>.   Each Loan Party hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to any Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court or such New York State court or, to the fullest extent permitted by applicable law, in such Federal court.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner *provided* by law.  Nothing in this Agreement or any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its properties in the courts of any jurisdiction.

(c)   <u>Waiver of Venue</u>.  Each Loan Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by applicable Requirements of Law, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in <u>Section 10.09(b)</u>.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Requirements of Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)   <u>Service of Process</u>.  Each party hereto irrevocably consents to service of process in any action or proceeding arising out of or relating to any Loan Document, in the manner provided for notices (other than telecopier) in <u>Section 10.01</u>. Nothing in this Agreement or any

other Loan Document will affect the right of any Agent or any Lender to serve process in any other manner permitted by applicable Requirements of Law or commence legal proceedings or otherwise proceed against any Loan Party or any Collateral in any jurisdiction.

(e)     General. Notwithstanding any other provision of this Section 10.09 to the contrary, the Bankruptcy Court shall have exclusive jurisdiction over any action or dispute involving, relating to or arising out of this Agreement or the other Loan Documents.

**SECTION 10.10  Waiver of Jury Trial**.   Each party hereto hereby waives, to the fullest extent permitted by applicable Requirements of Law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Loan Document or the transactions contemplated hereby (whether based on contract, tort or any other theory).   Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section 10.10.

**SECTION 10.11  Headings**.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**SECTION 10.12  Treatment of Certain Information; Confidentiality**.

(a)     Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information (other than Operations Information) may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.12, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and their obligations or (iii) any rating agency for the purpose of obtaining a credit rating applicable to any Lender, (g) with the consent of Holdings or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 10.12 or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower.   For purposes of this Section 10.12, "**Information**" means all information received from Holdings or any of its Subsidiaries relating to Holdings or any of its Subsidiaries or any of their respective businesses, other than any such information that is

available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings or any of its Subsidiaries.  Any person required to maintain the confidentiality of Information as provided in this Section 10.12 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord to its own confidential information.

(b)   For purposes of this Section 10.12, "**Operations Information**" means all information provided by Holdings or any of its Subsidiaries disclosing:  (i) prospective or proposed seismic contracts for development or acquisition of data, (ii) business prospects for Holdings or any of its Subsidiaries, (iii) location of ground crews and equipment used in connection with contracts for the acquisition of seismic data and (iv) terms within contracts with customers that are subject to their own confidentiality provisions.  The obligation of Holdings or any of its Subsidiaries under this Agreement to disclose Operations Information to the Agents and the Lenders will be satisfied by such Person providing to the Administrative Agent copies of such portions of the Operations Information as it has agreed herein to provide, against the execution and delivery by the Administrative Agent to Borrower of a nondisclosure agreement reasonably satisfactory in form and substance to Borrower. The delivery of Operations Information by the Administrative Agent to any other Agent or the Lenders shall only be permitted to the extent (i) such Agent or Lender has executed and delivered to Borrower and the Administrative Agent a nondisclosure agreement reasonably satisfactory in form and substance to Borrower, (ii) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (iii) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process or (iv) to the extent such Operations Information (A) becomes publicly available other than as a result of a breach of this Section 10.12 or (B) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Borrower.

**SECTION 10.13  USA PATRIOT Act Notice**.  Each Lender that is subject to the Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies Borrower, which information includes the name, address and tax identification number of Borrower and other information regarding Borrower that will allow such Lender or the Administrative Agent, as applicable, to identify Borrower in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Lenders and the Administrative Agent.

**SECTION 10.14  Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this

Section 10.14 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**SECTION 10.15  Obligations Absolute**.  To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)  any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)  any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)  any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)  any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)  any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)  any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**SECTION 10.16  No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Borrower acknowledge and agree that: (a) (i) the arranging and other services regarding this Agreement *provided* by the Lenders are arm's-length commercial transactions between Borrower and its Affiliates, on the one hand, and the Lenders, on the other hand, (i) Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent they have deemed appropriate, and (iii) Borrower is capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each of the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Borrower or any of its Affiliates, or any other person and (ii) no Lender has any obligation to Borrower or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) each of the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Borrower and its Affiliates, and no Lender has any obligation to disclose any of such interests to Borrower or its Affiliates.  To the fullest extent permitted by law, Borrower hereby waives and releases any claims that it may have against each

of the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

(Remainder of Page Intentionally Left Blank)

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

GLOBAL GEOPHYSICAL SERVICES, LLC,
as Holdings
GLOBAL GEOPHYSICAL SERVICES, INC.,
as Borrower
AUTOSEIS, INC.,
as Guarantor
GLOBAL AMBIENT SEISMIC, INC.,
as Guarantor
GLOBAL GEOPHYSICAL EAME, INC.,
as Guarantor
GGS INTERNATIONAL HOLDINGS, INC.,
as Guarantor
AUTOSEIS DEVELOPMENT COMPANY,
as Guarantor
GLOBAL GEOPHYSICAL (MCD), LLC,
as Guarantor


By: _____
Name: Sean M. Gore
Title:   Senior Vice President, Chief Financial
Officer, Treasurer and Assistant Secretary

*Signature Page to DIP Credit Agreement*

WILMINGTON SAVINGS FUND SOCIETY, FSB,
as Administrative Agent and Collateral Agent

By: _____
Name:  Geoffrey J. Lewis
Title:   Vice President

*Signature Page to DIP Credit Agreement*

MORGAN STANLEY SENIOR FUNDING, INC.,
as a Lender

By: _____
Name: John Ragusa
Title:   Authorized Signatory

*Signature Page to DIP Credit Agreement*

D-STAR LTD., as a Lender

By: _____
Name: James Duplessie
Title:   Managing Director

NAPIER PARK SELECT MASTER FUND LP, as
a Lender


By: _____
Name: James Duplessie
Title:   Managing Director

# **EXHIBIT B**

INITIAL APPROVED BUDGET

**DIP Budget [1]**

*Stated in USD$ thousands*

| | 8/12 | 8/19 | 8/26 | 9/2 | 9/9 | 9/16 | Total |
|---|---|---|---|---|---|---|---|
| | | | | **Weekly** | | | **Total** |
| **Inflows** | | | | | | | |
| Trade Receivable | $ 78 | $ 269 | $ 252 | $ - | $ - | $ - | $ 599 |
| Lease Receivable | - | - | - | - | - | - | - |
| Asset Sales | - | - | - | - | - | - | - |
| Late Sales | - | - | - | - | - | - | - |
| Other | - | - | 25 | - | - | - | 25 |
| **Total Inflows** | $ 78 | $ 269 | $ 277 | $ - | $ - | $ - | $ 624 |
| **Total Repatriations** | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Inflows & Repatriations** | $ 78 | $ 269 | $ 277 | $ - | $ - | $ - | $ 624 |
| **Outflows** | | | | | | | |
| Payroll, Benefits, Severance | $ (13) | $ (230) | $ (13) | $ (334) | $ (13) | $ (672) | $ (1,275) |
| Payroll Reimbursement | - | - | - | - | - | - | - |
| KEIP/ KERP | - | - | - | - | - | - | - |
| Incentive Comp | - | - | - | - | - | - | - |
| Leases | (18) | - | - | - | (17) | (18) | (52) |
| Shipping | - | - | - | - | - | - | - |
| Accounts Payable | - | - | (6) | (5) | - | - | (11) |
| Professional Fees | - | - | - | - | (90) | (940) | (1,030) |
| Bankruptcy Related Payments | - | - | - | - | - | (140) | (140) |
| Other Payables | (19) | (48) | (15) | (30) | (45) | (15) | (172) |
| Insurance | - | - | (38) | - | - | - | (38) |
| **Total Outflows** | $ (49) | $ (278) | $ (72) | $ (369) | $ (166) | $ (1,784) | $ (2,718) |
| **Funding** | (18) | - | (6) | (5) | (17) | (157) | (203) |
| Canada | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Colombia | - | - | - | - | - | (10) | (10) |
| Paraguay | - | - | - | - | - | - | - |
| UAE/Dubai | - | (15) | - | - | - | (20) | (35) |
| Kenya | (10) | - | - | - | - | - | (10) |
| Kurdistan | - | (50) | - | (40) | - | - | (90) |
| Brazil | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - |
| **Total Funding** | $ (10) | $ (65) | $ - | $ (40) | $ - | $ (30) | $ (145) |
| **Total Outflows & Funding** | $ (59) | $ (343) | $ (72) | $ (409) | $ (166) | $ (1,814) | $ (2,863) |
| **Net Cash Flow** | $ 19 | $ (74) | $ 205 | $ (409) | $ (166) | $ (1,814) | $ (2,239) |

[1] The DIP Budget period assumes a bankruptcy filing end of week 8/5 with projections beginning the week of 8/8 and emergence on or before the week ended 9/16

**Professional Fees and Expense Schedule [1]**

*Stated in USD$ thousands*

| | Weekly | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|
| | 8/12 | 8/19 | 8/26 | 9/2 | 9/9 | 9/16 | | |
| **Financial Advisors** | | | | | | | | |
| Alvarez and Marsal | $ (84) | $ (84) | $ (84) | $ (84) | $ (84) | $ (84) | $ | (505) |
| **Legal** | | | | | | | | |
| Baker Botts | (52) | (52) | (52) | (52) | (52) | (52) | | (310) |
| Willkie Farr & Gallagher | (21) | (21) | (21) | (21) | (21) | (21) | | (125) |
| **Other/ Administrative** | | | | | | | | |
| Prime Clerk | (9) | (9) | (9) | (9) | (9) | (9) | | (55) |
| **Total Professional Fees** | $ (166) | $ (166) | $ (166) | $ (166) | $ (166) | $ (166) | $ | (995) |

[1] Carve out professional fees do not include the budgeted US Trustee fees of $35K